IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:19-CV-512-BO

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel., ANJELICA BROWN,<br><br>    Plaintiff,<br><br>v.<br><br>MINDPATH CARE CENTERS, NORTH CAROLINA, PLLC; JEFF WILLIAMS; ABIGAIL SHERIFF, and SARAH WILLIAMS,<br><br>    Defendants. | **DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

NATURE OF THE CASE ……………………………………………………………… 1

STATEMENT OF FACTS ……………………………………………………………... 2

    **A. The Parties** ……………………………………………………………... 3

        1. **Defendants** ……………………………………..………………………… 3

        2. **Relator** …………………………………………………………………… 3

    **B. The Government's Flawed Investigation** …………………………………… 4

    **C. Relevant Medicare Requirements and Background**……………….………… 4

ARGUMENT ……………………………………………………………………………... 5

    A. **The Government Fails to Furnish Evidence Sufficient to Establish an "Objective Falsehood" as Required by the FCA**……………………………… 7

    B. **The Government Fails to Furnish Evidence Sufficient to Establish Any Level of Scienter**……………………………… …..…………………………... 10

        1. **No Evidence Supports a FCA Claim Based on Billings Before December 17, 2018** …………………………………………… 12

        2. **The Evidence Shows Defendants Prioritized Proper Coding** ……………………………………………..…... 13

            *a. Front Office Staff Were Routinely Encouraged to Report Billing Concerns*……………………..…………………………… 14

            *b. The Provider Practice and MSO Emphasized Training and Took Corrective Action When Needed*…………………………..…… 16

            *c. Sufficient Compliance Systems Were in Place to Catch, Prevent, and Address any Billing Mistakes*……………………………... 17

            *d. The False Claims Act Does Not Punish Bad Math or Negligence* …………………………………………... 18

    C. **The Government Fails to furnish Evidence Sufficient to Establish Any Alleged Misrepresentation Was Material to the Government's Payment Decision**………………………………………………………… 20

            *a. Compliance Was Not a Condition of Payment* …………….………… 20

            *b. Any Alleged Noncompliance Was Minor or Insubstantial* ……..……... 21

            *c. CMS's Inaction Shows Immateriality* ….…………………………….... 22

    D. **The Government Fails to Furnish Evidence Sufficient to Establish a Genuine Issue of Material Fact as to a Reverse False Claim** …………………….... 23

    E. **The Government Fails to Furnish Evidence Sufficient to Establish a Genuine Issue of Material Fact as to Conspiracy** ……………………………… 23

    **CONCLUSION**………………………………………………………………... 24

i

# TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE**

*Barber v. Coastal Horizons Ctr., Inc.*,
No. 7:21-cv-00061, 2024 WL 1235544 (E.D.N.C. Feb. 5, 2024) ............  6

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......................................................................  6

*Harrison v. Westinghouse Savannah River Co.*,
176 F.3d 776 (4th Cir. 1999) ..........................................................  6

*Marmott v. Md. Lumber Co.*,
807 F.2d 1180 (4th Cir. 1986) ........................................................  23

*United States v. AseraCare, Inc.*,
938 F.3d 1278 (11th Cir. 2019) ...........................................  8

*United States v. Bertie Ambulance Serv., Inc.*,
No. 2:14-cv-00053, 2015 WL 5916691 (E.D.N.C. Oct. 8, 2015) ............  11

*United States v. Fadul*,
No.8:11-cv-0385, 2013 WL781614 (D. Md. Feb. 28, 2013) ................  11, 12

*United States v. Jurik*,
943 F.Supp.2d 602 (E.D. N.C. May 3, 2013) ................................  7

*United States v. Nuwave Monitoring, LLC*,
No.1:12-cv-00069, 2016 WL 750155 (N.D. Ill. Jan. 26, 2016) ..............  10

*United States v. Odyssey Marketing Grp., Inc.*,
5:15-cv-000510, 2017 WL 2484180 (E.D.N.C. June 8, 2017) ..............  19, 24

*United States ex rel. Bachert v. Triple Canopy, Inc.*,
321 F. Supp. 3d 613 (E.D. Va. 2018) ........................................  22

*United States ex rel. Berge v. Bd. of Tr. Of the Univ. of Ala.*,
104 F.3d 1453 (4th Cir. 1997) ..........................................  20

*United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*,
290 F.3d 1301 (11th Cir. 2002) ..........................................  6

*United States ex rel. Complin v. N.C. Baptist Hosp.*,
818 F. App'x 179 (4th Cir. 2020) ..........................................  18

*United States ex rel. Davis v. Prince*,
No. 1:08-CV-1244, 2011 WL 13092085 (E.D. Va. June 23, 2011) ..........  11, 15

*United States ex rel. Harrison v. Westinghouse Savannah River Co.*,
352 F.3d 908(4th Cir. 2003) ..........................................  11, 12

*United States ex rel. Godfrey v. KBR, Inc.*,
360 F. App'x 407 (4th Cir. 2010) ........................................  24

*United States ex rel. Gugenheim v. Meridian Senior Living, LLC,*
    No. 5:16-cv-00410, 2020 WL 1932435 (E.D.N.C. Apr. 21, 2020) ……….   22

*United States ex rel. Gugenheim v. Meridian Senior Living, LLC,*
    36 F.4th 173 (4th Cir. 2022) …………………………………………....   13, 17, 18, 19

*United States ex rel. Kyer v. Thomas Health Sys., Inc.,*
    756 F. Supp. 3d 75 (S.D. W. Va. 2024) …………………………………   23, 24

*United States ex rel. Owens v. First Kuwait Gen. Trading & Contracting Co.,*
    612 F.3d 724 (4th Cir. 2010) ……………………………….………   11, 12

*United States ex rel. Phillips v. Pediatric Serv. of Am., Inc.,*
    142 F. Supp. 2d 717 (W.D.N.C. 2001) …………………………………   24

*United States ex rel. Purcell v. MWI Corp.,*
    807 F.3d 281 (D.C. Cir. 2015) …………………………………….....   18

*United States ex rel. Searle v. DRS Tech. Servs., Inc.,*
    No. 1:14-cv-00403, 2015 WL 669197 (E.D. Va. Nov. 2, 2015) ...………..   10

*United States ex rel. Schutte v. SuperValu Inc.,*
    598 U.S. 739 (2023) …………………………………...………........   11, 12

*United States ex rel. Scott v. Ariz. Ctr. for Hematology & Oncology, PLC,*
    No. 2:16-cv-03703, 2020 WL 2059076 (D. Ariz. Apr. 29, 2020) …………   13

*United States ex rel. Taylor v. Boyko,*
    39 F.4th 177 (4th Cir. 2022) ………………………………………   6, 20

*United States ex rel. Drakeford v. Tuomey,*
    792 F.3d 364 (4th Cir. 2015) …………………………………………   11

