IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:19-CV-512-BO

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| MINDPATH CARE CENTERS, NORTH | ) |
| CAROLINA, PLLC, JEFF WILLIAMS, | ) |
| ABIGAIL SHERIFF, SARAH WILLIAMS, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OF THE UNITED STATES IN OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS MINDPATH,
JEFF WILLIAMS, ABIGAIL SHERIFF AND SARAH WILLIAMS**

The Court should deny the motion for summary judgment filed by Defendants Mindpath Care Centers, Jeff Williams, Abigail Sheriff, and Sarah Williams for claims submitted through Mindpath Care Centers, (hereafter "Defendants"). [DE 73, DE 74]. Genuine issues of material fact as to falsity, scienter, and materiality preclude summary judgment. This response incorporates by reference the Government's response to the Defendants's Statement of Material Facts [DE 75], including Defendants' 560 fact statetments and the Government's genuine issues of material facts at pararaphs 561 to 690.

In a nutshell, the Government has ample evidence that Defendants caused false Medicare claims in order to increase their psychotherapy and related claims, and maximize their profits. They took advantage of their patients and the Medicare program out of greed. Defendants were paid over $1,600,000 for almost 16,000 claims, with approximately 27% not medically necessary, because not documented with the time and supporting information requred. Defendants made and caused systemic and blatant false claims, with at least reckless disregard, in violation of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.*

Contrary to Defendants' arguments, a jury should determine the Defendants' liability based upon the evidence, reasonable inferences and credibility determinations that create genuine issues of material fact precluding summary judgment as to falsity, scienter and materiality, as well as the reverse false claim and conspiracy counts.

Defendants' various arguments fail to establish adequate grounds for summary judgment, and are distractions from genuine issues of material fact and the substantive law. Defendants merely argue from selected and disputed evidence, rather than establishing that there are no genuine issues of material fact as to falsity, scienter, and materiality.

As to falsity, the Government's expert testifies that 31 of the identified Sample claims were false and not medically necessary based upon documentation presented, and the inaccuracy of many of the Sample claims is admitted by the Defendants and Defendants' expert. As to scienter, evidence and reasonable inferences establish at least reckless disregard in systemically causing false psychotherapy and related counseling without accurate and complete documentation. Mindpath's founder and trainer raised the fraud alarm in 2018 in emails and discussions, but Defendants failed to take effective action to stop the fraud or create a meaningful compliance program. As to materiality, the falsity and lack of inadequate documentation were capable of influencing Medicare payment recovery actions. Defendants also fail to establish that they are entitled to summary judgment as to the "reverse false claims" and conspiracy counts based upon genuine issues of material fact.

Defendants' arguments are baseless, and seek to ignore the substantive FCA issues. For all of those reasons, and as detailed below, the Court should deny Defendants' motion for summary judgment, and allow a jury to consider the conflicting evidence, make reasonable inferences, judge credibility, and determine the liabilities of the Defendants.

2

# FACTS AND PROCEDURAL HISTORY

The genuine issues of material fact are summarized below, but fully set out in the Government's Response To Statement of Material Facts (at 561 – 690), incorporated herein.

569.    Medicare policies allowed the Mindpath Practice to bill for a Psychotherapy "add-on" code (i.e., CPT code 90833), along with an Evaluation and Management session ("E&M" CPT codes 99212-99215), only if they provided separate Psychotherapy treatment as part of office visit, and Defendants admitted some 90833 psychotherapy claims may have lacked the requisite documentation. [PA 00011, # 20].

574.    Dr. George Corvin, an experienced and board certified Psychiatrist who regularly submitted claims to Medicare and supervised other providers, opined that 31 of the 60 sample 90833 claims of Mindpath were not "reasonable and necessary" as Medicare required.    [PA 000198-203, PA 000256 – 267; PA 000281 – 285].

575.    Dr. Corvin's exert report opined that 31 of the 90833 claims and 7 of the E&M claims were not reasonable and necessary based upon a careful review of the medical records, including inadequate time documented for support of services billed, no specific time documented for services, failure to list therapeutic modality/intervention, absence of documentation of psychotherapeutic services, failure to document services to support E&M code, therapeutic modality not consistent with documentation, education services billed as psychotherapy, and documentation showing all time was for psychotherapeutic service.    [PA 000198 – 203 and 000204].

579.    Defendants' expert Jodi Nayoski, a coder without any medical expertise, determined that 19 out of the 60 sample 90833 claims of Mindpath were made in error as to the total time or content documented, essentially agreeing with Dr. Corvin's opinions that documentaiton was inadequate for 19 of these 31 disputed 90833 claims. [PA 000289 – 292; 000293 – 295].

587.    In 2018 through 2020, Mindpath and Defendants Jeff Williams, Abigail Sheriff, and Sarah Williams, individually and collectively, provided guidance and supervision over the submission of Medicare claims for individual Mindpath Providers. [PA 00019, # 43].

588.    The Mindpath Practice and Defendants Jeff Williams, Abigail Sheriff, Manager Sarah Williams caused, and did not stop, the submission to Medicare of 90833 Psychotherapy claims without documentation of the minimum 16 minutes and separate Psychotherapy treatment during 2019 or 2020. [PA 00019, # 41].

3

591.    Jeff Williams testified some Mindpath "90833 psychotherapy claims may have lacked documentation of at least 16 minutes of 90833 psychotherapy treatment" and that the dispute is whether there was reckless disregard.   [PA 000299-000300].

592.    Jeff Williams testified he was aware Dr. Yvonne Monroe, office assistants, and BCBS raised concerns about the accuracy and documentation of 90833 claims in 2018 and 2019. [PA 000313-316].

596.    Abigail Sheriff agreed errors occured. [PA 000374 – 376].

599.    Sarah Williams admitted that there was illegal coding occurring at Mindpath, and that she did not know if they had a compliance officer or broader response to problems at that time.   [PA 000353 – 000355]

605.    Mindpath founder Dr. Yvonne Monroe testified that Abigail Sheriff and Sarah Williams would have been responsible for billing and coding policies in the 2018-2020 time frame, and that Jeff Williams was "hands-on everything." [PA 000406 – 000407].

620.    Mindpath president Stan Monroe emailed Abigail Sheriff and Jeff Williams on June 2-3, 2018, with subject line "Things to immediately improve margins …" and included "Optimized coding- for example an MD could perform a 99213/90833 in 30 minutes, or perform a 99214/90833 in the same half hour .…" [PA 000183].

626.    Dr. Yvonne Monroe notified Mindpath Chief Executive Officer Jeff Williams by email on December 17, 2018, that Mindpath's Medical Officer Dr. Lawrence Greenberg had been upcoding 90833 and E&M codes "for a long time", and Mindpath "cannot afford to have a provider training coding and documentation when he is/has engaged in years of fraudulent behavior [and] has up-coded 40%." [PA 00036-37].

631.    Dr. Monroe prepared a Plan that included Mindpath should "self-report to CMS and BCBSNC re: incorrectly performing and documenting 90833" [PA 0079-80].

