Page 1

1          IN THE UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF NORTH CAROLINA
2                  WESTERN DIVISION
                NO. 5:19-CV-512-BO
3
4   UNITED STATE OF AMERICA , ex rel.,    )
    ANJELICA BROWN,                       )
5                                         )
           Plaintiff,                     )
6                                         )
       vs.                                )
7                                         )
    MINDPATH CARE CENTERS, NORTH          )
8   CAROLINA, PLLC; JEFF WILLIAMS;        )
    ABIGAIL SHERIFF, and SARAH            )
9   WILLIAMS,                             )
                                          )
10         Defendants.                    )
    -------------------------------------
11
12
13
14
15          *    *   *CONFIDENTIAL*    *    *
16     VIDEOTAPED DEPOSITION OF GEORGE CORVIN, M.D.
17              (Taken by Defendant)
18             Raleigh, North Carolina
19             Tuesday, March 11, 2025
20
21
22
23
24          Reported in Stenotype by
                Jana F. Collins
25   Transcript produced by computer-aided transcription

**GOVERNMENT EXHIBIT B**

1                    APPEARANCES
2    ON BEHALF OF THE PLAINTIFF:
3        NEAL I. FOWLER, Esquire
         US Department of Justice
4        US Attorney's Office
         150 Fayetteville Street
5        Raleigh, North Carolina 27601
         (919) 856-4049
6        neal.fowler@usdoj.gov
7    ON BEHALF OF THE DEFENDANTS:
8        ALICE V. HARRIS, Esquire
         Maynard Nexsen, PC
9        1230 Main Street, Suite 700
         Columbia, South Carolina 29201
10       (843) 253-8284
         aharris@maynardnexsen.com
11
         R. DANIEL BOYCE, Esquire
12       Maynard Nexsen, PC
         4141 Parklake Avenue, Suite 200
13       Raleigh, North Carolina 27612
         (919) 653-7827
14       dboyce@maynardnexsen.com
15   ALSO PRESENT:  MATT WALTERS, Videographer
16
17
18
19        VIDEOTAPED DEPOSITION OF GEORGE CORVIN,
20   M.D., a witness called on behalf of Defendants,
21   before Jana Collins, Notary Public, in and for the
22   State of North Carolina, at the United States
23   Attorney's Office, 150 Fayetteville Street, Raleigh,
24   North Carolina, on Tuesday, the 11th day of March,
25   2025, commencing at 9:25 a.m.

```
 1              INDEX OF EXAMINATIONS
 2   BY MS. HARRIS. . . . . . . . . . . . .    PAGE 7
 3   BY MR. FOWLER. . . . . . . . . . . . .    PAGE 218
 4   BY MS. HARRIS. . . . . . . . . . . . .    PAGE 226
 5
 6
 7                INDEX OF EXHIBITS
 8   NUMBER       DESCRIPTION                   PAGE
 9   Exhibit 325  Report by Dr. Corvin and      11
                  other documents
10
     Exhibit 326  Website pages of North        26
11                Raleigh Psychiatry
12   Exhibit 327  Pages from CPT Code Manuals    34
                  2018-2021
13
     Exhibit 328  Website pages of Palmetto GBA  46
14
     Exhibit 329  LCD - (L37638)                 61
15
     Exhibit 330  LCD Article - (A56562)         63
16
     Exhibit 331  Website page of National       73
17                Institute of Standards and
                  Technology
18
     Exhibit 332  Report on Testimony using the  74
19                term "Reasonable Scientific
                  Certainty"
20
     Exhibit 333  Chart                          81
21
     Exhibit 334  Chart                          82
22
     Exhibit 335  Medical record for MA          84
23                dated 11/23/2020
24   Exhibit 336  Website page of American       89
                  Psychological Association
25
```

1    A    I'll try to do that.

2    Q    Okay.  And the court reporter and I will

3    help you remember if that happens.

4    A    Yes, ma'am.

5    Q    Let me know if you want to take a break

6    today at any point.

7    A    Will do.

8    Q    If I'm in the middle of a line of

9    questioning, I might ask to finish that line before

10   we start, but we want you to be comfortable today.

11   A    Thank you.

12   Q    Are you represented by an attorney today?

13   A    No, ma'am.

14   Q    Okay, all right.  Is there any reason you

15   can't answer truthfully and honestly today?

16   A    No, ma'am.

17   Q    Are you taking any sort of medication that

18   will affect your memory or ability to understand my

19   questions?

20   A    No, ma'am.

21   Q    Do you have any medical condition that would

22   affect your ability to understand the questions?

23   A    No, ma'am.

24   Q    Do you have any medical condition that would

25   affect your ability to recall details or events?

1     Q     Okay.  Did you --

2     A     I should say I talk to her about every case

3  I take, so.

4     Q     Okay.  Did you speak to anyone else?

5     A     I don't think so.  No, ma'am.

6     Q     Okay.  The government has produced your

7  report, CV, and different documentation.  We're

8  going to hand you what will be Exhibit Number 306?

9              THE COURT REPORTER:  325.

10             MS. HARRIS:  325.

11             (EXHIBIT 325 WAS MARKED FOR

12     IDENTIFICATION)

13             MS. HARRIS:  Here you go, Neal.

14             MR. FOWLER:  Thank you, Alice.

15  BY MS. HARRIS:

16     Q     You're welcome.

17             Dr. Corvin, I see you're looking at the

18  documents.  Can you confirm that that is your report

19  and your findings?

20     A     This is -- yeah.  It's several documents in

21  here, but the first part is a 9-page report and then

22  a chart of summary and then my CV, my case list, a

23  condition letter.  And then, a document that I don't

24  think I have -- I don't know that I've seen this

25  actual last piece of this.

1    Q    Okay.  So now, that's very helpful.  So what

2    you're talking about then is -- if you look at the

3    bottom of the pages, there's a Bates stamp.

