THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:17-CV-616-BR


UNITED STATES OF AMERICA, ex rel.,
ANJELICA BROWN,

      Plaintiff-Relator,

     v.

MINDPATH CARE CENTERS, NORTH CAROLINA,
PLLC, JEFF WILLIAMS, ABIGAIL SHERIFF,
SARAH WILLIAMS,

      Defendants.
_____


# **<u>CONFIDENTIAL</u>**


- - - - - - - - - - - - - -
Deposition
of
JODI LYNNE NAYOSKI
- - - - - - - - - - - - - -


     The oral deposition of JODI LYNNE NAYOSKI was taken by the Plaintiff-Relator on Monday, the 17th day of March, 2025, commencing at 9:02 a.m., at the Law Office of Maynard Nexsen PC, located at 4141 Parklake Avenue, Suite 200, Raleigh, North Carolina.


PATRICIA C. ELLIOTT
Verbatim Reporter

GOVERNMENT
EXHIBIT
C
_____

<u>APPEARANCES OF COUNSEL</u>


<u>FOR THE PLAINTIFF:</u>

NEAL I. FOWLER
Assistant United States Attorney
1500 Fayetteville Street, Suite 2100
Raleigh, NC  27601
(919) 856-4530
neal.fowler@usdoj.gov


<u>FOR THE DEFENDANTS:</u>

R. DANIEL BOYCE
ALICE HARRIS
Maynard Nexsen PC
4141 Parklake Avenue, Suite 200
Raleigh, NC  27612
(919) 653-7825
dboyce@maynardnexsen.com

<u>TABLE OF CONTENTS</u>

<u>PAGE</u>

<u>STIPULATIONS</u>

<u>EXAMINATION</u>
      BY MR. FOWLER...........................    6
      BY MS. HARRIS...........................  278
      BY MR. FOWLER...........................  280

<u>ADJOURN</u>.......................................  283

<u>REPORTER CERTIFICATE</u>...........................  284

- - - - - - - - - -

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 354 | Expert Report | 19 |
| 355 | Defendants' Supplemental Disclosure of Experts and Expert Reports | 30 |
| 356 | E&M Therapy Note – Patient CM (1/5/2021) | 242 |
| 357 | E&M Therapy Note – Patient CM (2/2/2021) | 242 |

- - - - - - - - - -

Quoted material is verbatim and
may/may not reflect a direct quote.

- - - - - - - - - -

<u>STIPULATIONS</u>

IT IS HEREBY STIPULATED AND AGREED BETWEEN THE PARTIES TO THIS ACTION, THROUGH THEIR RESPECTIVE COUNSEL OF RECORD:

(1)  On motion of counsel for the Plaintiff, the oral deposition of Jodi Lynne Nayoski was taken beginning at or around 9:02 a.m. on Monday, March 17, 2025, at the Law Office of Maynard Nexsen PC, located at 4141 Parklake Avenue, Suite 200, Raleigh, North Carolina, before Patricia C. Elliott, a notary public.

(2)  Formal opening and closing of the deposition by the court reporter is waived.

(3)  Said deposition shall be taken for the purpose of discovery or for use as evidence in this action, or for both purposes, or for any other purpose permitted by the Federal Rules of Civil Procedure.

(4)  Any objection of any party hereto as to notice of the taking of said deposition or as to the time or place thereof, or as to the competency of the person before whom the same shall be taken, are hereby waived.

(5)  The Federal Rules of Civil Procedure shall control the taking of said deposition and the use thereof in court.

(6)  That the signature of the witness to the transcript of

said testimony is hereby reserved.

    (7)  Except as waived by these stipulations, the provisions of the Federal Rules of Civil Procedure shall apply to the taking of said deposition and as to its submission to the respective deponent, certification and filing with the appropriate noticing attorney.

- - - - - - - - - - - - - - -

1  deposition confidential, but I would ask you not to use the names

2  of patients.  I will use initials and your number just to keep

3  track of everything, so we're talking about the same people.  But

4  it's easier, I think, for me, and I think better overall, not to

5  use the names of patients, because, obviously, this is sensitive

6  information.

7          I'm handing you what's marked as Government Exhibit

8  355, which is a supplemental disclosure that was provided by your

9  counsel to us after your expert report was provided.  It was

10  provided on March 7th, 2025.

11          Did you provide information that was included in the

12  supplemental disclosure of experts?

13          **MS. HARRIS:**  Object to the form.

14          **THE WITNESS:**  Yes.

15          **BY MR. FOWLER:**

16     Q.   Let me take you to the first bullet point on the bottom

17  of Page 1.  It states "Pursuant to 26(a)(2)(B)(iii), in addition

18  to Exhibits A, B and C attached to Ms. Nayoski's report, the

19  defendants supplement Ms. Nayoski's report with documents

20  Bates-labeled MindPath 0939649 through 93971."  And I think

21  there's a three left off, because those were some documents

22  provided to us.  So I think there's a typo there on the number.

23          And it continues, "Please note that Ms. Nayoski will

24  also rely on active websites -- website links cited in the

25  footnotes in her report.  She will also rely on previously

1    admitted Exhibit 301 and previously produced medical records for

2    the claims in the OIG sample set."

3          Is it your view that that supplements your expert

4    report?

5          A.   Yes.

6          Q.   How did you determine what additional exhibits and

7    information should be provided in the supplement?

8          **MS. HARRIS:**  Object to the form.

9          **BY MR. FOWLER:**

10         Q.   You may answer.

11         A.   It was, when this came out, noted that you guys were

12   requesting the actual paper versions of what were footnoted in

13   our reports --

14         Q.   Okay.

15         A.   -- which we felt that to be sufficient.  But then it

16   wasn't, so --

17         Q.   Okay.  And specifically, you provided some additional

18   documents, which are with Bates numbers there.