*United States ex rel. Wheeler v. Acadia Healthcare Co.,*
    127 F.4th 472, 495 (4th Cir. 2025) ……………………………………   23

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.,*
    525 F.3d 370 (4th Cir. 2008) ……………………...…………………   6

*Universal Health Services, Inc., v. United States ex rel. Escobar,*
    579 U.S. 176 (2016) …………………………….……………………   10, 20, 21, 22

*Vein & Wellness Group, LLC v. Becerra,*
    No. 1:22-cv-00397, 2022 WL 9361896 (D. Md. Oct. 14, 2022) ………...   9

**STATUTES**                               **PAGE**

31 U.S.C. § 3729 *et seq.*…………………………………………………   1, 23

**OTHER AUTHORITIES**                      **PAGE**

Fed. R. Civ. P. 56 ………………………………………………………….   5

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:19-CV-512-BO

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel., ANJELICA BROWN, | |
| Plaintiff, | |
| v. | **DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGEMENT** |
| MINDPATH CARE CENTERS, NORTH CAROLINA, PLLC; JEFF WILLIAMS; ABIGAIL SHERIFF, and SARAH WILLIAMS, | |
| Defendants. | |

## NATURE OF THE CASE

Relator Angelica Brown (hereinafter "Relator") commenced this *qui tam* action under the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, by filing a Complaint (hereinafter "Relator's Complaint") on November 13, 2019. ECF No. 1. Relator alleged that MindPath Care Centers, North Carolina, PLLC, Jeff Williams, Abigail Sheriff and Sarah Williams (hereinafter the "Defendants") defrauded the Government by submitting false claims for psychotherapy services through their improper use of an add-on code. ECF No. 1 ¶ 27. Four years later, the Government intervened in part, filing its Complaint in Intervention (the "Government's Complaint") on October 19, 2023. ECF Nos. 38,[1] 40. The Government's Complaint added claims for reverse false claims

---

[1] Relator's Complaint alleged fraud dating back to 2016, however, the Government intervened only as to claims submitted from 2018-2020. The claims the Government declined to intervene in remain pending claims. ECF No. 38.

and several common law claims for fraud, unjust enrichment, and payment by mistake. [2] ECF No. 40.

The Government's theory of liability, which relies on a sample of merely sixty records out of almost 16,000 total claims spanning over the course of three years, is that the Defendants improperly billed Medicare for psychotherapy services using add-on Current Procedural Terminology ("CPT") code 90833 because there was inadequate documentation to support (a) compliance with Medicare guidelines and/or (b) medical necessity. Appx. Ex. 17 ¶ 98. The Government alleges Defendants acted with the requisite scienter because they (1) ignored employee complaints, (2) failed to properly train and supervise providers, and (3) did not have an adequate system in place to ensure compliance with Medicare billing guidelines. Appx. Ex. 17 ¶¶ 155 – 156.

Defendants are entitled to summary judgment on all FCA claims because the Government's evidence is insufficient to permit a reasonable jury to find in its favor. To the contrary, the undisputed evidence is that Defendants were diligent in trying to comply with, and train all of the providers to comply with, all applicable Medicare rules, guidelines and regulations. The Government has a flawed theory and no evidence of the essential elements, making summary judgment appropriate.

## STATEMENT OF FACTS

In accordance with Local Rule 56.1(c), Defendants cross-reference their Statement of Material Facts and its Appendix ("Appx.")

---

[2] Should the Court grant summary judgment in favor of the Defendants on the False Claims Act and Conspiracy counts, summary judgment on the common law fraud claim would be appropriate.

## A.  The Parties

### 1.  Defendants

Defendant MindPath Care Centers, North Carolina, PLLC ("the Provider Practice") is a physician-owned practice. From 2018-2020, the Provide Practice operated 25-36 locations across North Carolina, employed 106-115 providers, including physicians, nurse practitioners, physician assistants, therapists, and psychiatrists, treated 120,000-200,000 patients, and filed 204,000-279,000 claims on an annual basis. The total universe of Medicare claims at issue encompassed approximately 16,000 claims. Appx. Ex. 17 ¶¶ 164-165.

MindPath Support Services, Inc. (hereinafter "Mindpath Support Services" or the "MSO") is a management services organization, which provided non-professional administrative and business support services to the Provider Practice, including management of administrative personnel and billing services. Defendants Jeff Williams, Abigail Sheriff, and Sarah Williams were employees of the MSO. Mindpath Support Services is not a defendant in this case.

Mr. Williams became the MSO's Chief Executive Officer in September 2018 and served in that role at all times relevant to this action. Appx. Ex. 6, 16:14; Appx. Ex. 5, 34:7-8. Ms. Sheriff was the MSO's Chief Operations Officer from September 2018 through 2020. Appx. Ex. 7, 24:20-24. Ms. Williams was the MSO's Front Office Operations and Customer Service Manager from November 2018 to 2020. Appx. Ex. 3, 12:1-5.

### 2.  Relator

Relator worked as an interoffice assistant at Mindpath Support Services from April 2018 to July 2020. Appx. Ex. 4, 25:12-22. She was assigned to work at approximately five of the 25 – 36 different locations before being permanently assigned to the Bush Street location in Raleigh, North Carolina. Appx. Ex. 4, 30:6-25. During her employment, Relator allegedly compiled information that she believed supported her FCA claims. Appx. Ex. 4, 67:4-10. Part of Relator's

job responsibilities included entering CPT codes into Mindpath Support Services' computer system based on charge sheets which were completed by providers. Appx. Ex. 4, 34:1-20. Relator has no medical training and has never taken any CPT coding classes or obtained any CPT coding certifications. Appx. Ex. 4, 21:5-8. Neither Relator nor any other front office staff member had any role in generating, billing, or submitting claims on behalf of the Provider Practice. Appx. Ex. 1, 68:12-20.

**B.      The Government and it's Flawed Investigation**

During the course of its four-year investigation, the Government interviewed only a single former Provider Practice employee, a nurse practitioner whose employment was terminated prior to the timeframe relevant to this action. Numerous witnesses with knowledge of key facts were never interviewed. For example, the Government did not interview anyone who served as a medical director, nor did it speak to any of the MSO's officers, directors, or billing staff, not even the individual Defendants. Appx. Ex. 1, 45-46. Instead, the Government relied upon Relator and other front office staff who had no part in generating, reviewing, or submitting claims to Medicare or any other payor, as the cornerstone for its claims.[3] Appx. Ex. 1, 68:12-20.

**C.      Relevant Medicare Requirements and Background**

The Center for Medicare and Medicaid Services ("CMS") oversees the administration of Medicare, including Medicare Part B, which covers outpatient medical care. Appx. Ex. 17 ¶¶ 25-26. CMS contracts with private third parties called Medicare Administrative Contractors ("MACs") to process Medicare Part B claims within a specific geographic region. Appx. Ex. 17 ¶ 26. At all relevant times during this case, the MAC for North Carolina was Palmetto GBA. Appx. Ex. 1, 80:19-24.