635.    CFO Rob Oliveri testified in part that Dr. Monroe was accusing Dr. Lawrence Greenberg (future Medical Director) of fraud for 90833 claims, that he and Jeff Williams did not believe Dr. Monroe's allegations, that no one confronted Dr. Greenberg regarding these 90833 fraud allegations, and that no actual audit was done of Dr. Greenberg claims by Rob Oliveri's wife.   [PA 000399 – 000401].

638.    Jeff Williams testified that Mindpath's documentation requirements continued to evolve regarding 90833 claims, and he did not know what experience Rob Oliveri's wife had to indirectly offer coding guidance on 90833 claims. [PA 000320-000324].

4

640.   Abigail Sheriff and Rob Oliveri had email exchanges on March 4, 2019, regarding upcoming coding fraud training by Dr. Monroe and "use of words like fraud, liable and overcoding will certainly temper the behavior we want to encourage" and "asked her to emphasize the point that the providers only at risk of liability if there is no mechanism set in place by the company [Mindpath] to catch potential errors but we are in the process of building a chart audit process to identify any risk and thus transfer the risk from practitioner to company." [PA 00093 - 00094].

647.   Jeff Williams agreed in an email dated April 12, 2019, that coding problems were "an ongoing issue" and "right about the coding training" as he acknowledged the harsh email from a departing provider which included that she could "no longer abide the staggering incompetence" and "like fast food psychiatry." [PA 000123 – 000124]

653.   Abigail Sheriff emailed seven providers on May 16, 2019, during BCBS review, directing them to "specifically document the time in and time out at least 16 minutes for your 90833 therapy add on codes" because "trying to get everyone up to speed on proper coding/documentation" and noting "piecemeal" and "confusion." [PA 000112].

654.   Abigail Sheriff sent email on June 3, 2019, stating Mindpath "putting a process in place to directly address coding with providers as well as bringing on a professional coder" and noting billing 90833 for 10 minute appointments. [PA 000126 – 000128].

657.   On June 7, 2019, Abigail Sheriff admitted that "it will be another six months to a year before we're able to meaningfully change providers' behavior" including "exorbitant billing/coding practices."   [PA 000108, 000110].

660.   Rob Oliveri emailed leadership on September 5, 2019, reporting concerns "our E&M documentation is not always sufficient to support the code selected" "and "our 90833 documentation needs to be better [:  1] Time in/ time out represent true psychotherapy time spent [2] Discuss what was done for the patient [3] Make the note unique to that patient [and 4] Discuss how patient progressing."   [PA 00048].

661.   Deborah Jackson then responded that "amount of 90833's that we've had to delete" has not signficantly decreased and "1. Providers are trying to do 99214/90833 in less than 30 minutes [and] those short sessions should be either 99214's or 99213's with no [90833] add on, in my opinion", "2. We still have folks not documenting the 90833 on the notes", "3. There are still mathematical errors", "4. Times In and Times Out on the notes are all over the place…" and "5. Time In and Time Out identical for both codes." [PA 00046 - 00047].

663/664.   Jeff Williams testified he did not discuss 90833 concerns with Deborah Jackson, that would likely find inaccurate billing today "because its dogs and cats" and "just hard to manage everybody", and 2019 BCBS coding problems did not cause Mindpath to review their prior Medicare claims.   [PA 000325 - 000330].

5

665.    Abigail Sheriff testified that the same rules applied to both BCBS and Medicare, and she did not know if Medicare claims were reviewed based upon the finding that 90833 claims were inaccurate.   [PA 000381 – 000385].

674.    Rob Oliveri emailed Jeff Williams and Abigail Sheriff on April 14, 2020, stating in part "The 90833 trend is nice" but E&M "99213/214 split needs improvement", with a flag to follow upon on these Key Performance Indicators.   [PA 000117].

678.    New coder Jennifer Arnold emailed Rob Oliveri on May 21, 2020, stating that, out of 30 sample claims reviewed in an audit, 9 of the "90833 should not have been billed" because "Timing seems off" and "not enough documentation." [PA 170 – 177].

679.    Jeff Williams emailed Abigail Sheriff on June 16, 2020, about overall 90833 billing percentages (70%), and specific providers at 36% to 78%.   [PA 000104 – 105].

683.    Jeff Williams stated monthly 90833 percentages and 7,414 additional 90833 claims at a 2020 board meeting, and a "6% increase of our med management providers using the 90833 code would yield an additional $445K annually."   [PA 00063].

684.    Jeff Williams emailed August 13, 2020, Williams raising concern that 90833 claims should be getting closer to 75%, but Rob Oliveri warned that Jenn Arnold is getting feedback that "do not feel the 90833 is warranted." [PA 00060 – 00061].

685.    Jeff Williams stated revenue "is better than budget due to work we have done this year on 90833 and 99214" in email dated December 8, 2020. [PA 000191 – 194].

686.    Rob Oliveri emailed Jeff Williams on May 18, 2021, stating coder Jennifer Arnold found "5 of the 10 either did not have a time entered for therapy or no therapy documented at all" for 90833, and that for "2 of the 10 the E&M is too high." [PA 25].

690.    The extrapolated damage amount (31 of 60 cliams) was $438,012, based upon universe of $1,600,861 paid for 15,984 claims, and 27% error rate found. [PA 00212].

## LEGAL STANDARDS

The summary judgment standard is rigorous.   "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   The movant for summary judgment bears the initial burden of coming forward and demonstrating an

6

absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are facts that "might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. *Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In making a determination on a summary judgment motion, the court must view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party, and cannot weigh the evidence or make credibility determinations. See, e.g., *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-70 (4th Cir. 2015).

<u>**ARGUMENT OF LAW**</u>

The Government has ample evidence of falsity, scienter, and materiality to establish FCA liability that should be considered by the jury. Defendants have not established a lack of genuine issues of material fact on falsity, scienter, or materiality, or the reverse false claim and conspiracy claims. See, Government's Response to Statement of Material Facts at paragraphs 561 to 686. The motion lacks merit.

In light of applicable law, the evidence and reasonable inferences establish at least genuine issues of material fact as to Defendants' liability.

**A. Defendants Fail To Establish Basis for Summary Judgment or Lack of Genuine Issues of Material Fact Regarding FCA Liability**

The Government has ample evidence of falsity, reckless disregard and materiality of 90833 and related E&M claims caused by Defendants.

Under the FCA, a person is liable for treble damages and civil penalties if, among other things, the person knowingly causes to be presented a false or fraudulent claim for

7

payment or approval.   31 U.S.C. § 3729(a)(1)(A)–(B).   To establish a violation of the FCA, the Government must establish four elements: (1) a false statement or fraudulent course of conduct; (2) made with the requisite scienter; (3) that is material to payment; and (4) that caused the government to pay out money.   *E.g., United States ex rel. Harrison v. Westinghouse Savannah River Co. (Harrison II)*, 352 F.3d 908, 913 (4th Cir. 2003).

<u>Falsity.</u>   "The phrase 'false or fraudulent claim' in the False Claims Act should be construed broadly."   *Harrison v. Westinghouse Savannah River Co. (Harrison I)*, 176 F.3d 776, 788 (4th Cir. 1999).   Courts have identified two different ways a claim may be "false or fraudulent":   they may be factually false or they may be legally false.   *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 741 (10th Cir. 2018).   A factually false claim typically involves a claim for services never provided or incorrectly described.   *Id.*   A legally false claim, on the other hand, "generally require[s] knowingly false certification of compliance with a regulation or contractual provision as a condition of payment."   *Id.; cf. United States ex rel. Jones v. Collegiate Funding Servs., Inc.*, 469 F. App'x 244, 258 (4th Cir. 2012) (describing relationship between false certification and "legally false" claims).