4    A    Yes, ma'am.

5    Q    USA underscore 0004014.

6    A    Correct.

7    Q    Okay.  So 4014 to 4016 are not your

8    findings?

9    A    Yeah.  Well, I don't know what it is.  I've

10   never read it so, but it's not -- it doesn't look

11   like something I prepared unless it got changed in

12   format, but it doesn't look like something I've seen

13   in this current form anyway.

14   Q    Okay.  So that's helpful.  Up until that

15   Bates stamp, up until 4000 to 4013 are documents

16   that you prepared and provided in this case?

17   A    That's correct.

18   Q    Okay, thank you.  That's helpful.

19   A    Uh-huh.

20   Q    Let's go to Bates -- the very first page at

21   the bottom.  This is the for the record, Bates

22   stamped 4000.  This is section Sources of

23   Information.

24   A    Yes.

25   Q    Okay.  And under that, you state at the top

Confidential George Corvin, MD  March 11, 2025
United States of America v. Mindpath Care Centers, North Carolina

Page 13

1 you -- a sample of 60 progress notes?

2  A Yes, ma'am.

3  Q Okay.  And did you review the medical

4 documentation related to these 60 progress notes?

5  A That is correct.  Sometimes it was

6 duplicative but, yes.  There was a way to look up

7 the dates of service for each of these dates of

8 service and then reviewed those notes.

9  Q Okay.  And when you say there was a way to

10 look up, are you looking at paper or electronic

11 documents?

12  A It was all electronic.

13  Q Okay.  And to your knowledge, were there

14 Bates numbers at the bottom?

15  A I don't remember seeing Bates numbers on

16 them.  I'm not saying they're not there.  I just --

17 it never popped out to me if they were.

18  Q Okay.  Do you know what database you were

19 looking at?

20  A I don't really.  I know that the folder

21 names were like PROD 001, 011, and 013 primarily and

22 then, there were image files within those.

23  Q Okay.

24  A I don't know if that helps any, but.

25  Q Okay.  It does.  Thank you.  Did you look at

1   medical record documentation outside of the progress

2   notes for these 60 patients?

3        A     Not until yesterday.  I did briefly

4   yesterday --

5        Q     Okay.

6        A     -- in one patient.

7        Q     And what patient was that?

8        A     I don't remember.  But if we go through

9   these, I will tell you.  And when we get to that, I

10  can tell you why, so.

11       Q     Okay.  So what records or sources of

12  information did you review or look at as you formed

13  your opinions regarding these claims that you

14  reviewed?

15       A     So to a large extent, I mean above and

16  beyond the medical record notes themselves, I'm not

17  a coding expert.  You probably already know that.

18  So what I did is -- but as a physician that's been

19  in practice for 30 years part of our training is, of

20  course, in the utility of documentation.  And so,

21  for example, when I was still working in a hospital,

22  I had folks that would be, I don't know, tasked with

23  making sure that my documentation was adequate for

24  the purposes that it's supposed to serve.  And so, a

25  lot of this is sort of my training and experience.

1   It's my training and experience having staff do

2   internal audits on my own records.  And also, from

3   later in my career for me doing the same audits in a

4   hospital setting and to a lesser extent in my

5   outpatient practice setting.

6           And I think it might be on my resume or CV.

7   I'm currently chairing the quality management

8   function for the Medicaid MCO in Central Carolina.

9   So a lot of what I'm using in terms of expertise, if

10  you will, is simply just how I was taught, how I was

11  trained, what I -- what I've always been told.  This

12  is what you need to do and it really kind of boils

13  down to what standard of care is for me as a

14  practicing physician in terms of documentation.  But

15  part of that is that I have folks that I've worked

16  with over the years who have said, look.  These are

17  the things that have to be here.  Attendings that

18  taught me, folks that I worked with in medical

19  records and peer review, things of that nature.  So

20  it's no short answer to that as you can probably

21  tell, so.

22      Q    So is the standard you're relying on

23  published anywhere?

24      A    If it is, it's not something I published.

25  Now I am aware that there have over time been

1    multiple different sort of publications, if you

2    will, federally in terms of documentation standards

3    for Medicare provided services which is not

4    something -- that's not something I live within,

5    right.

6         Q     Okay.

7         A     In other words, I am aware of it and I kind

8    of colloquially know it because I'm taught it and

9    held to it because I write thousands of those notes.

10   And so, but I'm not a coding expert.  I can't quote

11   statutes in that manner.  I look at this more in

12   terms of what is necessarily present in medical

13   documentation to both comport with documentation

14   guidelines federally, but more importantly as a

15   physician whether they serve the purpose of

16   providing the reviewer of those records necessary

17   information about that patient's care.  Does it

18   document that that care is necessary and reasonable?

19   Does it document what that care is?  And so, it

20   really becomes more of a standard of care clinical

21   issue for me.  But as you can imagine, there's

22   tremendous overlap in those areas, right.

23        Q     So this standard of care clinical issue,

24   have you seen your version published anywhere?

25        A     Not that I can quote to you now, although I

1  will tell you as a part of physician training like

2  the actual organization of psychotherapy progress

3  notes is something that all mental healthcare

4  providers are trained in.  And above and beyond any

5  sort of statutory guidelines, there are guidelines

6  that I can -- I can give you an example that are

7  still critically needed to be present in those

8  records because without them not only can you not

9  document the necessary reasonableness of treatment,

10  but it becomes difficult to understand even what the

11  treatment is.

12      Q    Okay.  But if somebody were to say I want to

13  look at Dr. Corvin's standard?

14      A    Other than the way I've sort of summed it up

15  in here, I don't know that I can give you a

16  publication saying that.

17      Q    So it's not published anywhere?

18      A    No, no.  Not that I'm -- well, I'm not

19  saying it's not.  It not that I can quote.

20      Q    To your knowledge?

21      A    Correct.

22      Q    Okay.  To your knowledge, it's not

23  published?