19         Were those documents that you provided to supplement

20   your expert report?

21         **MS. HARRIS:**  Object to the form.

22         **THE WITNESS:**  Without knowing what those Bates numbers

23         are, I can't speak to that.

24         **BY MR. FOWLER:**

25         Q.   I'm handing you what's previously been marked as

1  Government Exhibit 327.  Are those the Bates numbers that are

2  addressed there in your supplemental disclosure there at the

3  bottom right corner?

4     A.   Yes.

5     Q.   So 93649 to 939712.

6     A.   939712.  Actually, it goes to three.

7     Q.   Oh, 7-1-3.  Thank you.  And so this is what's

8  referenced in your supplemental that was provided to the

9  government on March 7th.

10      **MS. HARRIS:**  Object to the form.

11      **BY MR. FOWLER:**

12     Q.   Is that what you provided --

13     A.   That's --

14     Q.   -- that -- those additional Bates-numbered pages?

15     A.   Yes.

16     Q.   Okay.  Did you provide any other written documents in

17  supplement other than those Bates-numbered pages?

18      **MS. HARRIS:**  Object to the form.

19      **THE WITNESS:**  Again, there's only one more that I know

20    of that is a copy of a link that's in the footnote.

21      **BY MR. FOWLER:**

22     Q.   Okay.  Was that a definition?

23     A.   Not the definition.  It was the actual evaluation and

24  management guidelines.

25     Q.   Okay.  And we'll get to that in just a moment, I think.

1          So other than these supplemental pages which are

2     Bates-numbered here, did you provide any other additional

3     documents as part of that expert report other than that one item

4     that -- that you just mentioned?

5          A.   Not documents.

6          Q.   Okay.  Did you understand that you're required to

7     identify the facts or data considered by you in forming your

8     opinion when you submit an expert report?

9               **MS. HARRIS:**  Object to the form.

10              **MR. FOWLER:**  Can you ask that again?

11              **BY MR. FOWLER:**

12         Q.   Did you understand that you were required to identify

13    the facts or data considered by you in forming your opinions when

14    you submitted your expert report?

15              **MS. HARRIS:**  Object to the form.

16              **BY MR. FOWLER:**

17         Q.   You may answer.

18         A.   I still don't understand what you're saying.

19         Q.   You formed an opinion.

20         A.   I did.

21         Q.   And so you relied upon facts and data.

22         A.   Right.

23         Q.   Did you understand that you had to disclose and

24    identify the facts and data that you considered in forming your

25    opinions in this case?

1      A.    Yes.

2            **MS. HARRIS:**  Object to the form.

3            **BY MR. FOWLER:**

4      Q.    Did you do that within the four corners of your expert

5    report?

6      A.    Yes, I believe I did.

7      Q.    So how did you do that?

8            **MS. HARRIS:**  Well, object to the form.

9            **BY MR. FOWLER:**

10     Q.    Show me -- show me in your expert report where that is.

11     A.    The facts and data?

12     Q.    The fake -- facts and data that you relied upon in

13   forming your expert report.

14     A.    The facts and data would be all of this framework,

15   summary of findings, this -- these are all the rules and

16   regulations, guidelines.  So Page 2, 3, 4 basically shows all my

17   backup facts, guidelines as to how I conducted the audit.

18     Q.    Did your report set out what medical records you

19   reviewed in forming your opinions regarding these 60 sample

20   claims?

21            **MS. HARRIS:**  Object to the form.

22            **THE WITNESS:**  Yes, it's --

23            **BY MR. FOWLER:**

24     Q.    Where in the expert report?

25     A.    Page 6 -- begins on Page 6, Page 7.

1      Q.   Okay.  Where on Page 6 and 7 did you identify what

2  records you relied upon in forming your opinions in this

3  expert --

4      A.   Oh, I relied upon the records that were provided to me.

5      Q.   Well, the question is what records -- did you identify

6  in your extra report what records you relied upon?

7      A.   You're trying to get me to say something that I'm

8  not -- I don't -- I don't know.  The records were the medical

9  records that -- provided to me.

10     Q.   And you're telling me that here in the deposition.

11     A.   Yeah.

12     Q.   I'm asking where in the expert report did you identify

13  what records --

14     A.   Okay.

15     Q.   -- that you relied upon.

16     A.   So I personally reviewed documentation derived from 60

17  dates of service submitted to me.

18     Q.   So what documents?  You reviewed documents -- reviewed

19  documentation.  That's a very generic term.  So how do I know

20  which medical records you looked at?

21          **MS. HARRIS:**  Object to the form and asked and answered.

22          **THE WITNESS:**  All -- the sample numbers from the CID

23     correlate to the patients, the patient initials, the date of

24     service.  That feels pretty clear to me what I reviewed.

25          **BY MR. FOWLER:**

1    Q.    And those were all provided to you by MindPath counsel.

2    A.    Yes.

3    Q.    Okay.  And I'm not -- I don't want to ask about

4    communication with MindPath counsel, but I'm asking where in your

5    expert report that you identify what records that you actually

6    reviewed, put eyes on to help you form your opinions in this

7    case.

8         **MS. HARRIS:**  Object to the form.  Asked and answered.

9         And she also said she evaluated the corresponding progress

10        notes for audit samples, along with the remittance advice to

11        validate the payment amount.  So just for the record, she

12        identifies the records on Page 6.

13        **MR. FOWLER:**  I would ask counsel just to object and not

14        to testify.

15        **MS. HARRIS:**  I understand, but, you know --

16        **BY MR. FOWLER:**

17    Q.    So do you have in your report what specific records you

18    looked at for these 60 patients --

19    A.    Yes.

20    Q.    -- by Bates number or by date or anything else?

21    A.    I evaluated the corresponding progress notes for the

22    audit sample, along with the remittance advice, to validate the

23    payment amount.