---

[3] The Government refused to provide any reports from witness interviews.

Providers submitting claims to Medicare use CPT codes developed by the American Medical Association to identify the services provided. Appx. Ex. 17 ¶ 51. Reporting of CPT codes is guided by a Coding Policy Manual published by CMS.[4] CMS also periodically issues national coverage determinations ("NCDs") setting nationally applicable rules for Medicare coverage. *See* "Medicare Coverage of Items and Services," *available at* https://tinyurl.com/bdf3ntbm (last visited April 24, 2025). Additionally, individual MACs may issue local coverage determinations ("LCDs") establishing the circumstances under which Medicare will cover an item or service within that MAC's specific geographic jurisdiction. *See* "Local Coverage Determinations," *available at* https://tinyurl.com/z4k5smmk (last visited April 24, 2025); Appx. Ex. 18, p. 3.

The only CPT code at issue in this case is CPT code 90833, which is a psychotherapy add-on code that may be billed alongside a code for Evaluation and Management ("E/M") services when both services are provided during a single appointment. Appx. Ex. 17 ¶ 59. In 2023, following an audit related to billing for psychotherapy services, the Department of Health and Human Services, Office of Inspector General, issued a report stating that CMS had not issued national documentation requirements, nor had Palmetto GBA, the MAC which oversees North Carolina, issued an LCD related to psychotherapy. Appx. Ex. 18, p. 26.

## ARGUMENT

Summary judgment is appropriate if "there is no genuine issue of material fact" and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When the nonmovant bears the burden of proof at trial, the party seeking summary judgment bears the initial burden of pointing out to the district court –there is an absence of evidence to support the nonmoving party's

---

[4]https://www.cms.gov/medicare/coding-billing/national-correct-coding-initiative-ncci-edits/medicare-ncci-policy-manual  (last visited April 24, 2025).

case." *Barber v. Coastal Horizons Ctr., Inc.*, 7:21-cv-00061, 2024 WL 1235544, at *7 (E.D.N.C. Feb. 5, 2024) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Where a party "fails to make a showing sufficient to establish any one essential element of the party's claim on which he will bear the burden of proof at trial," the court should grant summary judgment. *Celotex*, 477 U.S. at 322-23.

"The [FCA] does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002) (*citing Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999)). To prevail on its claims, the Government must show: "(1) there was a *false* statement or fraudulent course of conduct; (2) made or carried out with the requisite *scienter*; (3) that was *material*; and (4) that *caused* the government to pay out or to forfeit moneys due (i.e. that involved a 'claim')." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 188 (4th Cir. 2022) (emphasis added).

Defendants are entitled to summary judgment because the Government's evidence is insufficient to establish falsity, materiality, and scienter, which are all essential elements of an FCA claim; corporations cannot conspire with their officers; and the same alleged fraudulent conduct cannot serve as the basis for both traditional FCA claims and reverse false claims. Accordingly, the Defendants are entitled to summary judgment on all claims.

As a preliminary matter, Defendant Sarah Williams is entitled to summary judgment on all claims. Ms. Williams was not personally involved in generating, reviewing or submitting bills on behalf of the Provider Practice. Appx. Ex. 3, 16:13-15. Her job responsibilities began and ended with supervising the front office staff. Appx. Ex. 15, 71:21-25, 72:14. (office managers had "little

to [no] role" in the billing process and did not "review claims or make any kind of decision about claims."); Appx. Ex. 3, 15:15-25, 16:1-12. When made aware of internal concerns, she passed those along to Defendant Abigail Sheriff. Appx. Ex. 3, 100:25. The evidence either exonerates Sarah Williams or fails to mention her at all. Therefore, summary judgment is appropriate in favor of Sarah Williams on all counts.

A.    **The Government Fails to Furnish Evidence Sufficient to Establish an "Objective Falsehood" as Required by the FCA**

To satisfy the first element of an FCA claim, the "false statement or fraudulent course of conduct" must represent an "objective falsehood." *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008). Allegations of "poor and inefficient management of contractual duties," and "imprecise statements or differences in interpretation growing out of a disputed question," are not actionable under the FCA. *Id.* at 377. Here, the Government seeks to punish Defendants for what it deems to be insufficient documentation to support certain billing decisions. Yet, the Government's only evidence to support these allegations are inapplicable billing guidelines and a difference of opinion among providers, neither of which are sufficient to overcome summary judgment.

The Government's theory of liability alleges the Defendants improperly submitted claims for psychotherapy services using add-on CPT code 90833 without maintaining the requisite documentation to support compliance with Medicare billing guidelines. Appx. Ex. 17 ¶ 98. In essence, the Government contends that the Defendants' claims for payment were false "due entirely to the time at which such claims were filed . . . because the . . . payment prerequisites were not satisfied prior to Defendants' claims for payment." *United States v. Jurik*, 943 F. Supp. 2d 602, 611 (E.D.N.C. May 3, 2013). However, the Government has put forth no credible evidence of any *applicable* regulation, guideline, or provision to support those contentions nor does its purported

"CPT Coding expert" Dr. George Corvin's differing opinion on "medical necessity" sufficiently establish an "objective falsehood."[5]

The Government cites a number of examples of claims it deems "false" because "medical records failed to establish that many of their sample claims were properly documented." Appx. Ex. 17 ¶ 169. Yet the undisputed record unequivocally shows that the regulations the Government alleges the Defendants violated were inapplicable to the claims at issue. Appx. Ex. 2, 63-64:4; Appx. Ex. 1, 89:11-17. The Government alleges LCD 37638 set forth the requisite guidance for documenting psychotherapy services to justify billing claims to Medicare, including that "the duration (stated in minutes) spent in the Health and Behavioral Assessment or Intervention encounter must be documented in the record." Appx. Ex. 17 ¶ 70.

Yet, LCD L37638 was not, nor has it ever been, applicable to psychotherapy claims or CPT code 90833. Appx. Ex. 2, 64:2-7; Appx. Ex. 1, 90:6-7, 14-15. More importantly, Palmetto GBA had no applicable LCD in place during the timeframe relevant to psychotherapy claims or CPT code 90833. Appx. Ex. 18, p. 6. Furthermore, even assuming arguendo that LCD L37638 was applicable, Dr. Corvin admits he did not rely on it while evaluating the medical records discussed in his report.[6] Appx. Ex. 2, 64:2-7. When asked what his sources were, Dr. Corvin replied, "I don't know other than that's just what I've been taught." Appx. Ex. 2, 42:1-4.