For legally false claims, courts recognize two theories of liability: express certification and implied certification.   With respect to express certification, a claim for payment is legally false "if the request for payment itself expressly, yet falsely, certifies 'compliance with an applicable federal statute, federal regulation, or contractual term.'"   *United States v. Speqtrum, Inc.*, 47 F. Supp. 3d 81, 90 (D.D.C. 2014).   For Medicare, Providers that submit claims seeking reimbursement for medical services regularly make express and implied certifications as to compliance with program requirements.   For example, every claim submitted was under a Medicare agreement that required an express certification that the claim is accurate and "the services on this form were medically necessary."   [PA 0008, #15].

8

Thus, when a Provider expressly certifies compliance with a condition of payment, but does not comply, the claim submitted is legally false.

Furthermore, because federal law and relevant regulatory guidance establish a number of conditions a Provider must satisfy to receive payment for medical services, whenever a Provider seeks reimbursement for services, it also impliedly certifies compliance with these conditions of payment. See, *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2000–01 (2016) (submission of claims for payment to Medicaid using improper payment codes were false under implied-certification theory); *United States v. Triple Canopy, Inc.*, 857 F.3d 174, 178 & n.3 (4th Cir. 2017)(noting expansive view of implied-certification in Fourth Circuit). Thus, even absent an express certification of compliance, when a Provider fails to comply with a condition of payment, the claim is legally false.

Applying these rules to the falsity element at issue, the evidence establishes at least genuine issue of material fact that Mindpath and individual Defendants are liable for causing false claims, including the 31 false Sample claims. The Government has evidence of 31 false claims submitted without medical necessity from the statistically valid random sample. [PA 198-203]. Defendants' expert admitted there were 19 sample claims that were inaccurate or not documented, and Defendants admit Mindpath made some false claims. [PA 289 – 295, PA 266 – 300]. Sarah Williams admitted some claims were illegal. [PA 353 - 355]

Defendants caused false claims for 90833 psychotherapy and related E&M sessions because they were not documented and medically necessary under Medicare requirements.

Scienter. The FCA term "knowing" mean that a person, with respect to information, "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b). No proof of specific intent to defraud is required. Id.

9

These three FCA definitions (knowledge, deliberate ignorance, reckless disregard) mirror the traditional common-law for claims of fraud. *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 750, 143 S. Ct. 1391, 1400, 216 L. Ed. 2d 1 (2023). Accordingly, the question here is whether Defendants knew or should have known [actual, ignorant, or reckless] that claims being submitted to the Government lacked medical necessity.

The statute does not require proof of specific intent. 31 U.S.C. § 3729(b)(1)(B). Because "[p]rotection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law," participants in the Medicare program have "a duty to familiarize [themselves] with the legal requirements for cost reimbursement." *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 63-64 (1984). Although the False Claims Act does not apply to mere negligence, *U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 380 (4th Cir. 2015), "it is intended to apply in situations that could be considered gross negligence where the submitted claims to the Government are prepared in such a sloppy or unsupervised fashion that [they] resulted in overcharges to the Government," 132 Cong. Rec. H9382-03 (daily ed. Oct. 7, 1986) (statement of Rep. Berman); accord *United States v. Krizek*, 111 F.3d 934, 941-42 (D.C. Cir. 1997) ("[W]e agree . . . that the best reading of the Act defines reckless disregard as an extension of gross negligence."); *U.S. ex rel. Orgnon v. Chang*, No. 3:13-CV-144-JAG, 2016 WL 715746, at *3 (E.D. Va. Feb. 19, 2016) (unpublished).

Thus, the failure to inform oneself of Medicare requirements before seeking government reimbursement amounts to reckless disregard or deliberate ignorance. *United States v. Macby*, 261 F.3d 821, 828 (9th Cir. 2001). "[I]n the healthcare setting," then, a defendant "demonstrates 'reckless disregard' when he fails to take reasonable steps to ensure that his clinic's claims for governmental reimbursement are accurate." *Stevens*, 605 F.

10

Supp. 2d 867, 268-269; *United States v. Dynamic Visions Inc.*, 971 F.3d 330, 336-38 (D.C. Cir. 2020) (holding that when "instances of noncompliance" are so "thoroughgoing" that "even the shoddiest recordkeeping would have revealed that false submissions were being made, it is reckless for a provider to request reimbursement" (quotation omitted)). FCA liability "covers not just those who set out to defraud the government, but also those who ignore obvious warning signs." *Crane Helicopters Servs. v. United States*, 45 Fed. Cl. 410, 433 (Fed. Cl. 1999).

Defendants only have to exhibit reckless disregard regarding the falsity of claims. Here, there are genuine issues of material fact as to reckless disregard and knowledge of false claims. For example, Sarah Williams admitted that illegal coding was occurring at Mindpath and then urged office assistants to allow "the powers that be" to correct false billing in the future. [PA 353 – 355]. Defendants admitted Dr. Yvonne Monroe, BCBS and employees raised concerns about false 90833 claims. [PA 374 - 376]. Further, Defendants failed to take effective action and instead directed the billing scheme to increase 90833 claims and maximize their profits, regardless of accuracy warnings raised. [PA 325 - 330, PA 063].

And of course, the 31 identified false claims (19 admitted erroneous by Defendants' expert), each of which lacks medical necessity and required documentation as outlined in detail in the Government's expert report, are further evidence of Defendant's reckless disregard in that the 27% error should have been obvious from any meaningful documentation review by medical professionals. [PA 195 – 204, PA 212]. All actual reviews uncovered falsity. The expert testimony is evidence of reckless disregard, including, for example, billing without the required time and absence of actual psychotherapy modality in documentaiton. [PA 198 – 203]. See, *Dynamic Visions*, 971 F.3d 335 (holding reckless disregard because "even a cursory review" of the files would have revealed the "rampant" false claims based upon number of false claims found in small operation).

11

The Defendants caused false claims without medical necessity and without documentation of the separate 16 minutes and psychotherapy modality as required. Defendants failed to create an effective compliance program, correct the blatant and continuing false claim problem, or effectively review and monitor the false claims that were systemically false and lacking in documentation. [1]

<u>Materiality</u>.  Materiality is expressly defined by the FCA as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).  Courts have interpreted and applied the FCA materiality standard to require that the falsity is capable of influencing the government's funding decision.  See, e.g., *Escobar*, 136 S. Ct. at 2002-04.