24      A    Correct.

25      Q    So someone -- would you agree with me, and

1    we can look at it if we need to, the dates of

2    service in these 60 are 2018, '19 and '20.  Do you

3    agree with that?

4         A    I think that's right, yes.

5         Q    So someone who's writing the notes in 2018,

6    '19 and '20 would not have been aware of your

7    standard?

8              MR. FOWLER:  Objection to form.

9         A    I suspect that they would actually.

10        Q    Okay.

11        A    Because it's -- because the standard -- it's

12   my position, if I have a position, that the standard

13   I'm utilizing is the same that every place I've ever

14   worked held me to.  It wasn't me doing it.  It was

15   how I was trained and it's how mental health

16   professionals --

17        Q    That's your personal experience, don't you

18   agree?

19             MR. FOWLER:  Objection to form.

20        A    It -- well, it is my personal experience.

21   But over the years, I've kind of gotten on the other

22   side of that.  And I know that that experience is in

23   my experience, in my training has been relatively

24   universal for mental healthcare providers.

25        Q    When you're coding a claim in 2018, '19 or

Page 19

1    '20, you agreed with me earlier you're not aware of

2    any publication in which your standard is published?

3         A    Well, I think the coding I mean to -- it's

4    not a yes or no answer to that question.  I will

5    start by saying no, I'm not prepared to give you a

6    document that says Dr. Corvin standard.

7         Q    So you're not aware of Dr. Corvin's

8    standards being --

9         A    Being published.

10        Q    Okay.

11        A    That's not something I've ever done.

12        Q    Okay.

13        A    That being said, even if we look at

14   applicable Medicare and Medicaid kind of guidelines

15   on documentation, they do -- they are informed by

16   the standard of care, but we haven't gotten to this

17   yet.  It's fairly obvious that the -- to define

18   something as necessary and reasonable is very, very

19   difficult to codify.  And so, while there are

20   efforts in mental health to do that -- well, for

21   example, the coding expert report I read said that

22   there is no universally government agreed upon

23   diagnosis for psychotherapy.  That's fine.  That's

24   what we do.  We decide what that is because somebody

25   must.  And so, certain things are recognized as

Veritext Legal Solutions
800.743.DEPO (3376)    calendar-carolinas@veritext.com    www.veritext.com
Case 5:19-cv-00512-BO-RJ    Document 88-2    Filed 06/11/25    Page 13 of 42

1  psychotherapeutic modalities and other things are

2  not, but it's very, very difficult to codify that.

3      Q    So your standard of care then is fairly

4  subjective, wouldn't you agree?

5          MR. FOWLER:  Objection to form.

6      A    I think I said that in my report.

7      Q    Okay.

8      A    There are -- there are aspects of an

9  assessment of a mental health note that are by

10 definition open to interpretation which is why I,

11 and I think I said this in the report, really have

12 tried to utilize a very permissive view of those

13 issues.  And let me just say I mean, I think the

14 same is apparent in the coding report that I read

15 which is there aren't definitions for these things.

16 What I would say is that the absence of a definition

17 of a code doesn't erase the necessity to meet that

18 requirement from standard of care.  That was a long

19 sentence I know, but I'll try again later.

20     Q    But again, I think what you're saying,

21 correct me if I'm wrong, is that your view of the

22 cases is like you said difficult to codify; is that

23 correct?

24         MR. FOWLER:  Objection to form.

25     A    The provision of mental healthcare

```
 1   completely is very difficult to codify.  And, in
 2   fact, isn't codified completely.
 3        Q    Okay, all righty.  So do you have --
 4        A    Of course -- I'm sorry.  I didn't mean to --
 5   of course, that changes over time because of rules.
 6        Q    Of course, it does.
 7        A    Yeah, yeah.
 8        Q    So what was applicable in 2018, '19 and '20,
 9   for example, may be different in '21, '22, '23; is
10   that correct?
11        A    So -- so the coding, the language that's
12   used has changed over time.  The standard of care
13   has not appreciable, in my opinion, not appreciably
14   changed over time nor has the requirement that that
15   documentation whatever you say has to be in there,
16   it still has to be sufficiently detailed and unique
17   applicable to that patient to demonstrate that that
18   treatment is necessary and reasonable.  That's
19   overarching.
20        Q    So who sets the standards for the detail
21   that's required to be in the record?
22        A    Who sets the standards?  Well, in today, I'm
23   offering my opinion as to what I think the standards
24   are in 60 progress notes.
25        Q    So that's your opinion then?
```

Case 5:19-cv-00512-BO-RJ    Document 88-2    Filed 06/11/25    Page 15 of 42

1      A     These are my opinions.

2      Q     Okay.  And your opinions are what you think

3   should be in the notes?

4      A     That is correct.  Based on my training and

5   experience, having my own notes reviewed, and

6   reviewing notes.

7      Q     Okay, okay.

8      A     Yeah.

9      Q     Do you by chance know what the definition of

10  a false claim is?

11     A     I'm sure there's a technical definition that

12  I don't know, but it seems like I might could get

13  close to knowing it.

14     Q     Do you know the definition of actual

15  knowledge?

16     A     Legally, no.

17     Q     Okay.

18     A     Or in coding language, I do not.

19     Q     How about deliberate ignorance?

20     A     That sounds like a -- if it's like

21  deliberate indifference but not -- I can't quote you

22  the definition.

23     Q     And reckless disregard?

24     A     Well, I know it in civil law, yes.

25     Q     Okay, okay.  All right.  Let's look at your

Veritext Legal Solutions
800.743.DEPO (3376)     calendar-carolinas@veritext.com          www.veritext.com
Case 5:19-cv-00512-BO-RJ     Document 88-2     Filed 06/11/25     Page 16 of 42

1    have any N -- N -- the national documentation

2    requirements?

3        A    Correct.

4        Q    Okay.  All righty.  Okay.  Then let's hold

5    this report here, but go back to your report.