24         There's no Bates numbers in here.  I am going by Dr.

25    Corvin's ID number, my sample ID number, the date of service that

1   you-all provided in the CID.  The patient initials, that is how I

2   identified which records I looked at.

3       Q.   But if there's confusion about what progress notes are

4   being looked at, how do we move past confusion to find out what

5   specifically you looked at --

6           **MS. HARRIS:**  Object to the form.

7           **BY MR. FOWLER:**

8       Q.   -- as -- as in the document, the Bates-numbered

9   document or some other identifier for that document?

10          **MS. HARRIS:**  Object to the form.

11          **THE WITNESS:**  Yeah, I don't know what you're -- I don't

12      know what you're trying to ask.

13          **BY MR. FOWLER:**

14      Q.   And I've -- I've been struggling to get an answer to

15  this.  My question is how do we know what actual medical record

16  you looked at when you were forming your opinions in this case.

17          **MS. HARRIS:**  Object to the form.

18          **BY MR. FOWLER:**

19      Q.   Is there anything in the report in any way that says,

20  "For Patient MA, I looked at these specific documents,"

21  identified by Bates number or identified by some other method?

22      A.   No.

23      Q.   Okay.  So there's no identification of specific

24  progress notes that you looked at for Patient MA or these other

25  patients?

 1          **MS. HARRIS:**  Object to the form.

 2          **THE WITNESS:**  Beyond that they were the progress notes

 3      for the patient and the date of service,

 4          **BY MR. FOWLER:**

 5      Q.   Which you -- which you obtained from your -- from

 6  MindPath counsel.  Okay.

 7          **MS. HARRIS:**  Object to the form.

 8          **BY MR. FOWLER:**

 9      Q.   Did you get medical records from any source other than

10  MindPath counsel?

11      A.   No.

12      Q.   Your supplemental indicates that you also relied upon

13  websites, but you did not attach those records to your expert

14  report or the supplemental, correct?

15          **MS. HARRIS:**  Object to the form.

16          **THE WITNESS:**  So in some cases, we -- we did

17      after -- after your request.

18          **BY MR. FOWLER:**

19      Q.   Okay.

20      A.   So CPT, we've copied the pages, which you've provided

21  to me as Exhibit 327.

22      Q.   Thank you.  And let's walk through each of them.

23          So Footnote 1 is the CPT -- AMA CPT codes.  And you did

24  provide that in your supplemental, which is Government Exhibit

25      327.

1     Q.   Number 9 -- Footnote 9 is items colored in green,  and
2  you show a discrepancy.  There's no additional information there
3  that you used in forming your opinion in this case, correct?
4          **MS. HARRIS:**  Object to the form.
5          **THE WITNESS:**  Correct.
6          **BY MR. FOWLER:**
7     Q.   And going to Exhibit [sic] 10, it is a footnote
8  to -- definition from the APA regarding supportive psychotherapy.
9          So you did rely upon that definition, correct?
10         **MS. HARRIS:**  Object to the form.
11         **THE WITNESS:**  Uh-huh (yes).
12         **BY MR. FOWLER:**
13    Q.   Was that a yes?
14    A.   Yes.
15    Q.   I'm handing you what's marked as Government Exhibit
16 336.  Is that the definition that you hyperlinked at the bottom
17 of Page 8, the definition from the APA about supportive
18 psychotherapy?
19         **MS. HARRIS:**  Object to the form.
20         **THE WITNESS:**  Yes.
21         **BY MR. FOWLER:**
22    Q.   Did you rely upon any other definitions from the
23 American -- APA?
24    A.   No.
25    Q.   Why did you rely upon that opinion or that definition?

1          **MS. HARRIS:**  Object to the form.

2          **THE WITNESS:**  Dr. Corvin indicated that he did not feel

3     education was part of psychotherapy.  And so when I look up

4     the definition of supportive psychotherapy, it includes the

5     word "reeducation," "reassurance," all those things.  So

6     that's why I used that.

7          **BY MR. FOWLER:**

8     Q.   So you look this up after you saw his report and his

9  deposition?

10         **MS. HARRIS:**  Object to the form.

11         **THE WITNESS:**  Not his deposition.

12         **BY MR. FOWLER:**

13    Q.   So --

14    A.   After I saw his expert report.

15    Q.   Okay.  So at the point in time he provided his expert

16  report and he did his deposition.

17         **MS. HARRIS:**  Object to the form.

18         **THE WITNESS:**  Prior to my --

19         **BY MR. FOWLER:**

20    Q.   Okay.

21    A.   -- report.

22    Q.   And you believe this definition goes to whether or not

23  the educational component is psychodynamic and qualifies for a

24  90833 psychotherapy claim.

25         **MS. HARRIS:**  Object to the form.

1          **BY MR. FOWLER:**

2      Q.   Is that a fair statement?

3          **MS. HARRIS:**  Object to the form.

4          **THE WITNESS:**  I believe this shows education can be a

5      component of supportive --

6          **BY MR. FOWLER:**

7      Q.   Okay.

8      A.   -- psychotherapy.

9      Q.   So education can be a component.

10     A.   Can be, yes.

11     Q.   How do you know whether it is or is not?

12         **MS. HARRIS:**  Object to the form.

13         **THE WITNESS:**  That's something you'd have to ask the

14     therapist who's in the room with the patient.

15         **BY MR. FOWLER:**

16     Q.   Can you ask a -- an expert that knows about

17  psychotherapy and what's required for psychotherapy?

18         **MS. HARRIS:**  Object to the form.

19         **THE WITNESS:**  I think because, as he stated, everything

20     is very, very subjective that it would rely on the patient

21     and the provider in the room and what that education was

22     actually going to.

23         **BY MR. FOWLER:**

24     Q.   So that can't be questioned.  What the provider decides

25  happened --

1      A.    The providers could question each other, but I don't

2  think that one person can make that determination without being

3  in the room.