Falsity under the FCA requires "an objective falsehood" that is something more than "a reasonable difference of opinion among physicians reviewing medical documentation ex post," which is "not sufficient on its own," to establish "falsity." *United States v. AseraCare, Inc.*, 938

---

[5] Defendants have filed a motion to exclude Dr. Corvin on the grounds that he admits he is unqualified and did not apply CPT coding standards to his review of the sample set.

[6] Dr. Corvin also admitted during his deposition that he does not know what a MAC was, what MACs do, or that Palmetto GBA was the MAC for North Carolina. Appx. Ex. 2, 45-47.

F.3d 1278, 1297 (11th Cir. 2019). But a "difference of opinion among physicians," is in fact, all the Government can point to as evidence of "false claims." Dr. Corvin admits as much stating, "today, I'm offering my opinion as to what I think the standards are in 60 progress notes," conceding that "it would be improper to hold a provider to a standard of care that did not exist at the time of the production of that treatment or documentation of treatment." Appx. Ex. 2, 21:22-24, 42:1-4. The Defendants do not challenge Dr. Corvin's livelihood as a psychiatrist, but his opinion as to the "falsity" of the claims he evaluated based on an imposition of his own standard of care rather than the CPT coding requirements, is not sufficient to create a genuine issue of material fact as to falsity.

The Government's investigating agent, Special Agent Eric Wiggam, however, admits to relying on LCD L37638 as a "determining factor" when investigating the Defendants' billing practices, but in the same breath concedes, "the referenced LCD" does not apply in this case. Appx. Ex. 1, 90:6-7, 14-15. Agent Wiggam further admitted that he was unaware that Palmetto GBA did not have an applicable LCD for psychotherapy services until his deposition and could not recall which LCDs he had relied on, stating they "were referenced in other reports . . . and online," conceding that some were "issued by other MACs." Appx. Ex. 1, 82-83.

Such testimony from the government agent responsible for investigating these allegations and from the Government's own purported expert support a finding of summary judgment in favor of the Defendants as to falsity. Notably, the Government routinely conflates CPT billing guidelines with medical necessity, despite these being distinct and separate requirements. *Vein & Wellness Group, LLC v. Becerra*, No. 1:22-cv-00397, 2022 WL 9361896, at *9 n.2 (D. Md. Oct. 14, 2022) ("Providers submit claims using the CPT coding systems . . . but these codes do not determine whether a claim is covered under Medicare."). Neither Agent Wiggam nor Dr. Corvin have any

CPT coding experience. Appx. Ex. 2, 178:9-10 (stating, "I'm not a coding person, so I don't know what they'll pay for."); Appx. Ex. 1, 67:15-20. And, despite Dr. Corvin's contentions that, "if CMS doesn't define what psychotherapy documentation is . . . somebody has to," neither he nor the Government is free to substitute their own standards here. Appx. Ex. 2, 56:14-16. Medical necessity, "in the absence of an applicable NCD or LCD," is assessed based on "whether the service is safe and effective, not experimental or investigational, and appropriate based on the strongest evidence possible." *Vein & Wellness Group,* 2022 WL 9361896, at *8. Dr. Corvin's report is notably missing such an assessment.

In sum, the Government's claims of falsity under the FCA are defeated because the regulations upon which those claims were based did not apply to the Defendants, a fact conceded by both the Government's investigating agent and expert. *United States ex rel. Searle v. DRS Tech. Servs., Inc.*, No. 1:14-cv-00403, 2015 WL 669197, at *8 (E.D. Va. Nov. 2, 2015) (granting summary judgment where the certifications upon which Plaintiff based his claims did not exist); *see also United States v. Nuwave Monitoring, LLC*, No. 1:12-cv-00069, 2016 WL 750155, at *4 (N.D. Ill. Jan. 26, 2016) (granting motion to dismiss where LCD at issue was retired at the time of treatment, and thus not a rule or regulation that defendant could have violated).

## B. The Government Fails to Furnish Evidence Sufficient to Establish Any Level of Scienter

While the FCA does not require proof of a "specific intent to defraud," scienter is nonetheless a "demanding" and "rigorous" element. *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192 (2016). Liability may be imposed where the plaintiff establishes the defendant's *subjective beliefs at the time a claim was submitted* show claims were submitted with "actual knowledge, willful ignorance, or reckless disregard," as to the falsity of

such claims. *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 750 (2023).[7] "The purpose of the FCA's scienter requirement is to avoid punishing honest mistakes or incorrect claims submitted through mere negligence." *United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 381 (4th Cir. 2015) (quoting *United States ex rel. Owens v. First Kuwait General Trading & Contracting, Co.*, 612 F.3d 724, 728 (4th Cir. 2010).

The Government has failed to demonstrate a genuine issue of material fact as to the scienter of any of the Defendants. The FCA imposes liability on corporate agents only under a corporate-veil-piercing theory or if that individual directly participated in the alleged fraud. *United States ex rel. Davis v. Prince*, No. 1:08-cv-1244, 2011 WL 13092085, at *5 (E.D. Va. June 23, 2011). Because the Government has not alleged or established a basis for piercing the MSO's corporate veil, it must furnish evidence "proving the requisite scienter for each individual defendant." *United States v. Bertie Ambulance Serv., Inc.*, 2:14-cv-00053, 2015 WL 5916691, at *5 (E.D.N.C. Oct. 8, 2015) (holding the FCA is "not a strict liability statute," and "does not punish high-ranking individuals merely because of their association with a wrongdoing corporation."). The Fourth Circuit has expressly rejected the "collective knowledge" doctrine, which would "allow a plaintiff to prove scienter by piecing together scraps of 'innocent' knowledge held by various corporate officials, even if those officials never had contact with each other or knew of what others were doing in connection with a claim seeking government funds." *United States ex rel. Harrison v. Westinghouse Savannah River Co. (Harrison II)*, 352 F.3d 908, 918 n.9 (4th Cir. 2003). Likewise, whether the Provider Practice as an entity acted with the requisite scienter is dependent on whether

---

[7] The Court defined actual knowledge as when a defendant is "aware of the information"; deliberate ignorance as when defendants who "are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statement's truth or falsity"; and reckless disregard as defendants who "are conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyway." *Schutte*, 598 U.S. at 751 (cleaned up).

the Government can demonstrate "that a particular employee or officer acted knowingly." *United States v. Fadul*, No. 8:11-cv-00385, 2013 WL 781614, at *9 (D. Md. Feb. 28, 2013) (discussing *Harrison II*, 352 F.2d at 918 n.9.).[8]

Throughout the course of litigation, which has included over 248,000 documents produced totaling near a million pages, at least 20 depositions taken, and 364 exhibits introduced, the Government attempted to prove scienter by throwing "as many allegations as it [could] against the wall, in the hope that one of them [would] stick," but the Government is "not entitled to a trial simply by dint of determination." *Owens*, 612 F.3d at 735. By the conclusion of discovery, the Government's efforts were overwhelmingly refuted by both witness testimony and corroborative exhibits.