Materiality turns on a holistic analysis of multiple factors, and no single consideration is determinative.  Instead, "materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id*. Several factors bear on that inquiry: whether the violation is "minor or insubstantial," whether the violation goes to the "essence of the bargain", and how the United States acted in this or other cases when it actually knew about similar violations. *Id*. at 2003-04.  These considerations may be analyzed from either

---

[1] Causation is satisfied if Defendants "cause to be presented" a false claim.  *See, e.g., United States v. Mack*, 2000 WL 33993336 at 7 (S.D.Tex. 2000) (reckless disregard for failing to review claims after aware of past deviant billings); *United States v. Mackby*, 261 F.3d 821, 827 (9th Cir. 2001) (finding owner of physical therapy clinic liable for false claims of clinic); *United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997) (physician held liable for false claims where he "delegated to his wife" the authority to submit claims and utterly failed to review claims); *United States v. Stevens*, 605 F. Supp. 2d 863, 869 (W.D. Ky. 2008) (demonstrated reckless disregard when he failed to take "reasonable steps to ensure that his clinic's claims for reimbursement [were] accurate").  *See also United States ex rel. Pitts v. Hedges*, 5:16-CV-127-BO at 17-18 (E.D.N.C. March 31, 2022).  The evidence and reasonable inferences show that each of the Defendants caused the filing of Mindpath claims for 90833 and E&M claims that lacked documentation of medical necessity.

12

of two perspectives: that of a "reasonable" person, or that of the particular defendants. *Id*. at 2002-03. But so long as a matter could be or is a "substantial factor" in determining the United States' payment, it is material.

The Supreme Court in *Escobar* makes clear that materiality depends on the capacity of the violation to affect the government decision maker, and is a flexible standard that can be met by a variety of approaches. *Id.* at 2001-03. See, e.g., *Triple Canopy*,, 857 F.3d at 178 (finding materiality applying *Escobar,* with focus on common sense); *Neder v. United States*, 527 U.S. 1, 16 (1999); *U.S. ex rel. Bibby v. Mortg. Inv'rs Corp.*, 987 F.3d 1340, 1350-52 (11th Cir. 2021) (noting that the materiality inquiry is "holistic"; that courts should "cast our materiality inquiry more broadly to consider the full array of tools at the [government agency's] disposal for detecting, deterring, and punishing false statements, and which of those it employed"); *U.S. ex rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1022 (9th Cir. 2018) ("The Department can demonstrate that requirements, such as the incentive compensation ban, are material without directly limiting, suspending, or terminating schools' access to federal student aid."); *U.S. ex rel. Hutchenson v. Blackstone Med., Inc.*, 647 F.3d 377, 394 (1st Cir. 2011) ("Express contractual language may 'constitute dispositive evidence of materiality.'); *U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 914, 916-17 (4th Cir. 2003) ("Courts give effect to the FCA by holding a party liable if the false statement it makes . . . has a natural tendency to influence or is capable of influencing the government's funding decision, not whether it actually influenced the government not to pay a particular claim.").

In short, the evidence and holistic considerations, taken together, establish false certifications are more than "capable of influencing" Medicare decision makers. The jury should consider all factors and the evidence based upon the holistic materiality approach,

13

including whether the overpayments for 2018-20 years were minor or insubstantial, and whether the initial automatic electronic payments or the ultimate overpayment determinations are more significant. Defendants made significant false claims, 31 of 60 Sample 90833 claims and 27% false of total Sample claims paid. [PA 198 - 204, PA 212]. Defendants' expert essentially admitted there were 19 sample claims that were inaccurate or not documented, and Defendants admit Mindpath made some false claims. [PA 289 – 295].

Damages. The Government seeks over $2,000,000 in treble damages, statutory penalties, and investigative costs  The compensatory damages are $438,012 based upon extrapolation. [PA 212].   Regardless of the amount of damages, the Defendants are liable for statutory penalties of $13,508 to $27,018 for each false claim.   31 U.S.C. § 3729(a)(1).

Defendants' arguments fail to establish that they should prevail on summary judgment, or the absence of genuine issues of material fact, as set out fully below:

## B. Defendants Fails To Establish Basis For Summary Judgment Based On Falsity, Including The Lack of Genuine Issues Of Material Fact Of Falsity

Defendants seek summary judgment based upon the argument that the Government cannot establish "objective falsehood", and seeks to obfuscate falsity by arguing that there are only competing opinions and there is no Local Coverage Determination (LCD).   But the expert opinion and ample evidence demonstrates numerous claims were not "reasonable" and "necessary" as required. [DE 74 at 7-10].   These baseless arguments are misdirection.

"The phrase 'false or fraudulent claim' in the False Claims Act should be construed broadly."   *Harrison I*, 176 F.3d at 788.

### 1. Medical Opinion As To Falsity Can Be Basis For FCA Liability

The Court should reject out-of-hand Defendants' arguments that the "medical necessity" for the challenged claims cannot be "objectively false" solely because "medical

14

necessity" and documentation requirements are based on differences of opinion. [DE 74 at 7]. Defendants' mistaken premise is that statements of medical necessity are incapable of being objectively false. Courts routinely reject this fallacy.

The FCA element of falsity should be read broadly "to reach all types of fraud, without qualification, that might result in financial loss to the Government," *United States v. Neifert-White Co.*, 390 U.S. 228, 232, (1968) ("refus[ing] to accept a rigid, restrictive reading"); *Polukoff*, 895 F.3d 742. More specifically, and as relevant here, the Fourth Circuit has recognized that opinions may be deemed false for the purposes of an FCA claim, holding that an opinion "carries with it an implied assertion, not only that the speaker knows no facts which would preclude such an opinion, but that he does know facts which justify it." See *Harrison I*, 176 F.3d at 792; cf. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 135 S.Ct. 1318, 1326, 191 L.Ed.2d 253 (2015) (suggesting, in the securities context, that a "false-statement provision ... appl[ies] to expressions of opinion");. *Triple Canopy*, 775 F.3d at 638 ("face" of invoice need not be objectively false). [2]

Defendants' factual disagreements about whether psychotherapy was documented

---

[2] Consistent with the Fourth Circuit, other circuits broadly hold that opinion can trigger FCA liability, that false certifications of medical necessity can give rise to FCA liability, and falsity under the FCA need not be objective. *See, e.g., Winter v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1117 (9th Cir. 2020) ("[A] subjective opinion is fraudulent if it implies the existence of facts that do not exist, or if it is not honestly held."). In *Polukoff*, the Tenth Circuit held "[i]t is possible for a medical judgment to be 'false or fraudulent' as proscribed by the FCA[.]" 895 F.3d 742. The court looked to CMS's definition of "medically necessary" for similar procedures, and held, "a doctor's certification to the government that a procedure is 'reasonable and necessary' is 'false' under the FCA if the procedure was not reasonable and necessary under the government's definition of the phrase." Id. at 743. The Third Circuit reached a similar conclusion in *United States ex rel. Druding v. Care Alternatives*, 952 F.3d 89 (3d Cir. 2020), holding that, in the context of certifying terminal illness, "for purposes of FCA falsity, a claim may be 'false' under a theory of legal falsity, where it fails to comply with statutory and regulatory requirements," and that "a physician's judgment may be scrutinized and considered 'false.'" Id. at 100–01.

15

as medically necessary are not grounds for summary judgment. The Court cannot make these credibility determinations at the summary judgment stage. Rather, these are disputed issues of fact for the jury to determine at trial. *See Druding*, 952 F.3d at 100 ("[A] difference in medical opinion is enough evidence to create a triable dispute of fact regarding FCA falsity."); see also *United States v. Paulus*, 894 F.3d 267, 276-77 (6th Cir. 2018) (whether cardiologist accused of implanting medically unnecessary cardiac stents was acting in good faith or committing fraud by misrepresenting the angiogram results was jury question).