6        A    Uh-huh.

7        Q    And on page 4 of your report and this is

8    Bates-stamped 4003?

9        A    Right.

10       Q    You again state that the documentation must

11   include issues that were addressed, interventions,

12   modalities utilized, and progress response to

13   interventions.  So if CMS and Palmetto do not have

14   any documentation requirements, why are you imposing

15   the standard?

16       A    Because CMS, there's still an overarching

17   standard of care issue and I think this is where we

18   might be talking apples and oranges a bit.  The

19   absence of CMS attempting to define psychotherapy

20   guidelines does not -- okay.  I'm just gonna say

21   this is just my opinion.  A common sense approach to

22   that would not mean that there are no documentation

23   requirements in that regard.  And so, then the issue

24   becomes remember my entire review is does the

25   documentation, well, support necessary and

Veritext Legal Solutions
800.743.DEPO (3376)     calendar-carolinas@veritext.com     www.veritext.com
Case 5:19-cv-00512-BO-RJ     Document 88-2     Filed 06/11/25     Page 17 of 42

1   reasonable care.  The absence of a defining variable

2   for psychotherapy documentation by CMS standards

3   does not mean that anything goes in my view.  Now

4   this is just my opinion, right.  Being aware that

5   CMS during the time in question had neither an LCD

6   or a national coverage determination or definition

7   doesn't mean that a provider can go in there and

8   write anything or nothing which is, I'm getting

9   ahead of myself, sometimes what happened here.  They

10  wrote anything or nothing and there are areas where

11  the -- your coder, the coding report, we agreed a

12  lot in my view.  This is just my read of that

13  report.

14          So I'm left to fall back on if CMS doesn't

15  define what psychotherapy documentation is,

16  there's -- somebody has to.  And, of course, who's

17  using these medical records really?  Well, mental

18  healthcare providers.  So if I were to go bill a

19  90833 and write that I was using leeches for PTSD,

20  you could be making an argument that that's

21  psychotherapy, maybe.  But standard of care would

22  suggest that that's just not -- that's nonsensical.

23  And so, I'm forced to fall back as all providers are

24  to what is necessary and reasonable, and what is

25  that.  Well, first of all, would another doctor be

Veritext Legal Solutions
800.743.DEPO (3376)     calendar-carolinas@veritext.com          www.veritext.com
Case 5:19-cv-00512-BO-RJ    Document 88-2    Filed 06/11/25    Page 18 of 42

1    able to come in if I get hit by a bus and pick up

2    where I left off?  Would that define that patient's

3    care in a way that helps that patient?  Or, for

4    example, is the same psychotherapy progress note

5    being dictated verbatim on seven occasions on seven

6    different dates of service.  That by definition

7    suggests that that is not support for the standard

8    of care.

9         Now back to your original question.  The

10   reality is is that, that these codes did not during

11   the time in question define that.  I would be of the

12   opinion that then we just left with, well, is it

13   necessary and reasonable.  Does it serve its

14   standard of care purposes?  Does it serve its

15   clinical purposes?  Can a coder look at that and see

16   what was done?  Can a -- more importantly, can a

17   physician look at it and see what was done?  And

18   that is where I think I filled in that blank because

19   that's how I'm judged every day.

20   Q    So, but you didn't -- I hate to disagree

21   with you.

22   A    That's okay.

23   Q    But you didn't review the records in that

24   manner?

25        MR. FOWLER:  Objection to form.

Veritext Legal Solutions
800.743.DEPO (3376)     calendar-carolinas@veritext.com     www.veritext.com
Case 5:19-cv-00512-BO-RJ    Document 88-2    Filed 06/11/25    Page 19 of 42

1      Q    Okay, all right.  On this one as well you

2  note, you say no goal/response listed.  Again, is

3  the goal or response required by Medicare or

4  Palmetto GBA?

5      A    So --

6            MR. FOWLER:  Objection to form.

7  Objection to form.

8      A    It is my under -- I'm sorry.  I didn't hear

9  what you said.

10     Q    I asked if the goal --

11           MR. FOWLER:  I was just objecting to

12     form.

13     A    Oh, okay.  I'm sorry.  I just went blank for

14  a second.  We're good.  I -- with the understanding

15  that that is not a described requirement in the

16  code.

17     Q    Okay.  Let's answer that first.

18     A    It is not.  It is my understanding it is

19  not.

20     Q    Okay.  It is not required by Palmetto GBA

21  and CMS?

22           MR. FOWLER:  Objection to form.

23     A    Not specifically, but my interpretation of

24  that --

25     Q    It's not required by CMS, Palmetto GBA in a

1    NCD or LCD?

2              MR. FOWLER:  Objection to form.

3        A     That is true.  And yet if you read the

4    entirety of the purpose of the code not knowing what

5    you're working towards or whether you're making

6    progress negates my ability to determine whether

7    that treatment was necessary or reasonable.  And so,

8    even if it's not stated there that you have to have

9    it, it's -- another poor example is, like, if I have

10   my appendix out, I want to know if I'm a doctor

11   looking at that medical record whether I survived

12   the surgery, right.  And I know that's hyperbolic,

13   but it's not that hyperbolic, right.  You got to say

14   what's going on.  And in this case, we got the

15   therapist, who I'm sure is a fine therapist,

16   listening to this patient and that's important, but

17   that's half of the equation.

18       Q     Okay.  So if a auditor, coding auditor, were

19   looking at -- for -- at your critique of goal and

20   response, they would say there's nothing in the OIG

21   to support that?

22             MR. FOWLER:  Objection to form.

23       A     I'm assuming that that is what they would

24   say and I have no reason to disagree with you --

25   with that hypothetical.  That demonstrates why it is

1    that the standard of care is not defined by that

2    document, and it's clearly not.  Well, in my view.

3    And so, they're not requiring it, in my opinion,

4    does not mean that if you're a Medicare patient, you

5    don't get to have documentation that meets with this

6    community standard of care.