4      Q.    So someone can't come after the fact and decide whether

5  or not that, in fact, is psychodynamic and qualifies for a 90833

6  psychotherapy code.

7          **MS. HARRIS:**  Object to the form.

8          **THE WITNESS:**  Not without talking to the physician who

9      was in the room.

10         **BY MR. FOWLER:**

11     Q.    So you have to talk to the physician in the room before

12  you can know whether or not it's a 90833 psychotherapy code that

13  qualifies.

14         **MS. HARRIS:**  Object to the form.

15         **THE WITNESS:**  Based on the nitpicking that you're

16     getting at with education -- you want to know if education

17     is supportive.

18         **BY MR. FOWLER:**

19     Q.    Uh-huh (yes).

20     A.    And I think it's different in different situations.

21  And so if you are going to be the one to deny a claim based on

22  that, having not been in the room, I don't think that's

23  appropriate.

24     Q.    What's the purpose of progress notes?

25     A.    Depends on who you ask.

1      Q.   For billing purposes, what's the purpose for progress

2  notes?

3      A.   To document and support the service that was provided.

4      Q.   Have you heard that if it wasn't documented, it wasn't

5  done?

6      A.   I refuse to acknowledge that statement.

7      Q.   Okay.  Have you heard that statement?

8      A.   I have.

9      Q.   Okay.

10      A.   It's very offensive to providers.

11      Q.   Do you know what that means?

12      A.   I do.

13      Q.   What does it mean?

14      A.   It's you believe that if it's not documented, then it's

15  not done.

16      Q.   Uh-huh (yes).

17      A.   And I think that's very offensive to providers.  If

18  it's not documented, we might have to look and see if we can bill

19  it --

20      Q.   Okay.

21      A.   -- but it's not for me to question whether it was done.

22  I think that's entirely offensive to the provider.

23      Q.   Can it be billed to Medicare if it's not properly

24  documented?

25           **MS. HARRIS:**  Object to the form.

1          **THE WITNESS:**  If it does not meet the documentation

2      requirements that are set forth in the governing bodies that

3      dictate the documentation requirements, then correct.

4          **BY MR. FOWLER:**

5      Q.    Okay.  Does Medicare or any reviewer go and talk to the

6   individual provider about whether what they did qualifies for a

7   90833 psychotherapy treatment?

8      A.    Often.

9      Q.    Do they?

10      A.    Often.

11      Q.    So they go directly to the provider to talk about a

12   specific claim to see whether or not it qualifies?

13      A.    If they are in any sort of debate over that, if there

14   is a question, then they will get to a point where they are in an

15   appeal level that they will have to speak to someone at CMS.

16      Q.    So Medicare goes and speaks with the specific providers

17   about whether something they claimed in the progress notes is

18   qualified or not.  They talk directly with them to determine

19   whether or not payment should be made.

20          **MS. HARRIS:**  Object to the form.

21          **THE WITNESS:**  Yes.

22          **BY MR. FOWLER:**

23      Q.    When do you believe that has happened?

24      A.    I've witnessed it happen at several different levels of

25   appeal.

1    A.    No.

2    Q.    So you've not been called upon by a provider doing your

3    audit function to testify as to facts in a case?

4    A.    No.

5    Q.    And that includes in your individual capacity.  I'm

6    asking mainly about healthcare, what you've done here.  But

7    you've never testified in court at any time for personal matters

8    or anything else.

9    A.    (No audible response.)

10    Q.    Okay.

11        **THE REPORTER:**  I'm sorry.  You shook your head.  Was

12        that a no?

13        **THE WITNESS:**  I'm sorry.  That was a no.

14        **BY MR. FOWLER:**

15    Q.    Okay.  And you've submitted one expert report, which

16    you talked about earlier, that did not go to deposition, but no

17    other expert reports other than that.

18    A.    Correct.

19    Q.    But you have been lead auditor in about a hundred

20    projects.  Tell me about those various projects where you were

21    lead auditor, just the overall -- you know, overview of what

22    those were.

23    A.    They're all healthcare related, mostly government

24    payors.  We get called in by clients to do a variety of things

25    related to their claims documentation, verifying that it's

 1    compliant, different specialties, different provider types.

 2            I primarily work with professional fee services, which

 3    are the provider services, so anything that would go to Part B.

 4    I don't work with facility claims or really Medicare Advantage.

 5            Some of them are -- we work as an independent review

 6    organization for people who are under a CIA or an IA.  We help

 7    people do voluntary refunds if they need to, self-disclosure

 8    protocol.  So I like to say that I'm their subject matter expert

 9    to prevent needing an expert witness.

10        Q.   Because if you're giving them good guidance and they

11    take it, they'll never be in a situation where they may have

12    fraud allegations against them.

13            **MS. HARRIS:**  Object to the form.

14            **BY MR. FOWLER:**

15        Q.   Is that accurate?

16        A.   I like to think of it as being that expert for them

17    so -- so that they don't ever have to be in this situation.

18        Q.   And you indicated Part B.  Part B would be

19    non-hospital --

20        A.   Non-hospital services.

21        Q.   -- and this is a Part B -- MindPath is a Part B --

22        A.   Uh-huh (yes).

23        Q.   -- provider.

24            Of those hundred or so audits, how many of those have

25    involved behavioral health?

1    A.    So I think I indicated ten -- approximately ten

2    percent.

3    Q.    Okay.  Of that ten percent, have any of them involved

4    billing for the 90833 psychotherapy code?

5    A.    Yes.

6    Q.    How many?

7    A.    It's hard to say, because all of these -- when I was

8    asked to do this, I had to go back through our client list in our

9    billing system to figure out the number of claims.