### 1. No Evidence Supports a FCA Claim Based on Billings Before December 17, 2018

The Government's universe of claims includes all claims submitted from January 1, 2018, through December 31, 2020. Yet, neither Jeff Williams nor Sarah Williams were even employed by the Mindpath MSO until September and November 2018, respectively. Appx. Ex. 5, 34:7.

Further, the Government seeks to retroactively impute knowledge to the named Defendants prior to any alleged notice of potential billing improprieties. Scienter, for the purposes of the FCA, focuses on "what the defendant thought when submitting the false claim–not what the defendant may have thought after submitting it." *Schutte*, 598 U.S. at 752. Here, the Government seeks to hold Defendants responsible for claims spanning an entire two-year period, despite the record showing that "the events that allegedly [give] rise to [the Defendants'] . . . knowledge occurred much later." *Fadul*, 2013 WL 781614, at *9.

---

[8] The Government cannot rely on the individual Defendants' alleged knowledge to satisfy scienter for the Provider Practice because none of them were employed by the Provider Practice.

The Government alleges that Dr. Yvonne Monroe first emailed Jeff Williams on December 17, 2018, expressing concern about a single provider's billing practices. Appx. Ex. 17 ¶ 110. Dr. Monroe's concerns arose only in late November 2018, following a one-on-one conversation with that provider. Dr. Monroe was not aware of concerns about any other providers. Appx. Ex. 6, 45:17-25, 46:1-3. Relator testified that the first and only time she communicated concerns about possible billing improprieties to Mr. Williams was during a March 2019 "Staff Improvement Conference." Appx. Ex. 4, 68:21-23. Similarly, Relator had only one conversation directly with Ms. Sheriff during the same meeting. Appx. Ex. 4, 70: 23-71:1.

Thus, Defendants are entitled to summary judgment on all allegations of false claims submitted prior to December 17, 2018. *United States ex rel. Scott v. Arizona Ctr. for Hematology & Oncology, PLLC*, No. 2:16-cv-03703, 2020 WL 2059926, at *15 (D. Ariz. Apr. 29, 2020) (granting summary judgment on subset of claims where the relator failed to present evidence that defendants had reason to doubt billing propriety until receiving results of a voluntary audit).

### 2. The Evidence Shows Defendants Prioritized Proper Coding

Turning next to the remaining claims submitted after December 17, 2018, the Government attempts to establish scienter through a series of events spun together and tailored to satisfy the Government's theory, alleging Defendants ignored complaints, failed to properly train and supervise providers, and did not implement a sufficient compliance system to catch and correct billing errors. Appx. Ex. 17 ¶¶ 155-156. But the evidence does not support the Government's allegations that Defendants acted with even the loosest standard of knowledge, i.e., that they "stuck their heads in the sand," and "plowed ahead" with little regard for the accuracy of the claims being submitted. *United States ex rel. Gugenheim v. Meridian Senior Living, LLC*, 36 F.4th 173, 181 (4th Cir. 2022). On the contrary, the evidence demonstrates consistent and proactive actions taken

by Jeff Williams, Abigail Sheriff, and the Provider Practice to ensure Providers were properly trained to properly document and select CPT codes for their services.

### a. Front Office Staff Were Routinely Encouraged to Report Billing Concerns

The Government alleges that front office staff regularly reported billing errors to Defendants, who ignored the complaints. Appx. Ex. 17 ¶ 151. But the evidence overwhelmingly refutes this, instead showing that administrative staff were encouraged to report billing concerns to management. Appx. Ex. 5, 94:17; Appx. Ex. 7, 281:9; Appx. Ex. 9, 34:7; Appx. Ex. 21. Any billing complaints that were received were thoroughly investigated, and corrective action was taken where appropriate, such as correcting the claim prior to submission, cancelling the submitted claim and resubmitting a corrected claim, or refunding identified overpayments. Appx. Ex. 15, 347:10; Appx. Ex. 9, 93:14; Appx. Ex. 16, 36: 9; Appx. Ex 27; Appx. Ex. 66.

The Government points to a truncated email reply from Mr. Williams to Dr. Monroe in December 2018 as proof he disregarded concerns about billing improprieties. Appx. Ex. 17 ¶ 110. But when taken in context and without the Government's edits, Mr. Williams's reply to Dr. Monroe packs less of a punch than the Government charges:

> I think it is best to discuss these matters in person. I know you wanted to meet today and I was unfortunately not available as I was traveling out of town. I would ask in the future, before matters like this get reduced to writing, that we have a discussion to make sure all sides of an issue, and all points of view, are perfectly clear and understood. This is why we have the QSB [Quality Standards Board]. There is a significant amount of hearsay in your comments and as such this sort of memo is inappropriate. *Clearly, we do not condone, nor will we ever condone, improper coding*. But email is not the forum to have this sort of conversation. I am looking forward to discussing when I return on Wednesday.

Appx. Ex. 19 (emphasis added); *see also* Appx. Ex. 83.

Less than two days later, Mr. Williams, Ms. Sheriff, and others[9] met with the provider, who "eagerly agreed" to undergo additional training, and a professional coder performed a chart audit of the provider's clinical notes to ensure no claims needed to be rebilled or refunded. Appx. Ex. 20; Appx. Ex. 5, 183:13.

During a "Staff Improvement Conference" on March 30, 2019, MSO administrative staff were asked to report any concerns, including billing concerns, to Ms. Sheriff and the MSO's Human Resources Director, Crystal Campbell. Appx. Ex. 17 ¶ 117.[10] At no point were staff told to ignore, overlook or disregard possible billing blunders. Appx. Ex. 4, 83:13-25. In fact, the evidence shows Defendants routinely encouraged staff, including Relator, to continue submitting feedback and complaints. In early April 2019, Relator and another administrative employee forwarded possible billing errors to Ms. Sheriff and Ms. Campbell via email as directed. Appx. Ex. 17 ¶ 117. During her deposition, Relator testified that her email was "never acknowledged as received" and that she was never "given any feedback on what was being done." Appx. Ex. 4, 106:20-107:1. In fact, Ms. Sheriff responded to Realtor's email on June 3, 2019, thanking her for the information, advising her that the MSO was working on "beefing up our clinical management program," and hiring a professional coder, and requesting that she "keep the feedback coming our way, please." Appx. Ex. 21. Likewise, Ms. Williams told Relator to keep track and make a list of concerns she noticed, stressing such concerns were "high on the scale" of issues and importance. Appx. Ex. 4, 119: 5-16; Appx. Ex. 72. That Relator did not receive more frequent updates as to the actions being taken by senior management is not sufficient to support allegations that

---

[9] Sarah Williams may have also been present. Appx. Ex. 20.