Contrary to Defendants' argument that there is no credible evidence to support the Government's contentions, [DE 74 at 7], the falsity of at least some claims was tacitly admitted by Defendant's expert and Sarah Williams. [PA 289 – 295, PA 353 - 355].

Defendants' "opinion" argument [DE 74 at 8-9] is mistaken and improperly relies upon *United States v. AseraCare, Inc.*, 938 F.3d 1278 (11th Cir. 2019). *AseraCare* is factually and procedurally distinguishable.[3] See, *Winter,* 953 F.3d at 1118, *Druding*, 952 F.3d 99-100.

The requirement that a statement be objectively false does not preclude a jury from considering whether an opinion is false. The Fourth Circuit has recognized that compliance can be an objective jury inquiry even though there are differences of interpretation. See,

---

[3] *AseraCare* acknowledged medical necessity was different outside the hospice context, as *AseraCare* involved claims for payment under a specific reimbursement scheme for hospice providers, based on physician certifications that patients admitted to hospice facilities were terminally ill. *AseraCare*, 938 F.3d at 1300 n.15 (distinguishing *Polukoff*'s "medical necessity" opinion from hospice certification). Courts have declined to apply *AseraCare* outside of its specific and unique hospice context. *See, e.g., United States v. Cross Garden Care Ctr., LLC,* No. 8:16-cv-961-T-27AEP, 2019 WL 6493972, at *5 n.5 (M.D. Fla. Dec. 3, 2019) (explaining that *AseraCare* arose in a unique procedural posture and contained language limiting its application to Medicare claims for reimbursement for hospice services). Further, *AseraCare* expressly recognized that some medical opinions could be false, and that "if the [doctor] does not actually hold that opinion" or "based on information that the physician knew, or had reason to know, was incorrect," or if "no reasonable physician" would agree with the doctor's opinion, falsity can be inferred "based on the evidence before that physician." *AseraCare*, 938 F.3d at 1302.

16

*United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 383 (4th Cir. 2015) (upholding jury instruction). Under the plain language of the statute, "the FCA imposes liability for all 'false or fraudulent claims'; it does not distinguish between 'objective' and 'subjective' falsity, or carve out an exception for clinical judgments and opinions." *Winter*, 953 at 1117.; see also *Polukoff*, 895 F.3d 742 (judgment concerning medical necessity of surgery could be false).

The Government has presented ample evidence of falsity, including the opinions of Dr. Corvin and Defendant's own expert [PA 198 – 204, PA 289 – 295], and the admission that illegal coding by Sarah Williams [PA 353 - 355]. See, Government's Response to Statement of Facts at paragraphs 572 – 581.

The falsity of the medical necessity certifications is a genuine issue of material fact.

## 2. **Falsity Is Based On "Reasonable And Necessary" Medicare Standard**

Contrary to Defendants' arguments, [DE 74 at 7-8, 10], falsity in this action is based upon whether the claims were "reasonable and necessary" under the statute, Medicare Program Integrity Manual, claim certification language and caselaw - not local LCD requirements. The LCD argument is a red herring. Defendants violated the requirement that all Medicare claims be "reasonable and necessary" and supported by documentation.

Under the Medicare Act, "no payment may be made . . . for any expenses incurred for items or services" that "are not reasonable and necessary for the diagnosis or treatment of illness or injury …." 42 U.S.C. § 1395y(a)(1)(A). The Fourth Circuit has recognized that a Medicare service is covered only if "it meets all of the conditions listed" in the Medicare Program Integrity Manual, including "the patient's medical need." *Almy v. Sebelius*, 679 F.3d 297, 300 (4th Cir. 2012). A Medicare claim is false if it is not reimbursable because the service provided fails to meet the Medicare Program Integrity Manual definition of "Reasonable and Necessary." *See, e.g.*, *U.S. ex rel. Polukoff v. St. Mark's Hospital*, 895 F.3d

17

730, 742-43 (10th Cir. 2018) (referencing comprehensive CMS definition that includes specifically that procedure "meets, but does not exceed, the patient's medical need"); *Banks v. HHS*, 38 F.4th 86, 90 (11th Cir. 2022)(recognizing "Reasonable and Necessary" is defined by HHS, and includes "patient's medical needs and condition").[4]

Defendants concede Dr. Corvin did not rely on inapplicable LCDs from other regions. [DE 74 at 8]. The Government's expert did not rely upon LCDs in making his determination that 31 claims were not "reasonable and necessary" based upon the documentation provided, as no LCD applied here. [PA 198 – 203; 268 – 281] Further, the investigative agent's initial views of the LCD's applicability are irrelevant to falsity. The HHS report as to enforcement strategies and LCD local requirements in other geographic areas is likewise irrelevant.

This "medical necessity" of the challenged claims is the central factual issue, regardless of whether a LCD applies in North Carolina. The Government's expert testified that there were 31 of 60 claims that were not "Reasonable and Necessary" based upon the documentation provided. [PA 198 – 204]. Defendants' expert found 19 errors. [PA 289 - 295]

A jury should evaluate the evidence, weigh credibility, consider inferences, and determine falsity and other factual disputes regarding Defendants' FCA liability.

### C. <u>Defendants Fail To Establish Basis For Summary Judgment On Scienter, Including The Lack of Genuine Issues Of Material Fact On Scienter</u>

Defendants also seek summary judgment based upon the argument that the Government cannot establish "any level of scienter", [DE 74 at 10-19], and that Defendants

---

[4] The Department of Health and Human Services, Centers for Medicare & Medicaid Services ("CMS"), which administers the Medicare program, defines a "Reasonable and Necessary" service as one that "meets, but does not exceed, the patient's medical need." CMS, Medicare Program Integrity Manual § 13.5.4 (2019). The electronic form for each claim submitted by Defendants includes a certification that "the services . . . were medically necessary" and that the claim submitted complies with Medicare laws and regulations. [DE 40 at 12].

did not act with reckless disregard. Defendants strive to ignore disputed facts, but Defendants must concede that the caselaw for the reckless disregard reaches those who "are conscious of a substantial and unjustified risk that their claims are false, but submit the claims anyway." [DE 74 at footnote 7].

1. **Jeff Williams, Abigail Sheriff and Sarah Williams Show Reckless Disregard**

Contrary to Defendants' arguments, the Government is not relying on "collective knowledge" to establish individual liability, and such cases relied upon by Defendants are inapplicable. [DE 74 11-12]. Defendants fail to establish lack of genuine issues of material fact as to the reckless disregard of Jeff Williams, Abigail Sheriff and Sarah Williams.

It is revealing that Defendants complain the Government is throwing "as many allegations as it [could] against the wall" and then ignore the actual evidence of reckless disregard by Mindpath Services CEO Jeff Williams, COO Abigail. Sheriff, and Manager Sarah Williams. The evidence demonstrates that each Defendant played a significant part in causing Mindpath false claims as Defendants directed the overuse of 90833 psychotherapy and related E&M claims in order to increase profits, despite numerous warnings that these claims were not justified and that documentation failed to establish 16 minutes of separate psychotherapy time and actual psychotherapy (and failed to document the related E&M counseling sessions), as set out more fully in the Government's Response to Statement of Material Facts, Paragraphs 561 - 690.