7        Q    So the OIG in its report went through and

8    determined overpayments --

9        A    Yes.

10       Q    -- for certain services, right?

11       A    They did, yes.

12       Q    But they only determined overpayments, for

13   example, with no goal and response listed to the

14   extent one of the seven MACs had an LCD that

15   required it.  Did you know that?

16       A    Not before today, no.

17       Q    Okay.  So in other words, the OIG itself did

18   not require or identify an overpayment to the extent

19   that a MAC did not require documentation -- the

20   documentation requirement?

21            MR. FOWLER:  Objection to form.

22       A    I don't think I disagree with what you're

23   saying.

24       Q    Okay.  Let's go to the -- back to the OIG

25   report on page 39.

1   that in chief complaint, it would technically fill

2   that requirement, right.

3       Q     Okay.  But you're dinging a whole note

4   because of that though.

5       A     Well, I don't mean to ding -- yeah.

6       Q     You are?

7       A     Well, I guess I am, yes.

8       Q     You are.  And so, you can tell on the first

9   page what the complaints are, can't you?

10      A     Yes.  I guess I don't have a way to split

11  the baby there as it were.

12      Q     Exactly.  So do you think that's fair?

13            MR. FOWLER:  Objection to form.

14      A     I --

15      Q     Well, do you seriously?

16            MR. FOWLER:  Objection to form.

17      A     It's -- it's -- it's -- I don't know that I

18  can define fair.  It's either -- it's either done

19  correctly or it's not done correctly.  All I can say

20  is that I would get treated the same way I'm

21  interpreting this.

22      Q     Okay.  Well, by whom?  By a coder?

23      A     By our -- I don't know that -- by our

24  internal auditors which I think are coders.

25      Q     Okay.  So we're not talking about that right

Veritext Legal Solutions
800.743.DEPO (3376)    calendar-carolinas@veritext.com    www.veritext.com
Case 5:19-cv-00512-BO-RJ    Document 88-2    Filed 06/11/25    Page 23 of 42

1  now.  We're talking about, you know, we're in a

2  coding audit here.  And you can tell on the first

3  page --

4          MR. FOWLER:  Objection to form.

5      A    Well, our auditors are coders.

6      Q    You can tell on the first page --

7      A    Yeah.

8      Q    -- that this patient -- what the complaints

9  are.

10     A    So the --

11     Q    You're saying the whole note fails because

12  it's not under chief complaint?

13          MR. FOWLER:  Objection to form.

14     A    Yeah.

15     Q    Okay.

16     A    I mean, because it's not in -- it's not

17  where it needs to be.  There's -- there's a reason

18  --

19     Q    That's fine.  You're saying that's not --

20     A    Okay.

21     Q    Okay.  So then, I've got History of Present

22  Illness on the next page.  Suicidal, talked about

23  the gun, the duration of timing?

24     A    Wait.  Which page are we talking about?

25     Q    So the first page is the History of Present

1    Illness.  The second page, and I'll go a little

2    slower, 537217?

3         A    No.  It's 5316, isn't it?

4         Q    Oh, sorry.  I missed a page.  You're right,

5    yeah.  The second page, 16 doesn't have anything on

6    it, but then if we go to -- I missed a page.

7    537217, you got a discussion of suicidal, denies.  A

8    gun in the house, no.  Duration and timing, chronic.

9    Severity severe?

10        A    Uh-huh.

11        Q    The next page 537218, modified factors are

12   present, associated signs and symptoms, anxiety.  No

13   SI, suicidal ideation; is that right?

14        A    You're right, right.

15        Q    Okay.  Side effects, none.  They talked

16   about the smoking status, never a smoker.  Talked

17   through the substance abuse and dependence.  Talked

18   about appearance and functioning?

19        A    Uh-huh.

20        Q    Talked about compliant or not with

21   medications.  Again a review of the prior PFSH and

22   no change in that.  And if you look on page 53729,

23   that prior PFSH was in fact --

24        A    Seven --

25        Q    537219?

Veritext Legal Solutions
800.743.DEPO (3376)     calendar-carolinas@veritext.com     www.veritext.com
Case 5:19-cv-00512-BO-RJ     Document 88-2     Filed 06/11/25     Page 25 of 42

Page 170

1      A      Oh, 219, okay.

2      Q      The prior PFSH was re-examined?

3      A      Right.

4      Q      You see that?

5      A      Uh-huh.

6      Q      Okay.  Then we go over -- we go over to

7  mental status exam and that, well, that's just on

8  page 53722?

9      A      Uh-huh.

10     Q      Appearance, well groomed.  Go to the next

11  page.  Mood, anxious.  Affect, congruent with mood.

12  Denies suicide.  Attention span and concentration is

13  good.  The next page, judgment and insight are

14  discussed.  And then, on page 537244, there's also a

15  nice assessment.  Do you see that?

16     A      I do, yes.

17     Q      Okay.  And, in fact, that assessment

18  continues in end note 1.  So it's not just what's

19  documented here.

20     A      Oh, no, no.  I got you.

21     Q      The end note 1 is 537299.  All righty.

22     A      Right.

23     Q      Okay.  And then, on page 537255, there's a

24  plan.  Patient understands and agrees with treatment

25  goals.  Patient understands they may call at any

1    that it's couple-fold.  One, let's start with the

2    baseline is if you are actively engaged in

3    psychotherapy, can you reasonably assert that having

4    a second psychotherapist is a necessary and

5    reasonable service or absent more, would it be a

6    duplicative service?  But on top of that from a

7    clinician standpoint, my concern is that, well, too

8    many chefs spoils the mix.  So I'll admit, I don't

9    know how familiar this therapist is with the

10   therapist -- the other therapist, C Peoples, but it

11   is more -- there is more than one way to skin a cat.

12   And if you have two therapists messing around in the

13   same psychopathology, you can do more harm than

14   good.  It can be confusing to the patient.  You can

15   wind up giving different interpretations or

16   psychotherapeutic interventions that conflict with

17   each other when neither of those interventions is

18   wrong.  But when a patient gets both at the same

19   time, it can be very confusing.