10         And, actually, all of the ones that were behavioral

11   health have been archived, so I don't have access to their

12   medical records or files or anything like that.  So I can't tell

13   you exactly how many.  In the mental health space, it's a pretty

14   common code, but I -- I can't say how many exactly.

15   Q.    Okay.  And I'm not going to ask you specifics about any

16   of those audits --

17   A.    Yeah.

18   Q.    -- you did, but if there's ten percent out of a

19   hundred, that means there are ten that were behavioral health

20   related, correct?

21   A.    Uh-huh (yes).

22   Q.    And so of those ten, do you know how many of them you

23   reviewed as an auditor to determine whether or not the 90833

24   codes were appropriate?

25   A.    Again, I can't tell you specifically how many had 90833

**CONFIDENTIAL**

1    involved.

2         Q.    Okay.  But it would be ten or less?

3         A.    It would be ten or less.

4         Q.    Were any of those reviews that you did similar to the

5    issues that you had to review in this case for MindPath?

6         A.    Everything related to 90833 would be similar.  It's an

7    add-on code to an E&M, so the guidance rules are -- are similar.

8    So --

9         Q.    For these up to ten that you did, do you know what time

10   frame, just a span of years?

11        A.    I've been here for nine years, so it would be somewhere

12   between the last nine years.

13        Q.    Do you know if you did any of them for the -- that

14   related to the 2018, '19 and '20 time years?

15        A.    I don't know specifically.

16        Q.    Okay.  Do you know any changes regarding 90833 billing

17   and what documentation was for 90833 billing in the '18, '19 and

18   '20 time frame?

19        A.    There were no changes in '18, '19 and '20.

20        Q.    Okay.

21        A.    Changes for that code came out in 2013.

22        Q.    Okay.  What about E&M codes related -- of course, E&M

23   codes are not just behavioral health but also other areas

24   of -- of medicine.  But were there changes in 2018, '19 and '20

25   regarding E&M codes?

1   based on knowledge, skill, experience, training or education that

2   demonstrates your specialized knowledge will help the trier of

3   fact determine a fact in issue in the case -- in this case.

4           What is your specialized knowledge about -- knowledge,

5   skill, experience, training or education that you're bringing

6   forward to give opinions on?

7           **MS. HARRIS:**  Object to the form.

8           **THE WITNESS:**  I am certified with several different

9       organizations related to coding, auditing, medical billing,

10      medical coding, medical auditing related to Part B claims

11      sent to Medicare.

12          **BY MR. FOWLER:**

13  Q.    Okay.  So is it fair to say that you're a professional

14  coder regarding Part B claims?

15          **MS. HARRIS:**  Object to the form.

16          **THE WITNESS:**  I am a professional coder and auditor.

17          **BY MR. FOWLER:**

18  Q.    Okay.  What's the difference between being a

19  professional coder and a auditor?

20  A.    An auditor goes quite a bit deeper into the records

21  than a coder might.  Typically, coders are production based,

22  where they're just trying to get codes out the door, claims out

23  the door, where an auditor will have the ability to look to the

24  record to really see documentation guidelines are being met.

25  Q.    And this may be obvious, but what is the source of your

 1    specialized knowledge?  Just set that out for me briefly, if you

 2    would.

 3              **MS. HARRIS:**  Object to the form.

 4              **THE WITNESS:**  The source are several different

 5         organizations.  Do you want them all?

 6              **BY MR. FOWLER:**

 7         Q.    I'll -- I'll get into those in just a minute, but --

 8         A.    Okay.

 9         Q.    But is your expertise based upon your education,

10    your --

11         A.    It's based on my education, plus my experience.

12         Q.    Okay.  Do you have any expertise specifically about

13    psychotherapy modalities?

14              **MS. HARRIS:**  Object to the form.

15              **THE WITNESS:**  They are part of my scope of work that I

16         do.

17              **BY MR. FOWLER:**

18         Q.    What knowledge, skill, experience, training or

19    education do you have about psychotherapy modalities?

20              **MS. HARRIS:**  Object to the form.

21              **THE WITNESS:**  I mean, modalities are part of the code.

22         It's all part of what some MACs require as far as

23         documentation goes.  So having reviewed that extensively, I

24         think I have a pretty good grasp on -- on that.

25              **BY MR. FOWLER:**

1    Q.   And we'll go into your education in just a moment, but

2    you don't have any medical training, do you?

3         **MS. HARRIS:**  Object to the form.

4         **THE WITNESS:**  No.

5         **BY MR. FOWLER:**

6    Q.   Okay.  What is your knowledge, skill, experience,

7    training or education regarding psychodynamic therapy?

8    A.   Other than how it gets coded, I would say none.

9    Q.   Do you know what psychodynamic therapy is?

10   A.   Psychodynamic therapy is more altering the patient's

11   kind of mindset, actions, beliefs to get them on a healthier

12   path.

13   Q.   Okay.  As an auditor or coder, what are you looking for

14   in the progress notes to demonstrate or document the

15   psychodynamic therapy that may or may not have been done?

16        **MS. HARRIS:**  Object to the form.

17        **THE WITNESS:**  So it will depend on who's the paying

18        body.  There are some payors that -- MACs that require very

19        specific bullet points that have to be documented.

20            There are some that don't.  And in the times where they

21        don't, we will objectively read the record and we can

22        determine if a patient has a psychiatric diagnosis and had a

23        psychiatric treatment performed, and that is documented with

24        the time and the distinction between the E&M visit and

25        psychotherapy.  If we're doing 90833, then that is what we

1          will -- that's the criteria we will use.

2                    **BY MR. FOWLER:**

3          Q.    What is your knowledge, skill, experience, training or

4    education regarding determining what is reasonable and necessary

5    for billing psychiatric services or psychotherapy?

6                    **MS. HARRIS:**  Object to the form.