[10] The Government alleges that Mr. Williams "delegated supervision of Mindpath's submission of 90833 claims" to Ms. Sheriff. Appx. Ex. 17 ¶ 118. Delegation to employees absent evidence that those employees are "incompetent or dishonest" is not a basis for liability under the FCA. *United States ex rel. Davis v. Prince*, 2011 WL 13092085, at *8 (E.D. Va. June 23, 2011).

Defendants approved of, enabled, or participated in fraudulent conduct, especially when the evidence demonstrates Relator's complaints were thoroughly investigated and addressed.

> b. *The Provider Practice and MSO Emphasized Training and Took Corrective Action When Needed*

Admittedly, there was confusion surrounding documentation requirements for billing the 90833 CPT code. But this confusion was regularly addressed at Quality Standards Board meetings, and actions plans were often put in place to ensure providers consistently and accurately maintained requisite documentation. Appx. Ex. 34, 36-37, 39-41, 43-45,48-49, 51-52. For example, Dr. Garza testified that he assisted with implementing a program specifically designed to exceed the minimum requirements to "ensure quality patient care." Appx. Ex. 56, ¶ 15. The program included consistent oversight of new providers, including chart audits, the results of which were taken into consideration when determining if additional training may be needed. Appx. Ex. 56, ¶ 18.

When providers had specific questions, they were directed to the Medical Director or their supervising physician. Appx. Ex. 9, 61:21-24; Appx. Ex. 69; Appx. Ex. 70; Appx. Ex. 54, ¶ 21. Dr. James Smith testified that he and Dr. Monroe trained providers and put procedures and policies in place to ensure accurate documentation. Appx. Ex. 8, 33:1, 99:8; Appx. Ex. 28; Appx. Ex. 85; Appx. Ex. 54, ¶ 9. Likewise, Dr. Monroe testified that she was primary trainer from 2018 – 2020, and "met with everybody in the company who was a medical provider . . . for at least two hours." Appx. Ex. 6, 25:4-15, 27:3. Providers who had consistent documentation problems often underwent additional individualized training. Appx. Ex. 9, 231:19; Appx. Ex. 8, 119:16; Appx. Ex. 7, 55:1, 17; Appx. Ex. 22; Appx. Ex. 23; Appx. Ex. 88; Appx. Ex. 89. Ms. Sheriff would reach out to the Medical Director, requesting he follow up with providers having consistent

documentation problems, and providers would be internally audited if billing errors indicated a misunderstanding of billing guidelines. Appx. Ex. 61; Appx Ex. 97.

The evidence also shows that providers and senior management regularly sought guidance on properly documenting psychotherapy for which a 90833 CPT code may be billed.[11] Appx. Ex. 24; Appx. Ex. 25; Appx. Ex.6, 33:17-22. In early 2019, Dr. James Smith surveyed other psychiatric and medical practices who used the 90833 code and noted in an email that "they do not time in and out." Appx. Ex. 24. Dr. Smith additionally spoke with Dr. Mike Zarzar, "who has been seen by the NCPA [North Carolina Psychiatric Association] as an expert in this area," who similarly advised that his practice did not require providers to document time in and time out for 90833 coding. Appx. Ex. 24. Mr. Williams strongly advocated for the hiring of "a certified professional coder, starting in 2018," to "educate our existing people," and "put out a written statement" regarding coding and proper documentation." Appx. Ex. 6, 31: 15-16; Appx. Ex. 54.

If specific providers were identified as having issues documenting sufficiently or coding properly, appropriate action was taken, including placing them on Performance Improvement Plans ("PIPs") and terminating those deemed "untrainable." Appx. Ex. 7, 60: 22-23. During the relevant period, approximately seven providers were placed on PIPs, terminated, or otherwise disciplined. Appx. Ex. 7, 61:13-24, 62: 3-15, 63:2-21; Appx. Ex. 26; Appx. Ex. 22; Appx. Ex. 23; Appx. Ex. 66.

### c. Sufficient Compliance Systems Were in Place to Catch, Prevent, and Address any Billing Mistakes

The Government contends the individual Defendants failed to ensure compliance with Medicare guidelines and supervise claims submissions. Appx. Ex. 17 ¶ 140. However, testimony

---

[11] That Defendants "could have sought more guidance" about confusing or ambiguous regulations is not enough to establish scienter. *Gugenheim*, 36 F.4th at 181.

and corroborating evidence show that there were compliance systems in place to catch and correct billing errors. Appx. Ex. 9, 32:12; Appx. Ex. 15, 52:1; Appx. Ex. 11, 36:21; Appx. Ex. 66. Front desk staff were not responsible for generating, reviewing, or submitting claims to Medicare, and potential errors they may have noticed and passed along to the billing department who took action to correct, void or resubmit claims as appropriate. Appx. Ex. 1, 68:12-20; Appx. Ex. 7, 53:25; Appx. Ex. 15, 72:23-25. For example, Tory Wood recalled receiving a complaint from Relator relating to provider Jerry Ji improperly documenting a 90833-add-on code for a patient he had seen for only twelve minutes. Appx. Ex. 9, 236:25. Ms. Wood relayed the complaint to Ms. Sheriff, advising that she "[had] not added the 90833 into the system" due to the timing issue. Appx. Ex. 9, 236:25; Appx. Ex. 66. The billing department kept track of providers with potential documentation issues and provided reports to Ms. Sheriff regarding the same. Appx. Ex. 63; Appx. Ex. 64; Appx. Ex. 78; Appx. Ex. 79. Ms. Sheriff communicated with clinical leadership when errors were identified, reminding them to document the requisite coding support. Appx. Ex. 13, 64:5; Appx. Ex. 29; Appx. Ex. 30; Appx. Ex. 31; Appx. Ex. 32.

Deposition testimony of MSO billing staff supports that if potential billing errors were identified post-submission of claims, such instances were investigated and claims were properly corrected as appropriate, including by resubmitting claims and refunding overpayments. Appx. Ex. 15, 347:10, 227:22; Appx. Ex. 14, 101:8, 124:17; Appx. Ex. 11, 36:1; Appx. Ex. 9, 31:14, 80:21, 98:22; Appx. Ex. 27.

#### d. The False Claims Act Does Not Punish Bad Math or Negligence

"[T]he FCA does not reach an innocent, good-faith mistake about the meaning of an applicable rule or regulation." *United States ex rel. Complin v. N.C. Baptist Hosp.*, 818 F. App'x 179, 184 (4th Cir. 2020) (quoting *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287

(D.C. Cir. 2015)). Even in a light most favorable to the Government, the purported deficiencies identified by the Government "CPT coding expert" Dr. Corvin are more reflective of "negligence or billing errors," which are "insufficient at the summary judgment stage to create a genuine issue of material fact," as to scienter.[12] *Gugenheim*, 36 F.4th at 182. Likewise, "the government's own investigating agent in this case presents equivocal testimony at best," which is "simply insufficient to support a claim under the FCA at this state of the proceedings." *United States v. Odyssey Marketing Grp., Inc.*, 5:15-cv-000510, 2017 WL 2484180, at *7 (E.D.N.C. June 8, 2017) (Boyle, J.). When confronted about the lack of an applicable LCD or NCD and whether he had conducted his investigation in accordance with this fact, Agent Wiggam stated, "I have not revised any of the previous reports to reflect this finding," but that he "believe[d] there's still merit in this case." Appx. Ex. 1, 86-87.