Each of the Defendants guided and supervised Mindpath claims, [PA 019, PA 021]. Sarah Williams, Abigail Sheriff and Jeff Williams directed coding. [PA 406 – 407].

Defendants fail to establish that Defendant Sarah Williams did not cause false claims with reckless disregard. [DE 74 at 6-7]. Contrary to Defendants arguments, the evidence includes Sarah Williams admitting that illegal coding was occurring at Mindpath, and that she

19

asked office assistants to allow time for the powers that be to make needed but delayed corrections. [PA 353 – 355]. Sarah Williams worked on Mindpath's practice subcommittee and knew of violations, but could not recall any compliance program or compliance policies, and could not answer why Mindpath did not adequately correct the 90833 and E&M coding problems in 2018, 2019, or 2020. [PA 351 – 352, PA 75, PA 416 – 419, PA 337 – 338, PA 359 – 361]. Sarah Williams admitted that billing errors were not a priority as late as 2020. [PA 106 – 107].

Likewise, Jeff Williams and Abigail Sheriff were also aware of these false claims. [PA 374 – 376]. And Jeff Williams and Abigail Sheriff directed the 90833 billing scheme to maximize profits. [PA 183, PA 63, PA 60-61, PA 191 – 194]. Please note the Government's Response to Statement of Material Facts at paragraphs 587 to 688, incorporated herein.

Reckless disregard is a genuine issue of material fact for each of Defendants based upon the evidence, credibility determinations, and reasonable inferences.

### 2. **Evidence Demonstrated Reckless Disregard Before and Through 2018**

Defendants fail to establish that there are no genuine issues of material fact as to their reckless disregard prior to December 17, 2018. The evidence shows Defendants were aware of the 90833 psychotherapy billing scheme throughout 2018, Jeff Williams and Sarah Williams exhibited reckless disregard during 2018, and Defendants failed to review, correct or repay prior false claims the were submitted in 2018 after their knowledge expanded.

Defendants implicitly accept that reckless disregard was established for Defendants when Jeff Williams and Mindpath were notified of blatant, systematic and ongoing fraud in the email dated December 17, 2018, of Dr. Yvonne Monroe (who was a founder and Co-chair of the Practice Management Committee). [DE 74 at 13]. But the Government has presented ample evidence that Defendants ignored obvious warning signs of the 90833 fraud scheme

during and before 2018, and failed to take adequate corrective action, such as developing a compliance program, effectively training, and conducing genuine audits of documentation supporting claims. See, Government's Response to Statement of Facts at 612 to 636.

### 3. **Defendants' Empty Words And Half-Measures Show Reckless Disregard**

Contrary to Defendants' arguments, the evidence establishes that Defendants did not prioritize accurate coding and they failed to take effective or meaningful action to stop the routine and ongoing false 90833 claims throughout 2018, 2019 and 2020.   [EX 74 at 14-15]. Defendants' intermittent words to request internal reporting of inaccurate coding were meaningless because Mindpath never took significant, systematic, or effective actions to catch, stop or correct the routine false 90833 billing.   The empty words and hollow gestures argued by Defendants did not slow the fraud because it was in Mindpath's financial interest to create expanding 90833 claims to increase profits. [PA 63, PA 60 – 61, PA 191 – 194].

Contrary to Defendants' arguments and cherry-picked evidence, [DE 74 at 14-15], Defendants did not take meaningful action to enforce accurate coding, and did not have a compliance program to stop the systemic fraud.   Tellingly, Defendants argue that the Staff Improvement Conference of March 30, 2019, shows action, [DE 74 at 15], but the meeting only shows that Jeff Williams, Abigail Sheriff, and Sarah Williams knew of the billing problems and sought to convince office staff to channel their complaints in a way that allowed them to delay or avoid effective correction.   Sarah Williams admitted to staff that coding was illegal, but asked that they allow senior management to correct eventually. [PA 353 – 355].

Contrary to Defendant's arguments and conflicting evidence (DE 74 at 16], Defendants did not take effective corrective action and used training as a shield to cover their 90833 billing scheme to increase profits.   These occasional and inadequate efforts to control false 90833 billing was undercut by Defendants consistent efforts to increase the percentages

21

of 90833 claims to increase profits. [PA 63, PA 60 – 61]. Defendants were working to increase 90833 claims in order to increase profits, and monitored the percentage of 90833 claims related to and "add on" to E&M counseling sessions. [PA 63, PA 60 – 61, PA 191 – 194]. Defendants manipulated the Medical Directors to increase 90833 billing. [PA 70 - 72, PA 146, PA 155 – 156, PA 167]. Mindpath opposed effective training that emphasized fraud exposure from inaccurate billing, and limited Monroe from training after she alleged fraud by future Medical Director Dr. Lawrence Greenberg. [PA 93 - 94] Profit was their focus.

Contrary to Defendant's arguments and ample evidence to the contrary [DE 74 at 17-18], Defendants did not have an actual compliance program in place in 2018, 2019 and 2020 to catch, prevent or repay false claims despite systematic and ongoing false claims. Defendants did not have written compliance policies, and it was unclear to Providers and others if Mindpath had an actual Compliance Officer. [PA 304 – 312, PA 377 – 380, PA 337 – 338, PA 408 – 415, PA 389 – 391, PA 396 – 398, PA 425 - 427]

The late addition of a coder in February, 2020, failed to adequately correct the systemic false claims, and Defendants failed to review and correct prior false claims. Defendants did not take meaningful actions to stop and repay the false 90833 claims, or related E&M claims, because accuracy would impact profits. [PA 325 – 330, PA 381 – 385].

Contrary to Defendants' arguments, [DE 74 at 18-19], the systemic false claims were not mere negligence or math errors. Ample evidence establishes that Defendants routinely and systematically submitted false 90833 and E&M claims without required documentation throughout 2018, 2019 and 2020. Defendants seek to minimize the false claims, and argue that the blatant false claims resulted from confusion, but the evidence demonstrates that Mindpath had a strategy to increase profits by increasing 90833 claims.

Contrary to Defendants' arguments, [DE 74 at 19], although some of the Providers

may have been confused by the mixed signals and intermittent efforts to correct fraud, the Defendants exhibited reckless disregard and had no compliance systems in place to monitor and stop fraudulent 90833 claims. The "reasonable and necessary" requirement was clear, and Dr. Yvonne Monroe was a clear and honest voice that Mindpath was pursuing a fraudulent scheme to increase 90833 claims without the time and documentation required for psychotherapy. [PA 36 – 37, PA 79 - 80]   Defendants cannot hide behind the confusion they created by prioritizing increasing 90833 claims.[5]   Defendants ignored reality for profit.

Defendants did not have an actual compliance policy and failed to take meaningful and effective actions to detect, stop, and repay egregious billing errors.   *See Stevens*, 605 F. Supp. 2d at 869 (reckless disregard when fail to take "reasonable steps to ensure that his clinic's claims for reimbursement [were] accurate").

In sum, Defendants knew of the false 90833 billing practices, caused Mindpath and Providers to bill falsely, and took no action to review, stop or repay fraudulent claims.