20        Q    Okay.  So it's not -- not something that's

21   in the CPT coding books, correct?

22        A    Well, I mean the book does say it needs to

23   be necessary and reasonable and it's not necessary

24   and reasonable to have two therapists.

25        Q    How can you tell that?

Veritext Legal Solutions
800.743.DEPO (3376)     calendar-carolinas@veritext.com          www.veritext.com
Case 5:19-cv-00512-BO-RJ    Document 88-2    Filed 06/11/25    Page 27 of 42

```
 1      A     Because I'm a psychiatrist.  I mean --
 2      Q     I mean, how could you tell -- wasn't the
 3   provider the one who's able to tell at that time
 4   whether the psych -- the short amount of 90833 they
 5   provided the patient wouldn't also benefit from
 6   therapy from C Peoples?
 7            MR. FOWLER:  Objection to form.
 8      A     I think the patient was in therapy with C
 9   Peoples and he should have left that alone.  That's
10   the clinical standard.
11      Q     That's your opinion though.  Didn't --
12   couldn't this provider have had a different opinion
13   on that?
14            MR. FOWLER:  Objection to form.
15      A     He would be standing apart from -- yes.  He
16   could have a different opinion.
17      Q     Okay.  And then, and so what's your source?
18   Besides your opinion, what is your source?  Can you
19   point me to a CPT code book?  Can you --
20      A     No, not a CPT --
21      Q     -- point me to a LCD?
22      A     -- code book.
23      Q     How about an LCD?
24      A     No.
25      Q     NCD?
```

1      A      No.   That says you can't have more than one

2  therapist?   I don't know how they wouldn't interpret

3  that as duplication of service, but that's fine.   I

4  mean --

5      Q      But there's no NCD that says you can't have

6  a patient -- in fact, Medicare will pay for multiple

7  therapists, won't they?

8              MR. FOWLER:   Objection to form.

9      A      I'm not a coding person, so I don't know

10  what they'll pay for.   But that would not -- but as

11  a clinician, I'll tell you it's not necessarily

12  reasonable or recommended.

13      Q      Okay.   But you don't know in this case

14  what -- do you know who C Peoples is?

15      A      Yeah.   That's a name -- I don't know C

16  Peoples but it's somebody, you know, there's not

17  that many of us around.

18      Q      Okay.   But do you know what kind of therapy

19  C Peoples was doing?

20      A      No.   And I don't know that this person does

21  either.   It doesn't say.

22      Q      But again, you don't know so how can you say

23  it wasn't medically necessary when you don't even

24  know who C Peoples is or what therapy they were

25  practicing?

Veritext Legal Solutions
800.743.DEPO (3376)     calendar-carolinas@veritext.com     www.veritext.com
Case 5:19-cv-00512-BO-RJ     Document 88-2     Filed 06/11/25     Page 29 of 42

1  A Oh, yeah.  The note itself is good.

2 Something is wrong with the --

3  Q The note itself is good?

4  A Yeah.

5  Q It meets the CPT code requirements for 2020.

6 Would you agree with that?

7   MR. FOWLER:  Objection to form.

8  A Uh --

9  Q That we discussed about the three factors?

10  A Yes.

11  Q Okay.  And then, you remember that when you

12 were looking at documenting E/M, you don't have to

13 record time if it's -- in fact, the CPT code book

14 says you shouldn't if it's related to the time based

15 code like 90833?

16   MR. FOWLER:  Objection to form.

17  A Is the argument that you can make errors in

18 the record and be forgiven for that?

19  Q Did I -- did I ask you that?

20  A That is what you're asking.

21  Q That's not what I'm asking.  I'm asking the

22 E/M CPT code book says that time is not a

23 requirement and shouldn't be recorded for these E/M

24 codes.

25  A But I would suggest --

```
 1          MR. FOWLER:  Objection to form.
 2     A    -- that if you write a record that suggests
 3   --
 4     Q    So can you answer my question though?
 5     A    Yes.  That -- what you're saying is correct.
 6     Q    Okay, thank you.
 7     A    I would add to that saying that, but it -- I
 8   mean I'm trying not to say that it doesn't make
 9   sense --
10     Q    Okay.  Well, let's --
11     A    -- to not question a note that says you did
12   all that work in zero minutes.
13     Q    So they did all this work.  Does it make
14   sense it wasn't done?
15     A    Then it makes me wonder what was done.
16     Q    Okay.  Let's look at it, okay.  On page --
17     A    No.  I'm not -- I'm not talking about the
18   E/M.  I know it was done.  It's documented.
19     Q    Okay.  So that's all we're talking about
20   right now is the E/M.
21     A    Right.
22     Q    You know it was done as documented?
23     A    Well, it can't be done as documented.  It
24   can't be done as documented because it's documented
25   it was done in zero minutes.
```

1    Q    It does not say that.

2    A    It says that exactly.

3    Q    It says that in another part of the record.

4    A    Well, okay.  I mean if I break them apart.

5    Each note stands on its own.

6    Q    Are you saying that this -- it's just --

7    A    I'm not saying that it was made up.

8    Q    All right.

9    A    That's not what I'm saying.

10   Q    Okay.  So let's say that.

11   A    All right.

12   Q    So are you not saying that there isn't

13   sufficient documentation --

14        MR. FOWLER:  Objection to form.

15   Q    -- to support the CPT code as described in

16   the CPT code book?

17   A    That -- right.  If the note -- if the times

18   were right, the documentation for the E/M code is

19   sufficient.  The note is fatally flawed in that

20   regard.  It needs to say what really happened.

21   Q    Okay.  Does -- it said what really happened.

22   A    So they did all that in zero minutes.

23   Q    No.  You're making -- you're building an

24   assumption that's not true here.

25        MR. FOWLER:  Objection to form.

Veritext Legal Solutions
800.743.DEPO (3376)     calendar-carolinas@veritext.com     www.veritext.com
Case 5:19-cv-00512-BO-RJ     Document 88-2     Filed 06/11/25     Page 32 of 42

1      time today.  I appreciate it.