7                    **THE WITNESS:**  Reasonable and necessary is -- is,

8               obviously, a education, experience-type thing.  I can

9               objectively from a note look to see, again, that the patient

10              has psychiatric issues, that they are being presented with

11              treatment options and the treatment related to psychiatry or

12              psychology.  That would be my experience.

13                   **BY MR. FOWLER:**

14         Q.    And that was on-the-job experience.

15         A.    On-the-job experience.

16         Q.    Okay.  So you don't have education about that.  You

17    haven't trained in psychiatry or medical --

18         A.    No training --

19         Q.    -- training --

20         A.    -- in psychiatry.

21         Q.    So what you know is from what you learned on the job as

22    a coder and auditor.

23         A.    Yes.

24         Q.    Okay.  And we're going to get into certifications.

25    You've had some of that.  But you haven't had any formal training

1   regarding medical -- what is reasonable and necessary for -- in

2   terms of psychotherapy, correct?

3           **MS. HARRIS:**  Object to the form.

4           **THE WITNESS:**  I have not.

5           **BY MR. FOWLER:**

6       Q.   Okay.  Let's walk through your educational background,

7   and thank you for your patience as I do this.  And we'll go to

8   Exhibit C of your expert report, and I'll do it in reverse order,

9   if you don't mind.  We'll go to Page 3.

10          Your education was at the University of Dayton in

11  Dayton, Ohio.  You graduated in 2000.  What is the bachelor of

12  general studies?

13      A.   That is undecided for four years.

14      Q.   Okay.  So you didn't declare a major.

15      A.   I declared several that didn't stick.  And so when

16  I -- I actually took a break from school.  When I went back, I

17  was already in the coding world, and so this is the major that

18  allowed me to complete with several different types of studies.

19      Q.   So the University of Dayton -- that means that you

20  graduate without a major.  Is that accurate?

21      A.   No.  A bachelor of general studies is the major.

22      Q.   That is the major.  Okay.  Thank you.

23      A.   It is a degree program.

24      Q.   Okay.  Did you take any medically related courses?

25      A.   I did.

1    certified coder, were you able to make a -- form an opinion about

2    whether the therapeutic modality was inconsistent with the

3    documented service?

4        A.    Well, I think that's the problem, is he did not give

5    any -- any basis for what inconsistent meant.

6        Q.    Okay.  If he had, as a professional coder and auditor,

7    how would you have been able to evaluate what his opinions were

8    as a psychiatrist?

9            **MS. HARRIS:**  Object to the form.

10           **THE WITNESS:**  As in any audit, there should be audit

11           criteria.  So if his criteria was they need to say A, B, C

12           for it to be inconsistent, then I could look to see if A, B,

13           C was there.  And if it wasn't, then we could have both

14           determined that was inconsistent.

15           **BY MR. FOWLER:**

16       Q.    Okay.  So you don't believe that requires any medical

17    training to make that evaluation.

18       A.    I don't know what inconsistent means.

19       Q.    Okay.

20       A.    So I don't know if that requires medical training or

21    not.

22       Q.    You end that section with "The form of psychotherapy

23    used at any visit is largely a clinical judgment of the physician

24    based on the relationship with a patient."

25           Can you explain what that means?

1      A.    That was something that Linda quoted.  I'm not sure

2  where she quoted it from, but I think when we were trying to

3  interpret what inconsistent meant that really it should be left

4  up to the provider who has the relationship with the patient to

5  determine what is consistent or what is -- what's not.

6      Q.    So that's a direct quote from Ms. Fahey.

7      A.    Yes.

8      Q.    Do you know her source for that?

9      A.    I just said I don't.

10     Q.    Okay.  And it's largely a clinical judgment.  Are you

11 testifying that it cannot be evaluated by another medical

12 professional?

13         **MS. HARRIS:**  Object to the form.

14         **THE WITNESS:**  I'm sorry.  What?

15         **BY MR. FOWLER:**

16     Q.    The -- the quote Ms. Fahey gave you is "The form of

17 psychotherapy used at any visit is largely a clinical judgment of

18 the physician based on the relationship with the patient."

19         My question is whether another medical professional can

20 look at those same documentation -- same documentation provided

21 and determine whether or not the modality is inconsistent with

22 the document service.

23         **MS. HARRIS:**  Object to the form.

24         **THE WITNESS:**  Yeah, that would be a -- a question for

25     two physicians to work out.

**CONFIDENTIAL**

1              **BY MR. FOWLER:**

2         Q.   So that's beyond your expertise.

3              **MS. HARRIS:**  Object to the form.

4              **THE WITNESS:**  Clinically, this is not something I would

5         opine on.

6              **BY MR. FOWLER:**

7         Q.   Now, you quoted Ms. Fahey there.  Did she make any

8    other important statements to you?

9         A.   No.

10        Q.   Okay.  So is that the gist of what she said to you?

11             **MS. HARRIS:**  Object to the form.

12             **BY MR. FOWLER:**

13        Q.   I mean, if you talked 30 minutes, it's surprising you

14   have one quote from her.

15             **MS. HARRIS:**  Object to the form.

16             **THE WITNESS:**  Well, we looked at cases.  We looked at

17        the medical records.

18             **BY MR. FOWLER:**

19        Q.   And she provided nothing in writing.  Did you take any

20   notes of your communications with Ms. Fahey?

21             **MS. HARRIS:**  Object to the form.

22             **THE WITNESS:**  No.

23             **BY MR. FOWLER:**

24        Q.   Okay.  And I believe you stated that she did not affect

25   your opinions in any way as far as --

1      A.    No.

2      Q.    -- your review of this.

3            Okay.  So you talked to her for 30 minutes.  You quote

4    her here.  But she didn't affect your opinions regarding whether

5    therapeutic modalities were inconsistent with documented service.

6            **MS. HARRIS:**  Object to the form.

7            **THE WITNESS:**  She didn't change my opinion.