There was some confusion surrounding billing for psychotherapy add-on services, not only amongst the Provider Practice and the MSO, but across the country. *See generally* Appx. Ex. 18. But the Government cannot exploit such confusion to manufacture liability under the FCA when the evidence shows the concerted effort by Defendants to train providers on proper documentation and coding and ensure billing errors were identified and corrected are akin to actions this Circuit has held "do not betoken a deliberate effort to avoid learning the truth." *Gugenheim*, 36 F.4th at 182.

---

[12] Nine of the thirty-one claims identified as "false" by Dr. Corvin were submitted prior to December 17, 2018. Assuming *arguendo* that claims submitted prior to December 17, 2018, are excluded for the reasons set forth above, the universe of "false claims" from December 17, 2018-December 31, 2020, becomes even smaller. Appx. Ex. 87. Likewise, Dr. Corvin's determinations of "falsity" are based entirely on his own standards and not those set forth by CMS or the applicable MAC, Palmetto GBA. Appx. Ex. 2, 21:22-24.

**C.**     **The Government Fails to Furnish Evidence Sufficient to Establish Any Alleged Misrepresentation was Material to the Government's Payment Decision**

Likewise, the materiality standard is just as "rigorous" and "demanding," as scienter, and regulatory, statutory, or contractual noncompliance alone, even when designated as a condition of payment, will not suffice to satisfy the materiality element. *Boyko*, 39 F.4th at 190. When evaluating materiality, courts take a holistic approach and may consider a number of factors, including whether the government expressly identifies a provision as a condition of payment, whether the alleged noncompliance is minor or "goes to the very essence of the bargain," and the government's action in the wake of a claimant's noncompliance. *Id*. (*citing Escobar*, 579 U.S. at 191-96). Though "materiality" is a "mixed question of fact and law," it is "one for the court." *United States ex rel. Berge v. Bd. of Tr. of the Univ. of Ala.*, 104 F.3d 1453, 1460 (4th Cir. 1997). Here, the factors each weigh in favor of a finding of immateriality.

*a.   Compliance Was Not a Condition of Payment*

The first *Escobar* materiality factor, whether a provision has been "expressly identified" as a payment condition, also weighs in Defendants' favor. *Escobar*, 579 U.S. at 194. Defendants agree that billing an E/M code in conjunction with a psychotherapy add-on code requires the services be "significant and separately identifiable," and that at least 16 minutes of psychotherapy must be provided to support billing a 90833 CPT code. But there are no documentation requirements for *how* providers justify billing psychotherapy services, and the Government has based its claim on standards invented by their purported expert and an inapplicable LCD. At no time relevant to this action had CMS issued an NCD establishing uniform documentation requirements for billing psychotherapy claims, nor had Palmetto GBA established documentation requirements for its jurisdiction. Appx. Ex. 18, p. 26.

*b.  Any Alleged Noncompliance Was Minor or Insubstantial.*

The second *Escoba*r materiality factor evaluates whether any noncompliance was "minor" or "went to the very essence of the bargain." *Id*. at 193-94. According to the Government, providers must document "the time duration (stated in minutes)." Appx. Ex. 17 ¶ 70.

Defendants maintain the time duration stated in minutes is not an express requirement. Regardless, any noncompliance is minor because the use of a specific CPT code itself establishes at least 16 minutes of psychotherapy services were provided and documenting the time duration is not a consistent requirement in other jurisdictions. Appx. Ex. 18, pp. 39-40.

When a provider selects a specific add-on code, the code selection itself conclusively establishes that the minimum time required was spent providing psychotherapy services. The CPT guidelines themselves instruct providers to select the CPT code that best reflects "the number of minutes closest to the time actually spent" on psychotherapy.[13] For example, a provider who spends 18 minutes on psychotherapy will select the same add-on code as a provider who spends 36 minutes on psychotherapy, despite the latter spending twice the amount of time providing the service.

CMS has set no national documentation requirements for psychotherapy add-on codes, and Palmetto GBA has not issued an LCD, despite five other MAC jurisdictions having done so. Appx. Ex. 18, pp. 39-40. Of these, only three require providers to document the amount of time spent on psychotherapy. Appx. Ex. 18, pp. 39-40. While those LCDs were not applicable to the Defendants during the timeframe at issue, the inconsistency in documentation requirements across jurisdictions nevertheless persuasively suggests that failure to document "in minutes" time spent

---

[13] CPT codes 90832 and 90833 represent 16-37 minutes; CPT codes 90834 and 90835 represent 38-52 minutes; CPT codes 90837 and 90838 represent 53 minutes or more.

on psychotherapy were provided in conjunction with an E/M service does not "go to the very essence of the bargain." *Escobar*, 579 U.S. at 193; *see also United States ex rel. Gugenheim v. Meridian Senior Living, LLC*, 5:16-cv-00410, 2020 WL 1932435, at *5 (E.D.N.C. Apr. 21, 2020) (Boyle, J.) (holding that because there was no requirement to "demonstrate the time spent providing PCS, it follows that the actual amount of time spent providing PCS is immaterial"). Likewise, CMS responded to OIG's recommendation that it "review MAC jurisdictions' LCD requirements," and "consider additional steps," to issue more uniform coverage requirements stating that CMS believes that the MACs' LCDs are consistent with their statutory authority," which only further supports Defendants' argument that failure to document how much time is spent on psychotherapy is immaterial to the Government's payment decision. Appx. Ex. 18, pp. 50-51.

### c. CMS's Inaction Shows Immateriality

Relator filed her Complaint in 2019, and the Government spent nearly four years investigating her claims prior to filing its own Complaint. At no point in the past six years did CMS conduct its own audit of the Provider Practice, terminate the Provider Practice from participating in Medicare, or demand repayments. Instead, the Provider Practice continues to submit, and receive payment for, psychotherapy services using the 90833 add-on code. This Circuit and others have held that continued payment after learning of the allegations of fraud is "very strong evidence" of immateriality. *Escobar*, 579 U.S. at 194; *see United States ex rel. Bachert v. Triple Canopy, Inc.*, 321 F. Supp. 3d 613, 621 (E.D. Va. 2018) (holding no reasonable jury could find materiality where the government "never asked for any money back . . . upon learning of . . . allegations" of fraud).