The evidence and reasonable inferences—which, at this stage, must be drawn in favor of the Government—create genuine issues of material fact as to Defendants' reckless disregard.   A jury should evaluate the evidence, weigh credibility, consider inferences, and determine scienter and other factual disputes regarding Defendants' FCA liability.

D. **Defendants Fails To Establish Basis For Summary Judgment On Materiality, Or The Lack of Genuine Issues Of Material Fact On Issue**

Defendants seeks summary judgment based upon arguments that the Government lacks evidence of materiality as to the false claims. [DE 74 at 20-22].   These arguments fail.

---

[5] Contrary to Defendants' arguments, [DE 74 footnote 12], Dr. Corvin found the 31 claims (and the 9 later claims) were false based upon the applicable "reasonable and necessary" standard, and Defendants' own expert agreed that 19 of these claims were in error and lacked documentation. [PA 198 - 204, PA 289 - 295 ].   The jury should determine from the evidence whether 31 or 9 false claims in sample are enough to demonstrates scienter and damages.

As stated above in Section A, materiality is expressly defined by the FCA as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Materiality turns on a holistic analysis of multiple factors and "materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar*, 136 S. Ct. at 2002-04. But so long as a matter could be or is a "substantial factor" in determining the United States' payment, it is material. *Id.* at 2001-03; *Triple Canopy*, 857 F.3d at 178 (focus on "common sense").

The Court and jury should consider all the *Escobar* factors and the evidence at trial based upon the holistic materiality approach, including, among other things, whether the systemic 2018-20 overpayments were minor or insubstantial, what weight should be given to express warnings in the Medicare agreement and forms, and whether the initial automatic payments or the ultimate Government overpayment determinations are more significant.

In short, the evidence and holistic legal considerations, taken together, establish the routine false claims were more than "capable of influencing" Medicare decision makers.

1. **"Reasonable and Necessary" Accuracy Is Material Condition of Payment**

Contrary to Defendants' arguments, [EX 74 at 20], "reasonable and necessary" and documentation are express conditions of payment for every Medicare claim. The argument that "Compliance Was Not a Condition of Payment" is refuted by the statute and certifications that each claim submitted was accurate and "reasonable and necessary", as well as the warning of liability for false claims. The absence of a targeted LCD with detailed documentation requirements does not establish that compliance was not required.

Defendants seek to minimize the falsity of 90833 claims, but whether the psychotherapy was "reasonable and necessary" is material to payment, including whether at least 16 minutes of "separate and distinct" psychotherapy were documented (i.e., at least time

24

and psychotherapy modality used), and a genuine issue of material fact. [PA 195 – 204, PA 212 – 213, PA 299 – 300, PA 353 – 355; PA 416 – 419; PA 36 – 37; PA 331 – 332].

### 2. **Defendants' Systematic False Claims Were Not Minor or Insubstantial**

Contrary to Defendants' arguments, [EX 74 at 21-22], the evidence establishes that systematic false claims were significant and demonstrate an error rate of 27% in the Sample claims, with extrapolated single damages of $438,012. [DE 212, DE 198 – 204]. The systematic fraud was egregious.

Defendants now argue that 16 minutes are not expressly required for 90833 psychotherapy claims, [DE 74 at 21], despite a clear requirement that CPT codes be accurate, the CPT description that expressly states 90833 claims must have 16 minutes of separate psychotherapy, and Mindpath's acceptance of the 16 minute documentation requirement during training in 2018-2020, and in prior admissions. [PA 011, # 20, 013 # 25, PA 012, # 23, 081 – 084. PA 50 – 52, PA 164, PA 112, PA 70 - 72]   Defendants' argument that at least 16 minutes of separate and distinct psychotherapy treatment was not required is baseless.

Defendants' argument that no LCD expressly requires specific documentation in this state, [DE 74 at 21], does not establish there are no documentation requirements.   There are no LCDs for many types of Medicare claims, but the general requirements to document the "medical necessity" of each claim continue to apply, including at least the minutes and modality of psychotherapy claim. [PA 195 – 204, PA 112, PA 46 – 48, PA 50 - 52].   Defendants cannot establish that the 2023 HHS Inspector General report lowers requirements for 90833 claims, but this would at most be a genuine issue of material fact.   [DE 74 at 21].

### 3. **Materiality Demonstrated Despite Medicare Enforcement Delay**

Contrary to Defendants' arguments, [DE 74 at 22], the Government need not prove that Medicare conducted an audit of the Mindpath Practice, terminated Medicare claims, or

25

previously demanded repayment in order to establish the materiality element. Defendants now demand an artificial materiality requirement that Medicare audit and demand repayment of the millions of Medicare false claims from Mindpath before it can pursue a FCA action. This argument is unrealistic and fundamentally misunderstands the automatic Medicare payment process and enforcement through FCA actions, as well as other methods.

The Court and jury should consider all factors and evidence based upon the holistic materiality approach, including whether the 27 percent overpayments for 2018-20 years were minor or insubstantial, and whether the initial automatic electronic payments or the ultimate Government overpayment determinations are more significant. The strategic decision not to audit Mindpath or place it on pre-payment is only one materiality factor to consider. *See, e.g., U.S. ex rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1021 & n.7 (9th Cir. 2018) (concluding that not even a Government program review of specific defendant, which did not find any relevant wrongdoing or recommend any action against the defendant, was enough to conclusively defeat materiality). There are genuine issues of material fact. See *U.S. ex rel. Bibby v. Mortg. Inv'rs Corp.*, 987 F.3d 1340, 1350-52 (11th Cir. 2021).

The evidence and reasonable inferences—which, at this stage, must be drawn in favor of the Government—establish materiality or create genuine issues of material fact.

E. **Defendants Fails To Establish Basis For Summary Judgment On Reverse False Claim, Or The Lack of Genuine Issues Of Material Fact**

Defendants seek summary judgment based upon arguments that the Government has no evidence of reverse false claims. [DE 74 at 23-24]. These reverse false claims are distinct, and supported by ample evidence. Defendants' arguments should be rejected.

The Fourth Circuit held that a company may be held liable for a reverse false claim if it: (1) "knowingly makes, uses, or causes to be made or used, a false record or statement

26

material to an obligation to pay or transmit money or property to the Government;" or (2) "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." *United States ex rel. Wheeler v. Acadia Healthcare Co., Inc.*, 127 F.4th 472, 495 (4th Cir. 2025); 31 U.S.C. § 3729(a)(1)(G).

The FCA defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual … relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). A federal statute provides that any person receiving an overpayment from the Medicare program must notify the United States and return that overpayment within sixty days. 42 U.S.C. § 1320a-7k(d). "Any overpayment retained by a person after the deadline for reporting and returning the overpayment … is an obligation." 42 U.S.C. § 1320a-7k.