2                    THE WITNESS:  Thank you.

3                    MR. FOWLER:  I have just a few.

4                    EXAMINATION

5     BY MR. FOWLER:

6      Q    There was a lot of discussion about

7     reasonable and necessary.  Can you explain what you

8     mean by reasonable and necessary?

9      A    Right.  So -- so it is -- it's undeniably a

10    clinical term.  And what it describes is a course of

11    treatment reasonably applicable to a source of

12    pathology or a condition, and is it necessary for

13    management of that condition.  And so, it really

14    speaks to we don't want to provide treatment that is

15    inappropriate for a condition, known to be

16    ineffective for a condition, or not reasonable in

17    terms of its approach to managing the condition

18    efficiently.

19     Q    Okay.  Are you familiar with the old forms

20    called 1500 paper forms?

21     A    Oh, yes.

22     Q    Was -- was reasonable and necessary one of

23    the certifications that had to be made on that old

24    1500 form?

25     A    It was like signing an affidavit essentially

1    swearing that you believe what you are doing is

2    reasonable and necessary for that condition.

3        Q    Do you know if the electronic forms include

4    any similar requirement of these claims submitted to

5    be reasonable and necessary?

6        A    Pretty sure they do.

7        Q    Okay.  Is that also part of the provider

8    agreement that every provider has to sign with

9    Medicare?

10            MS. HARRIS:  Object to the form.

11       A    Oh, so it is on mine anyway, yes.

12            MS. HARRIS:  Object to the form.

13       A    Sorry.

14       Q    So reasonable and necessary is part of the

15   requirement in your provider agreement with

16   Medicare?

17            MS. HARRIS:  Object to the form.

18       A    That's true.

19       Q    Do you understand that's also a requirement

20   of the statute?

21            MS. HARRIS:  Object to the form.

22       A    Yes.

23       Q    Okay.  Now there was a lot discussion about

24   LCDs and lack of an LCD.  Does a lack of an LCD

25   change what's reasonable and necessary for a claim

Page 220

1   submitted for psychotherapy?

2          MS. HARRIS:  Object to the form.

3      A     Not in my opinion, it does not.

4      Q     And there was also a lot of discussion about

5   NCDs, the lack of NCDs.  Does that change what is

6   reasonable and necessary in your view?

7      A     It does not in my view.

8      Q     There was a discussion about the HHS OIG

9   2023 report which you had lots of questions about.

10  Does anything in that report or any of the testimony

11  you've given change your view about what is

12  reasonable and necessary for these claims?

13         MS. HARRIS:  Object to the form.

14     A     It does not.

15     Q     Okay.  Did that report go into what was

16  reasonable and necessary?

17         MS. HARRIS:  Object to the form.

18     Q     As opposed to what the specific MACs were

19  requiring?

20         MS. HARRIS:  Object to the form.

21     A     Having not read the entire report, I'm not

22  sure how to say that, how to answer that.

23     Q     Okay.  So you don't know if they focused on

24  reasonable and necessary versus what the additional

25  requirements were by the MACs?

Veritext Legal Solutions
800.743.DEPO (3376)    calendar-carolinas@veritext.com    www.veritext.com
Case 5:19-cv-00512-BO-RJ    Document 88-2    Filed 06/11/25    Page 35 of 42

1          MS. HARRIS:  Object to the form.

2     A    Well, I would -- no, I don't, but I would --

3     well, it would be hoped that reason -- that they

4     would -- that they would maintain a focus at the end

5     of the day on providing treatment that is necessary

6     and reasonable and paying for treatment that's

7     necessary and reasonable.

8          MS. HARRIS:  Object to the form.

9     Q    And we heard you, I think, say this many

10    different times, but is reasonable and necessary a

11    requirement for billing purposes only or is it

12    required also for standard of care purposes?

13    A    It is standard --

14         MS. HARRIS:  Object to the form.

15    A    It is standard of care as well.

16    Q    Okay, all right.  So why is it important in

17    both areas?

18         MS. HARRIS:  Object to the form.

19    A    So in the first form for billing purposes,

20    of course, if you're providing medical services, you

21    want to document to the person paying the bill what

22    you are doing.  And you want to document in such a

23    way that they know, the payor knows that you are

24    deeming this necessary and desirable but more

25    important, necessary and reasonable, but more

Veritext Legal Solutions
800.743.DEPO (3376)     calendar-carolinas@veritext.com     www.veritext.com
Case 5:19-cv-00512-BO-RJ     Document 88-2     Filed 06/11/25     Page 36 of 42

1  importantly documenting it that they -- so that the

2  trier -- that the person looking at that submission

3  can say, yeah.  This is right.

4        From a standard of care issue why it's

5  important is because it violates our oath as

6  physicians to knowingly provide care that is

7  reasonably expected not to work or known to be

8  ineffective or known to be not appropriate or not

9  needed for a condition.

10     Q    Okay.  And not need could be because there's

11  duplicate -- there's a provider somewhere else?

12     A    Duplicate -- duplicate services would be an

13  example of that.

14     Q    Now you reviewed the report of the billing

15  expert, Ms. Nogowski (phonetic).  And you were asked

16  questions just about where you disagreed with her

17  and, I think, there were 18 or so of those.  There

18  were no questions about where she agreed with you.

19  But the reason for your denial of a lot of the

20  90833s that she agreed with are in your report,

21  correct?

22     A    That is correct.

23     Q    I don't want to go through all that for the

24  sake time, but she agreed with many of your 90833

25  decision.  She disagreed, I believe, with all of

Veritext Legal Solutions
800.743.DEPO (3376)     calendar-carolinas@veritext.com     www.veritext.com
Case 5:19-cv-00512-BO-RJ     Document 88-2     Filed 06/11/25     Page 37 of 42

Page 223

1  your E/M decisions?