8            **MS. HARRIS:**  Asked and answered.

9            **BY MR. FOWLER:**

10     Q.    Okay.  She did not change your opinions.  Did she add

11   to it or -- or --

12     A.    She validated my opinion.

13     Q.    She validated.  Okay.  So you had your opinion formed

14   before you spoke with her.

15     A.    I had a way that I would handle these claims before I

16   spoke to her.

17     Q.    Okay.  And she simply validated the opinion you already

18   had.

19     A.    She confirmed that my thinking was correct.

20     Q.    Okay.  Let's go to number two.  "Dr. Corvin noted that

21   12 samples were lacking documentation of a modality, slash,

22   intervention, comma, goals and/or a response to treatment.  The

23   lack of modality, comma, goals and/or responsive treatment in

24   each progress is not substantiated as a reason for a refund based

25   on the specific absence of documentation requirements as defined

1    above.  Modality, slash, intervention, goals -- interventions,

2    comma, goals and/or a response to treatment are not elements that

3    are required by CMS or Palmetto during the audit period."

4            What's the basis for that opinion?

5        A.   That CMS, Palmetto did not have any LCD or NCD or any

6    documentation guidelines -- nothing that said those things had to

7    be documented in every note.

8        Q.   Okay.  And without NCDs or LCDs, you fall back on

9    what's reasonable and necessary in CPT notes or CPT guidance,

10   correct?

11       A.   Yes.

12       Q.   Okay.  And you and Dr. Corvin have a difference of

13   opinion about what is reasonable and necessary and what the CPT

14   guidance requires, correct?

15           **MS. HARRIS:**  Object to the form.

16           **THE WITNESS:**  I believe we do.

17           **BY MR. FOWLER:**

18       Q.   Okay.  The fourth line, you make a reference as a

19   reason for a refund.  Are most of your audits in the context of

20   refunds to payors?

21           **MS. HARRIS:**  Object to the form.

22           **THE WITNESS:**  They're -- they're a mix, but this

23       clearly -- your request was for refunds, so that, to me, is

24       the basis of this audit.

25           **BY MR. FOWLER:**

1      Q.   What do you understand to be the distinction that Dr.

2  Corvin was making between psychotherapeutic intervention and

3  educational services?

4           **MS. HARRIS:**  Object to the form.

5           **THE WITNESS:**  That was also part of the problem, is I

6       couldn't figure out what -- where his line was.  He didn't

7       provide any criteria or support for that.  So, again, I

8       could not test to the same method he was.

9           **BY MR. FOWLER:**

10     Q.   Do you believe psychiatrists would know the distinction

11  between psychotherapeutic intervention and educational services?

12          **MS. HARRIS:**  Object to the form.

13          **THE WITNESS:**  I think they -- they each might have

14      their own definition of that.

15          **BY MR. FOWLER:**

16     Q.   Okay.  Do you think there's a standard understanding

17  what psychotherapeutic intervention is?

18          **MS. HARRIS:**  Object to the form.

19          **THE WITNESS:**  I do not believe so.

20          **BY MR. FOWLER:**

21     Q.   Okay.  But you didn't look that up, did you?

22          **MS. HARRIS:**  Object to the form.

23          **THE WITNESS:**  Did not.

24          **BY MR. FOWLER:**

25     Q.   Okay.  How did you determine what was educational

1  services that was only an E&M service and that which rose to the

2  level of psychotherapy?  How did you draw that line in your

3  review?

4        A.    In my review, again, I based on CPT guidelines.

5  Anything that would have fell under the counseling and the

6  coordinating of care section, which is clearly identified in

7  their notes, to me, would be educational.  Anything that fell

8  under the add-on therapy note, to me, is part of their

9  therapeutic service.

10        Q.    Okay.  How does the supportive therapy definition that

11  you insert here help you in making that distinction between what

12  is psychotherapeutic and that which is merely E&M educational?

13              **MS. HARRIS:**  Object to the form.

14              **THE WITNESS:**  The whole definition here is -- its aim

15        is to relieve emotional distress and symptoms without

16        probing into the sources of conflicts or attempting to alter

17        basic personality structure.

18              It emphasizes reassurance, re-education, advice,

19        persuasion, remotivation, encouragement of desirable

20        behavior.  It's frequently applied to individuals with

21        relatively minor or limited problems, as well as to fragile

22        or hospitalized patients as a means of maintaining morale

23        and preventing deterioration.

24              So if the education fell under any of that, to me, then

25        I would consider that part of supportive psychotherapy.

1          **BY MR. FOWLER:**

2      Q.    Is supportive psychotherapy a type of modality?

3          **MS. HARRIS:**  Object to the form.

4          **THE WITNESS:**  I believe it has been identified as a

5      modality previously.  Again, there are no defined modalities

6      within the CPT code definition any longer.

7          **BY MR. FOWLER:**

8      Q.    Is that distinct or different than CBT?

9      A.    Is what --

10         **MS. HARRIS:**  Object to the form.

11         **BY MR. FOWLER:**

12     Q.    Supportive psychotherapy.

13     A.    Supportive psychotherapy is not in the CPT book,

14  apparently.

15     Q.    No.  CBT.

16     A.    Oh, CBT, cognitive --

17     Q.    Right.

18         **MS. HARRIS:**  Object to the form.

19         **THE WITNESS:**  -- behavioral therapy.

20         **BY MR. FOWLER:**

21     Q.    Correct.

22     A.    There -- to me, those are different things,  yes.

23     Q.    Okay.  So supportive psychotherapy is different than

24  CBT psychotherapy.

25     A.    CBT is -- yes -- cognitive behavioral therapy.

1    Q.    And that's different than relaxation psychotherapy.

2    A.    Yes.

3    Q.    Is that different than maintenance psychotherapy?

4    A.    To my understanding, yes.

5    Q.    Okay.  So for one of these types, supportive

6    psychotherapy, it includes re-education as part of the

7    definition, according to the APA.