**D.** **The Government Fails to Furnish Evidence Sufficient to Establish a Genuine Issue of Material Fact as to a Reverse False Claim**

Count III of the Government's Complaint alleges a violation of the reverse false claims provision of the FCA. *See* 31 U.S.C. § 3729(a)(1)(G). This provision imposes liability for "improper withholding of money or property to which the United States is legally entitled." *United States ex rel. Wheeler v. Acadia Healthcare Co.*, 127 F.4th 472, 495 (4th Cir. 2025). To survive summary judgment, the Government must furnish evidence that the Defendants "knowingly concealed an obligation to pay or transmit money . . . to the Government." 31 U.S.C. § 3729(a)(1)(G). However, the FCA "does not contain a two-for-one deal," and "a traditional false claim action cannot simultaneously give rise to a reverse false claim action." *United States ex rel. Kyer v. Thomas Health Sys., Inc.,* 756 F. Supp. 3d 75, 92 (S.D. W. Va. 2024).

Here, the Government has alleged no conduct and furnished no evidence supporting a reverse false claim other than the conduct it relies on as the basis for Counts I and II, stating even the Complaint that "[by] virtue of the acts and omissions described above," the Defendants are liable for a reverse false claim. Appx. Ex. 17 ¶ 205. Thus, the Defendants are entitled to summary judgment on Count III.

**E.** **The Government Fails to Furnish Evidence Sufficient to Establish a Genuine Issue of Material Fact as to Conspiracy**

Though the MSO is not named as a defendant, the individual Defendants are its officers, agents, or employees, who cannot be said to have conspired with one another under the intra-corporate conspiracy doctrine. *See Marmott v. Md. Lumber Co.*, 807 F.2d 1180, 1184 (4th Cir. 1986). At no point does the Government identify who outside the company the Defendants "conspired with," alleging generally they collectively conspired "with others." Appx. Ex. 17 ¶ 209. The Government's Complaint only uses the words "conspire, conspiracy, or conspired," in six

paragraphs either reciting the FCA's conspiracy definition or stating conclusory allegations unsupported by evidence of any kind. <u>Appx. Ex. 17 ¶¶ 19, 21, 208, 209, 212, 215</u>.

While a traditional FCA claim does not require proof of a "specific intent to defraud," when a plaintiff alleges a conspiracy claim, the general principles of civil conspiracy still apply. *United States ex rel. Phillips v. Pediatric Serv. of Am., Inc.*, 142 F. Supp. 2d 717, 733 (W.D.N.C. 2001). It is not enough that each defendant "engaged in simultaneous conduct" or "knew their conduct would violate the FCA"; rather, a conspiracy claims hinges on whether the defendants "had a meeting of the minds" in which they "intended to defraud the government." *United States ex rel. Godfrey v. KBR, Inc.*, 360 F. App'x 407, 413 (4th Cir. 2010).[14] Here, the Government can offer no evidence of a "meeting of the minds to defraud the government," and so, its FCA conspiracy claim must fail. *Odyssey Marketing Group*, 2017 WL 2484180, at *8.

## CONCLUSION

The Government's investigation was flawed from its very inception. Its entire theory relies on a false equivalency, improperly conflating billing guidelines with medical necessity and evaluating claims based on inapplicable guidelines and regulations. But an FCA case cannot be sustained on conclusory allegations based on faulty interpretations of Medicare guidelines and invented standards of care which neither CMS nor Palmetto GBA impose.

Defendants are entitled to summary judgment on Counts I and II for several reasons. First, the Government has failed to furnish evidence from which a rational jury could find an "objective falsehood," as required by the FCA. Second, the individual Defendants are entitled to summary judgment because the Government has failed to establish even the lowest standard of scienter. Jeff

---

[14] The mental state required to prove a conspiracy to violate the FCA is higher than the mental state required under the traditional false claims act. *Kyer*, 756 F. Supp. 3d at 90 n.8.

Williams timely responded when concerns were brought to his attention, and delegated oversight to trusted employees, like Abigail Sheriff. Ms. Sheriff prioritized provider training and ensured providers who had issues with documentation received additional individualized training and recommended appropriate disciplinary action when necessary. The Government's failure to proffer evidence of scienter is particularly stark as to Ms. Williams. The undisputed evidence shows that she was not involved in reviewing, submitting, or generating claims. Moreover, she escalated complaints when brought to her attention and encouraged Relator and others to document and report billing concerns to management. Third, the Government has failed to furnish evidence sufficient to establish that any purported misrepresentation was material to the government's decision to pay. The Government can point to no regulatory, statutory or contractual obligation deemed a condition of payment, CMS did not impose any uniform obligations and has expressly deemed other LCDs which do not require time to be documented as sufficient, and the Government continues to pay claims, despite knowledge of the allegations for at least six years.

Defendants are entitled to summary judgment on Count III because the Government has failed to furnish any evidence sufficient to maintain a reverse false claim and instead attempts to get a two-for-one deal by relying on the same evidence for Counts I and II.

Defendants are entitled to summary judgment on Count IV because the Government has failed to furnish any evidence sufficient to establish a meeting of the minds to defraud the Government. Moreover, the individual Defendants cannot conspire with one another under the intracorporate conspiracy doctrine.

Thus, summary judgment is appropriate on all FCA claims.

Respectfully submitted this the 30th day of April 2025.

MAYNARD NEXSEN, PC

/s/ R. Daniel Boyce
R. Daniel Boyce
NC Bar No. 12329
4141 Parklake Ave., Suite 200
Raleigh, NC 27612
dboyce@maynardnexsen.com
Phone: (919) 653 – 7827
Fax: (919) 654 – 0435
*Attorney for Defendants*

/s/ Alice V. Harris
Alice V. Harris
SC Bar No. 66223
1230 Main Street Suite 700
Columbia, SC 29201
AHarris@maynardnexsen.com
Phone: (843) 253 – 8284
*Attorney for Defendants*

/s/ Jenna K. Godlewski
Jenna K. Godlewski
AZ Bar No. 21794
IL Bar No. 6269273
1230 Main Street Suite 700
Columbia, SC 29201
JGodlewski@maynardnexsen.com
Phone: (843) 720 – 1720
*Attorney for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2025, I electronically filed the foregoing and that the same is available for viewing and downloading from the Court's CM/ECF system. The same has been served upon Counsel for the Government as follows:

Neal I. Fowler, Esq.
Assistant U.S. Attorney
Civil Division
150 Fayetteville Street
Suite 2100
Raleigh, North Carolina 27601-1461
E: neal.fowler@usdoj.gov
*Counsel for the Government*

/s/ R. Daniel Boyce
R. Daniel Boyce
NC Bar No. 12329
MAYNARD NEXSEN, PC
4141 Parklake Ave., Suite 200
Raleigh, NC 27612
dboyce@maynardnexsen.com
Phone: (919) 653 – 7827
Fax: (919) 654 – 0435
*Attorney for Defendants*