Separate and distinct from causing the submission of underlying false claims, Defendants received additional information that Mindpath claims should not have been paid. Each time Defendants gained such further knowledge, they had an obligation to make repayment, and their failure to do so violated the reverse false claims provision. This new information, accumulated over time and after the initial submission of false claims, constitutes an independent violation of the FCA, including by way of the sixty-day repayment requirement. See, e.g., *United States v. Crumb*, 2016 WL 4480690, at *16 (S.D. Ala. Aug. 24, 2016) (holding complaint sufficiently alleged both that the defendant physician submitted false billing claims to Medicare and that the defendant later gained knowledge that he had submitted false claims, giving rise to an obligation to repay). Another court held that "even though the reimbursement required for the reverse false claim stems from the actions alleged in the direct false claims, the Government alleges a separate 'obligation that arose independent of the affirmative false claims.'" *United States v. Cockerell Dermatopathology,*

27

*P.A.*, 2021 WL 4894173, at *10-11 (N.D. Tex. Oct. 20, 2021).[6]

After numerous false Mindpath claims were submitted, Defendants continued to learn that at least some 90833 claims were false. As an example, Dr. Yvonne Monroe put Mindpath and Jeff Williams on notice that widespread false 90833 claims were being submitted by Dr. Greenberg, in her email of December 17, 2018, including 40% overcoding and false claims earlier that year by Dr. Greenberg. To the extent evidence establishes that Defendants became aware of false claims that previously paid as alleged in the Complaint, [DE 40 at 38-39], Mindpath had an obligation to report and repay these false claims, but failed to take action to redetermine and repay amounts falsely obtained. Dr. Yvonne Monroe recommended that Mindpath and Jeff Williams "self report" the false claims in December, 2018, but they elected to keep the false claims hidden from Medicare. [PA 79 – 80].

The Government has presented evidence that Defendants elected to not repay the false claims improperly obtained, after they were on notice of these prior false claims. [PA 325 – 330, 381 – 385]. This new information represents both a new obligation to repay, and a distinct set of FCA violations occurring later in time.

The evidence and reasonable inferences—which, at this stage, must be drawn in favor of the Government—create genuine issues of material fact as to reverse false claims.

---

[6] This case is analogous to the *Crumb* and *Cockerell* cases. The *Cockerell* court specifically held that the new information received by the defendant over time both (1) created a "separate set of operative facts" from the original allegations that the defendant submitted false claims and (2) represented a distinct claim in that the violations occurred at different times when the defendant possessed different information. *Id.* *See, e.g., United States ex rel. Ginger v. Ensign Grp., Inc.*, 2022 WL 4110166, at *10 (C.D. Cal. Mar. 10, 2022) ("[C]ourts have allowed reverse false claims to proceed when they concern an obligation under Medicare."); *United States ex rel. Dunlap v. Alaska Radiology Assocs., Inc.*, 2016 WL 11786411, at *6 (D. Alaska Mar. 31, 2016) ("[A] recipient of an overpayment from Medicare, who after "identifying" that overpayment, knowingly fails to report and return it within 60 days, has committed a reverse false claim.").

28

**F. Defendants Fails To Establish Basis For Summary Judgment On Conspiracy, Or Lack of Genuine Issues Of Material Fact On Conspiracy**

Defendants seek summary judgment based upon the argument that the Government has no evidence of conspiracy.. [DE 74 at 23-24]. These arguments should be rejected because evidence will create at least the inference that Jeff Williams, Abigail Sheriff and Mindpath Services conspired with the separate Mindpath practice, its Medical Directors, and Mindpath Providers to maximize 90833 and related E&M claims and increase profits through a scheme to submit additional 90833 and E&M claims regardless of time and documentation.

For a FCA conspiracy claim, it is well settled that the Government must show 1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim reimbursed by the government and 2) at least one act in furtherance of the agreement. See e.g., 31 U.S.C.A. § 3729(a)(1)(C); *United States ex rel. Devarapally v. Ferncreek Cardiology*, 2023 WL 2333872 at 6 (E.D.N.C. March 2, 2023). The Government "need not allege that an express or formal agreement was entered into in order to establish that the parties were in agreement for the purpose of a conspiracy claim." *See, e.g., United States ex rel. Howard v. Caddell Construction*, 2016 WL 11786600 at 5 (E.D.N.C. February 29, 2016).*United States ex rel. Tran v. Computer Scis. Corp.*, 53 F.Supp.3d 104, 134 (D.D.C. 2014).

Contrary to Defendants' argument, [DE 74 at 23], the "intra-corporate conspiracy doctrine" is not applicable because the conspiracy is not internal between Mindpath Services and its officers, but instead between Mindpath Services with the separate Defendant Mindpath Practice, the Mindpath Medical Directors, and Mindpath Providers.

Contrary to Defendants' argument, [DE 74 at 24], the evidence, and allowed inferences therefrom, show that Mindpath Services officers (including Abigail Sheriff, Rob Oliveri and others) directed the fraudulent 90833 scheme through the Mindpath Practice's

29

Medical Directors and others at the Mindpath Practice. [PA 63, PA 60 – 61, PA 191 – 194]. Defendants directed Medical Directors and Providers in order to accomplish increased 90833 billing  The evidence of acts in furtherance of the agreement include directing the Medical Directors to push higher percentages of 90833 claims both generally and for specific Providers, and directing Mindpath Providers to increase their 90833 claims in order to increase their salaries.  [PA 70 - 72, PA 146, PA 155 – 156, PA 167, PA 42, PA 112].

The evidence and reasonable inferences create genuine issues of material fact.  A jury should evaluate the evidence, weigh credibility, consider inferences, and other factual disputes regarding the conspiracy claims presented.

### CONCLUSION

For these reasons, and based upon the foregoing evidence, this Court should deny the Motion for Summary Judgment based primarily upon the numerous genuine issues of material fact set forth herein, and in the Government's Response to Statement of Material Facts.  Substantial evidence, and reasonable inferences therefrom, will establish falsity, reckless disregard and materiality of numerous 90833 and related E&M claims at trial.

Respectfully submitted, this the 11th day of June, 2024.

DANIEL P. BUBAR
Acting United States Attorney


By:     /s/ Neal I. Fowler
        NEAL I. FOWLER
Assistant United States Attorney
Civil Division
150 Fayetteville Street
Suite 2100
Raleigh, NC 27601-1461
Telephone: (919) 856-4049
Facsimile: (919) 856-4821
NC Bar #27371
Counsel for United States of America

30

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this 11th day of June, 2025, served a copy of the foregoing memorandum upon the below-listed parties electronically and/or by placing a copy of the same in the U.S. Mails, addressed as follows:

R. Daniel Boyce, Esquire
MAYNARD NEXSEN PC
4141 Parklake Avenue, Suite 200
Raleigh, North Carolina 27612
Email: dboyce@maynardnexsen.com

Alice V. Harris
Jenna K Godlewski
MAYNARD NEXSEN PC
1230 Main Street, Suite 700
Columbia, SC 29201
Email: aharris@maynardnexsen.com
Email: jgodlewski@maynardnexsen.com

W. Stacy Miller, II
MaryAnne M. Hamilton
Miller Law Group, PLLC
Post Office Box 6340
Raleigh, NC 27628
Email: stacy@millerlawgroupnc.com
Email: maryanne@millerlawgroupnc.com

/s/ Neal I. Fowler
NEAL I. FOWLER
Assistant United States Attorney
150 Fayetteville Street
Suite 2100
Raleigh, NC 27601-1461
Telephone: (919) 856-4049
Facsimile: (919) 856-4821
NC Bar #27371
Counsel for United States of America


Counsel for United States of America

31