2      A     Right.  It's sort of --

3             MS. HARRIS:  Object to the form.

4      A     So as I recall that what you just said is

5  true.  I think the notes that I found acceptable,

6  she found all of them acceptable.

7      Q     Right.

8      A     And then, there was a -- I would -- I would

9  say describe it as a significant area of agreement

10  between us.

11     Q     Okay.  And in your questioning from Mindpath

12  counsel, you were asked typically about the part

13  that you disagreed with.  So if there was agreement

14  on 90833 but a disagreement on the E/M, they only

15  asked you about one.  But your report stands as it

16  does regarding your denials in some cases for both

17  the E/M and the 90833?

18     A     Oh, that is still true, yes.

19     Q     Okay.  So I won't go back into that just for

20  the sake of time.  And it's your view, I believe you

21  stated that the 90833 notes should stand alone as in

22  the 90833 part of the notes should explain the

23  medical necessity of the claim, correct?

24     A     That is correct.

25             MS. HARRIS:  Object to the form.

1      A      Because it's a distinct treatment.

2      Q      Right.  And the requirement to document is

3   separate and distinct between the 90833 and the E/M?

4      A      That is my understanding as well.  I mean

5   yes, that's correct.

6      Q      Okay.  There were questions about some clone

7   notes for Patient CM, 12/7 of 2020, Exhibit 348?

8      A      Right.

9              MS. HARRIS:  Object to the form.

10     Q      And there were other notes, progress notes

11   that you looked at that you said were adjacent to,

12   just before and just after, that date that you

13   thought were cloned or identical?

14     A      That's correct.

15     Q      And obviously, counsel didn't want you to go

16   into that but that was something that you found when

17   you looked back over this based on the review from

18   Ms. Nogowski, correct?

19             MS. HARRIS:  Object to the form.

20     A      That is correct.  I was just prepping

21   yesterday and I looked at that.  And I was like, you

22   know, and I got curious.  Maybe I shouldn't have

23   done that, but I started looking a little more.

24     Q      But that supports your overall opinion

25   regarding the denial of claims for Patient CM,

Veritext Legal Solutions
800.743.DEPO (3376)     calendar-carolinas@veritext.com     www.veritext.com
Case 5:19-cv-00512-BO-RJ     Document 88-2     Filed 06/11/25     Page 39 of 42

1    12/7/2020?

2              MS. HARRIS:   Object to the form.

3      A    Well, it does to -- yes.

4      Q    Okay.   You also talked about having 90833s

5    inextricably intertwined with the E/M.   Why is it

6    inextricably intertwined?

7      A    So, because what we're doing here is it's --

8    they're two distinct modes of treatment, but it's

9    one person.   And I know it's really, really hard

10   sometimes to sort of ferret that all out.   But at

11   the end of the day, the provision of therapy is a

12   distinct service as opposed to managing medicines or

13   sort of the things that happen in E/M evaluation and

14   management services.   It's still that same patient.

15   And they need to tie -- they need to be consistent

16   with each other.   So an example being if -- not to

17   get back into this, but if one note seems to me to

18   clinically describe someone who either won't engage

19   in treatment or can't, then it seems perhaps not

20   necessary or reasonable to then engage -- attempt to

21   engage them in therapy.

22     Q    Can a 90833 be billed on its own without an

23   underlying E/M code?

24     A    No.

25     Q    Okay.   By definition it's an add-on?

Page 226

1      A    It's an add-on code.

2            MR. FOWLER:  Unless you have further

3      questions, that's it.

4                  EXAMINATION

5      BY MS. HARRIS:

6      Q    I've got one further question and that's

7      let's go back to the OIG report.

8      A    That is your favorite.  Let's see here.

9      Q    It is my favorite.

10     A    Hang on.  I'll find it.  It's thick, right?

11     Q    It is.

12           MR. FOWLER:  It's number 301.

13     A    They're all out of order now.  I'll get it.

14     It'll be quick.  I swear I didn't steal it.

15           MR. FOWLER:  This is mine, but he's

16     welcome to use it.

17     Q    Just want to look at one page, page 39.

18     A    Okay.

19           MS. HARRIS:  Unless you have notes that

20     say please say -- no.  I'm playing with you.

21           MR. FOWLER:  I just tabbed it.

22     BY MS. HARRIS:

23     Q    We had to use my yellow highlighting so,

24     anyway.  On page 39, you remember we talked about

25     the appendix where the OIG lists psychotherapy --

Veritext Legal Solutions
800.743.DEPO (3376)     calendar-carolinas@veritext.com     www.veritext.com
Case 5:19-cv-00512-BO-RJ     Document 88-2     Filed 06/11/25     Page 41 of 42

Page 229

```
 1   STATE OF NORTH CAROLINA

 2   COUNTY OF FORSYTH

 3                   REPORTER'S CERTIFICATE

 4        I, Jana Collins, a Notary Public in and for

 5   the State of North Carolina, do hereby certify that

 6   there came before me on Tuesday, the 11th of March,

 7   2025, the person hereinbefore named, who was by me

 8   duly sworn to testify to the truth and nothing but

 9   the truth of his knowledge concerning the matters in

10   controversy in this cause; that the witness was

11   thereupon examined under oath, the examination

12   reduced to typewriting under my direction, and the

13   deposition is a true record of the testimony given

14   by the witness.

15        I further certify that I am neither attorney

16   or counsel for, nor related to or employed by, any

17   attorney or counsel employed by the parties hereto

18   or financially interested in the action.

19        IN WITNESS WHEREOF, I have hereto set my

20   hand, this the 14th of March, 2025.

21

22                        Jana Collins

23

24             Jana Collins, Notary Public

25             Notary Number: 200733100028
```

Veritext Legal Solutions
800.743.DEPO (3376)    calendar-carolinas@veritext.com    www.veritext.com
Case 5:19-cv-00512-BO-RJ    Document 88-2    Filed 06/11/25    Page 42 of 42