8         Do you know if re-education or education is included in

9    any of the other modalities that are described?

10        **MS. HARRIS:**  Object to the form.

11        **THE WITNESS:**  I don't know.

12        **BY MR. FOWLER:**

13    Q.    Okay.  I am genuinely trying to figure out why you used

14    the supportive psychotherapy definition.  So can you explain why

15    you pull this in to address Dr. Corvin's view that some of the

16    psychotherapy was only educational?

17    A.    Well, because I think that's exactly why, because he's

18    saying that some of it is only educational -- only educational,

19    which -- which minimizes it.  And, to me, supportive

20    psychotherapy is probably what people would consider the -- the

21    minimal therapy.

22        You know, we're not actively trying to rewire your

23    brain.  We're trying to be there for you.  We're trying to

24    support you.  And so it just -- naturally, education would fall,

25    to me, under something like supportive psychotherapy, which is

1  why I looked in the definition.  And, sure enough, it says

2  education.

3      Q.   If it was sleep hygiene or diet education or something

4  specifically like that and it was in a CBT context, why would

5  that be 90833 psychotherapy, that time spent with diet or sleep

6  hygiene, instead of --

7      A.   You're saying that --

8      Q.   -- E&M?

9      A.   -- diet and sleep hygiene are under CBT.  That's very

10  much therapeutic, cognitive behavioral therapy.

11      Q.   Okay.

12      A.   So I wouldn't question -- if they said they were doing

13  CBT and they were talking about things like that,

14  that's -- that's a very specific type of therapy.

15      Q.   Okay.

16      A.   It also -- because, in my opinion, they don't have to

17  document anything, whether it falls under CBT or supportive or

18  psychotherapy down the street, it's still psychotherapy.  It

19  doesn't matter the modality if the goal is reasonable and

20  necessary to reasonably treat a psychiatric diagnosis with a

21  psychiatric treatment.

22      Q.   All right.  But what I'm struggling with is the

23  distinction between hygiene or diet -- sleep hygiene and diet,

24  that type of thing, whether that falls within E&M counseling

25  generally or whether that is a unique psychotherapy session

1   that's separate and distinct.

2          A.    I think it can be both based on the patient.  I think

3   if I just go to my doctor and say, "I don't -- I'm really tired.

4   I'm having a hard time sleeping," and he says, "You should

5   probably turn the clock off or put your phone away," okay.

6              If I have a history of chronic insomnia that I cannot

7   have sleep and I am at my psychiatrist to get medication for that

8   sleep, and then he wants to talk to me about, you know, ways that

9   I can help go to sleep and ways that I can do other things,

10  that's treating my insomnia.  That's treating my psychiatric

11  condition that I have, and that, to me, is part of supportive

12  psychotherapy.

13         Q.    What specialized knowledge, education or training do

14  you have regarding what qualifies as 90833 psychotherapy versus

15  merely educational?

16             **MS. HARRIS:**  Object to the form.

17             **THE WITNESS:**  Again, experience doing this for however

18         long we've been doing it, reading the records, knowing what

19         gets coded where and being able to read the CPT book.

20             **BY MR. FOWLER:**

21         Q.    And you've had approximately ten audits that you've

22  done regarding 90833 psychotherapy.  Am I remembering that

23  correctly?

24             **MS. HARRIS:**  Object to the form and out of context.

25             **THE WITNESS:**  (No audible response.)

**CONFIDENTIAL**

 1          **BY MR. FOWLER:**

 2      Q.   And you've had no education or medical training

 3  regarding what should qualify as a 90833 versus what is E&M

 4  education, correct?

 5          **MS. HARRIS:**  Object to the form.

 6          **THE WITNESS:**  I've had no medical training.

 7          **BY MR. FOWLER:**

 8      Q.   Okay.  Let's go to number four.  You state, "Dr. Corvin

 9  considered seven E&M visits as not supported due to lack of

10  documentation to support the visit.  I believe all E&M visits are

11  supported as they are clearly documented.  It raises the question

12  whether Dr. Corvin reviewed all the documentation, including the

13  E&M visits."

14          And that -- is that a summary of your opinion regarding

15  why all the E&Ms should be allowed that Dr. Corvin questioned?

16          **MS. HARRIS:**  Object to the form.

17          **THE WITNESS:**  Yeah, he didn't give any reason for not

18      allowing -- he only gave reason in one of the cases why he

19      didn't allow it.  He simply said it was not supported.

20          But I -- again, that was very hard to understand what

21      he was going with, because they were all pretty clearly

22      documented.  There was only one where he gave a reason.

23          **BY MR. FOWLER:**

24      Q.   Do you agree that the CPT requires that the E&M codes

25  be reasonable and necessary?

STATE OF NORTH CAROLINA

COUNTY OF FRANKLIN


<u>CERTIFICATE</u>

I, PATRICIA C. ELLIOTT, VERBATIM REPORTER AND NOTARY PUBLIC, DO HEREBY CERTIFY THAT THE FOREGOING WITNESS WAS DULY SWORN AND THAT THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPTION OF MY VOICE WRITER NOTES AND IS A TRUE RECORD OF THE TESTIMONY GIVEN BY THE FOREGOING WITNESS.

I FURTHER CERTIFY THAT I AM NOT EMPLOYED BY OR RELATED TO ANY PARTY TO THIS ACTION BY BLOOD OR MARRIAGE AND THAT I AM IN NO WAY INTERESTED IN THE OUTCOME OF THIS MATTER.

IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND THIS 7th DAY OF JANUARY, 2025.


/S/ *Patricia C. Elliott*

_____
PATRICIA C. ELLIOTT
VERBATIM REPORTER
NOTARY PUBLIC