IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:19-CV-512-BO

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel., ANJELICA BROWN,<br><br>   Plaintiff,<br><br>v.<br><br>MINDPATH CARE CENTERS, NORTH CAROLINA, PLLC; JEFF WILLIAMS; ABIGAIL SHERIFF, and SARAH WILLIAMS,<br><br>   Defendants. | **DEFENDANTS' MEMORANDUM IN OPPOSITION TO GOVERNMENT'S MOTION TO STRIKE OR LIMIT TESTIMONY OF DEFENSE EXPERTS NAYOSKI AND TRUITT** |

Defendants MindPath Care Centers, North Carolina, PLLC ("MindPath"), Jeff Williams, Abigail Sheriff and Sarah Williams, respectfully submit this memorandum in opposition to the motion by Plaintiff United States of America (the "Government") to strike or limit the testimony of defense experts Jodi Nayoski, CPC, CCS-P, CPC-I, CDIP, CHC, CHIAP, and Bruce Truitt, MA, MA, MPAFF. The Government's motion should be denied.

**NATURE OF THE CASE**

In this case under the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, the Government has filed a Complaint in Intervention (DE 40) contending that from 2018 through 2020, Defendants improperly billed Medicare for psychotherapy using add-on Current Procedural Terminology ("CPT") code 90833 without adequately documenting (1) at least 16 minutes devoted to psychotherapy services and/or (2) that the psychotherapy treatment time was separate and distinct from the evaluation and management ("E/M") service time. (DE 40 at ¶¶ 2-4.) Critically, the Government does not allege that the services were medically unnecessary, only that they were

improperly documented. Specifically, in three of its four FCA claims the Government alleges Defendants submitted claims for psychotherapy that were false because:

- They "were billed *without required documentation* of the treatment time and otherwise did not meet billing requirements for Psychotherapy treatment, [and] because the claims were not supported by adequate documentation";
- "Medicare does not allow payment for 90833 claims *without documentation* of the requisite time and Psychotherapy treatment";
- Treatments "were billed *without documentation* of the time and without satisfying other billing requirements for Psychotherapy treatment."

(DE 40 at ¶¶ 193, 197, 200 (emphasis added).) Despite the Government's attempts in its Motion to confuse coding with medical necessity, none of the Government's FCA claims uses the phrase "medical necessity" or any similar phrase.

**FACTS PERTINENT TO THIS OPPOSITION**

The Government seeks to present testimony from two purported experts, George Corvin, M.D., and Robert D'Zio, MIS.[1]

**Dr. Corvin's Opinions and Ms. Nayoski's Rebuttal Opinions**

The Government has designated Dr. Corvin as the "expert review[er]" of 60 sample claims where the add-on CPT code 90833 for psychotherapy services was billed on the same day as a code for E/M services. Dr. Corvin opined that in 30[2] of the 60 claims, the documentation did not support application of the 90833 CPT code. (DE 68-1 (Expert Report of George P. Corvin, M.D.

---

[1] Defendants have moved to exclude the testimony of Dr. Corvin and Mr. D'Zio. (DE 67, 68 (Corvin motion and memorandum in support); DE 69, 72 (D'Zio motion and memorandum in support).)

[2] Dr. Corvin rejected the claim for patient MS, services provided 11/6/2019, for failure to document time spent in psychotherapy. (DE 68-1 at 8 (Corvin Report at 8).) Upon learning that the documentation actually existed but erroneously failed to be included in the printout produced in discovery, Dr. Corvin agreed that the claim was properly submitted. (DE 68-2 at 80-82 (Corvin Dep. 210:13-212:12).)

("Corvin Report")) at 4).) Dr. Corvin identified one or more purported documentation errors for each of the 30 claims. As to seven of the 30 claims, Dr. Corvin opined that the 90833 CPT code was improper because the documentation did not support the predicate E/M code. In those seven instances, Dr. Corvin did not consider the adequacy of the documentation supporting the 90833 CPT code. Dr. Corvin is not a Certified Professional Coder, has never received formal training in coding, and has no working or clinical experience in CPT coding or auditing CPT codes and claims. (DE 68 at 3.) Dr. Corvin's review of the sample claims was based on his own clinical judgment and not on any Medicare or CPT coding requirements detailed in a manual, official guidelines, or local or national coverage determinations. (DE 68 at 4-5.)

Ms. Nayoski is a "professional coder and auditor" who is "certified with several different professional organizations related to coding, auditing, medical billing, medical coding, medical auditing related to Part B claims sent to Medicare." (**Ex. 1** (Deposition of Jodi Lynne Nayoski ("Nayoski Dep.") 73:8-16).) As an auditor, Ms. Nayoski can go "quite a bit deeper into the records than a coder might" and has "the ability to look to the record to really see [whether] documentation guidelines are being met." (Nayoski Dep. 73:20-24.) Ms. Nayoski reviewed the 30 claims rejected by Dr. Corvin and determined that 18 of the 30 were properly documented and should not have been rejected. (DE 72-5 (Expert Report of Jodi Lynne Nayoski ("Nayoski Report")) at 6-7.)

**Mr. D'Zio's Opinions and Mr. Truitt's Rebuttal Opinions**

The Government has proffered Mr. D'Zio as a "non-retained expert" who will testify regarding the statistical sampling and extrapolation process underlying the Government's damages claim. Mr. D'Zio did not perform the sampling and extrapolation but merely parroted the conclusions from work done by someone else. (DE 71 at 3-4.) According to Mr. D'Zio's recitation of those conclusions, "[t]he Point Estimate for damage extrapolation purposes is $438,012, with a

lower bound of a one-sided 90% confidence interval of $349,844, a [26.99]% error rate (based upon calculations of dollars overpaid in the Sample), and an estimated precision of 20%." (DE 71 at 3 (internal quotation marks omitted).)

Mr. Truitt, who has decades of experience in performing statistical analyses in the healthcare field, identified thirteen distinct errors in the statistical sampling and extrapolation presented by Mr. D'Zio. (DE 72-7 (Expert Report of Bruce E. Truitt ("Truitt Report")) at 3-13; **Ex. 2** (Deposition of Bruce E. Truitt ("Truitt Dep.")) 138:21-142:6.)

## LEGAL STANDARD

Expert testimony is appropriate "if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. "The Supreme Court has made clear that it is the trial court's duty to play a gatekeeping function in deciding whether to admit expert testimony." *United States v. Crisp*, 324 F.3d 261, 265 (4th Cir. 2003) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). In performing this gatekeeping function, "the district court must decide whether the expert has 'sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case.'" *Belk, Inc. v. Meyer Corp.*, 679 F.3d 146, 162 (4th Cir. 2012) (quoting *Kumho Tire*, 526 U.S. at 156). In doing so, the court must "consider the proposed expert's full range of experience and training, not just [the expert's] professional qualifications." *Id.* (internal quotation marks omitted). Thus, an expert's qualifications are not judged solely by whether the expert has attained a particular degree or certification; "experience is an equally valuable teacher." *Artis v. Santos*, 95 F.4th 518, 526 (7th Cir. 2024). Nor is it relevant that an expert has never before been qualified; after all, "[e]very expert has a first time." *United States v. Garcia*, 752 F.3d 382, 391 (4th Cir. 2014); *see United*

States v. Young*, 916 F.3d 368, 380 (4th Cir. 2019) ("Even when an expert has never previously been qualified, it is the quality of the expert's qualifications that a district court must focus on." (internal quotation marks & emphasis omitted)).

## ARGUMENT

### I. Defendants' Rebuttal Experts Were Fully Disclosed

The Government contends that Defendants failed to provide complete and timely disclosures of Ms. Nayoski's and Mr. Truitt's expert opinions. These arguments are without merit. Ms. Nayoski's and Mr. Truitt's expert reports were timely produced to the Government and, at 11 and 13 pages respectively, contained fulsome statements of their opinions. In claiming otherwise, the Government ignores the substance of the reports and manufactures "nondisclosures" out of thin air. Defendants completely and timely satisfied their obligations under Rule 26(a)(2)(B), and the Government cannot show otherwise. In any event, the Government cannot show that it was prejudiced by any purported nondisclosure.

#### A. Legal Standard

To satisfy Rule 26(a)(2)(B), an expert report must "set forth the substance of the direct examination of the expert witness" and "disclose the data and other information considered by the expert." Fed. R. Civ. P. 26, advisory committee's note to 1993 amendment. "Furthermore, the report must provide the substantive rationale in detail with respect to the basis and reasons for the proffered opinions. It must explain factually why and how the witness has reached them." *Team 7, LLC v. Protective Sols., Inc.*, No. 5:08-cv-597-BO, 2010 WL 5348782, at *2 (E.D.N.C. Dec. 13, 2010) (internal quotation marks & alteration omitted). "If any information disclosed in the report is later found to be incomplete or inaccurate, the parties have a duty to supplement their disclosures to address the deficiency." *United States v. 685.76 Acres of Land, More or Less in*

*Bethel Twp.*, No. 2:07-cv-2-FL, 2008 WL 11429304, at *2 (E.D.N.C. Mar. 21, 2008) (citing *Golden Nugget, Inc. v. Chesapeake Bay Fishing Co.*, 93 F. A'ppx 530, 533 (4th Cir. 2003)). "[W]hether a late disclosure is prejudicial depends on whether the expert testimony was unexpected and left the other party without adequate opportunity to prepare for it." *Michelone v. Desmarais*, 25 F. App'x 155, 158 (4th Cir. 2002).

The cases the Government cites to support its position bear no resemblance to this case. (Mot. at 14 (citing *Gallagher v. Southern Source Packaging, LLC*, 568 F. Supp. 2d 624 (E.D.N.C. 2008), and *Western Plastics, Inc. v. DuBose Strapping, Inc.*, 334 F. Supp. 3d 744 (E.D.N.C. 2018)).) In both *Gallagher* and *Western Plastics*, the court struck supplemental reports submitted in conjunction with summary judgment (long after discovery had closed) that contained a new or materially changed opinion. *See Gallagher*, 568 F. Supp. 2d at 629, 631 (striking supplemental expert report that materially changed the amount of a lost-revenue setoff; supplemental report caused surprise that could only be remedied by "further delay and further discovery, including another deposition of" the expert); *Western Packaging*, 334 F. Supp. 3d at 754-55 (striking supplemental expert report containing a new opinion that was submitted "four months after discovery concluded and eleven months after expert reports were due," such that the other party "did not have an opportunity to conduct discovery or address the new expert opinion").

### B. Ms. Nayoski's Report and Her Opinions Were Properly Disclosed

In attempting to show that Ms. Nayoski's opinions were not fully disclosed, the Government resorts to misleading claims regarding her report and her deposition testimony. For example, the Government points to Ms. Nayoski's statement that "most" of her opinions are in her expert report. (Motion at 14.) But as she explained, since her role is to rebut Dr. Corvin's findings, her written report addresses only those claims where she disagrees with Dr. Corvin's conclusion

that the claim should be denied. (Nayoski Report at 8 ("Dr. Corvin and I agree on forty-two (42) complete (E/M and psychotherapy) encounters leaving a discrepancy on eighteen (18) encounters. I do not agree with his findings on seven (7) E/M services and twelve (12) psychotherapy services."); *id.* at 9-11 (explaining the reasons for her disagreement with Dr. Corvin as to the 12 findings on which she disagrees); Nayoski Dep. 175:25-176:1 ("I did not describe anything that Dr. Corvin and I agreed with.").) Ms. Nayoski also testified that where a matter was not discussed in Dr. Corvin's written report but came up in his deposition, her response would also not be included in her report since it was written before Dr. Corvin's deposition. (Nayoski Dep. 47:16-20.)

The Government's complaint that Ms. Nayoski "could not identify where the facts and data relied upon were provided to her in her expert report" (Motion at 14) is specious. As the Government knows perfectly well—and as Ms. Nayoski stated in her report and testified at her deposition—the "facts and data" underlying her opinion are the patient records related to the 60 sample claims reviewed by Dr. Corvin. (Nayoski Report at 6 ("I personally reviewed documentation derived from sixty (60) dates of service submitted to me."); Nayoski Dep. 36:4-39:11.)

### C. Mr. Truitt's Report and His Opinions Were Properly Disclosed

The Government likewise fails in attempting to demonstrate nondisclosure with respect to Mr. Truitt's expert opinions. The Government claims Mr. Truitt "considered his expert report an audit or executive summary." (Mot. at 22 (citing Truitt Dep. 87:5-22).) Mr. Truitt says nothing like this in the cited portion of his deposition. Mr. Truitt did use the phrase "executive summary" once in his deposition testimony, referring to one specific finding—not to his entire expert report. (Truitt Dep. 274:16-21.)

7

The Government's claim that it "had to seek 9 additional documents/data relied on by" Mr. Truitt is pure sophistry. The nine documents are:

1. An expert report from an unrelated case (Truitt Dep. 76:12-77:19, 80:16-81:6);

2. Privileged communications between Mr. Truitt and Ms. Nayoski (Truitt Dep. 99:15-21);

3. A pre-contract evaluation noting that Mr. Truitt "exceeded [CMS's] requirements for a statistician" (Truitt Dep. 123:4-24)

4. Documents showing that Mr. Truitt's "methods, curriculum techniques, and techniques" have been recognized by the Harvard School of Business (Truitt Dep. 128:25-129:13);

5. Documents showing that Mr. Truitt's "methods, curriculum techniques, and techniques" have been recognized by the National State Auditor's Association and National Association of State Auditors, Controllers, and Treasurers (Truitt Dep. 128:25-129:13);

6. A table referenced in a footnote in Mr. Truitt's expert report (Truitt Dep. 210:8-211:6);

7. Quantitative information received from Ms. Nayoski regarding the 12 disputed sample claims, which is reflected in the tables on pages 11-12 of Mr. Truitt's expert report (Truitt Dep. 262:17-263:11);

8. The Medicare Program Integrity Manual ("MPIM") provisions related to Mr. Truitt's opinion that the Government's expert "assert[ed] but did not achieve MPIM compliance" (Truitt Dep. 264:20-24); and

9. The specific source for a statement by the American Institute of Certified Public Accountants (Truitt Dep. 285:16-286:3).

As the above descriptions show, items 1 and 3-5 relate to Mr. Truitt's qualifications; they are not materials he would have relied on in forming his expert opinions in this case. The other items are simply background documents for information or data that is fully and clearly set forth in Mr. Truitt's expert report and discussed during his deposition.

**D. The Government Was Not Prejudiced by any Purported Nondisclosure**

For the reasons explained above, there has been no material nondisclosure as to either Ms. Nayoski or Mr. Truitt. Regardless, exclusion would be improper because the Government suffered

no prejudice whatsoever.

The Government claims Ms. Nayoski's supposed nondisclosure of (a) her opinions regarding claims where she and Dr. Corvin agreed and (b) the records she relied on "created harm, including making the deposition unproductive and incomplete." (Mot. at 16-17.) Tellingly, however, the Government fails to support this baseless contention with any specific facts and in fact there was nothing "unproductive [or] incomplete" about its deposition of Ms. Nayoski. The deposition went from 9:02 am to 4:13 pm, resulting in a transcript of nearly 300 pages. (Nayoski Dep. 1, 284.) During the course of the seven-hour deposition, the Government questioned Ms. Nayoski about every single one of the claims where she disagreed with Dr. Corvin. At no point did the Government claim it was unable to ask questions or receive answers due to any lack of disclosure.

As to the purported nondisclosures related to Mr. Truitt, the Government's Motion makes no attempt at all to demonstrate it suffered any resulting prejudice, nor did it ever indicate during Mr. Truitt's deposition that not having these documents hindered its ability to question Mr. Truitt. In fact, the Government deposed Mr. Truitt for *eight hours*, questioning him extensively about each of his opinions and receiving detailed explanations as to each one. It is clear, therefore, that the "additional documents" are immaterial to Mr. Truitt's expert opinions and their purported nondisclosure caused no prejudice whatsoever.

## II. Defendants' Experts Are Highly Qualified

The Government next contends that Ms. Nayoski and Mr. Truitt are not qualified to give expert testimony. Its argument as to Ms. Nayoski's qualifications depends upon grossly mischaracterizing its FCA claims as being about medical necessity, when in fact this a case about coding and documentation requirements. The Government's argument regarding Mr. Truitt's

9

Case 5:19-cv-00512-BO-RJ     Document 90     Filed 06/11/25     Page 9 of 19

qualification boils down to its contention that, despite Mr. Truitt's decades of experience performing statistical analyses and teaching these methodologies, he is not qualified because he does not have a degree in statistics. The Court should reject the Government's arguments regarding Ms. Nayoski's and Mr. Truitt's qualifications.

### A. Legal Standard

"[A] person may qualify to render expert testimony in any one of the five ways listed [in Rule 702]: knowledge, skill, experience, training, or education." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993). Exclusion for lack of qualifications is appropriate only when "the purported expert [has] *neither* satisfactory knowledge, skill, experience, training, *nor* education on the issue for which the opinion is proffered." *Id.* (internal quotation marks omitted; emphasis added). Thus, a specific degree or particular form of training are not mandatory prerequisites to expert testimony; experience alone can be a sufficient source of expertise. *Cf. Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F.Supp.2d 457, 458–59 (S.D.N.Y. 2007) (finding expert with substantial career survey experience to be qualified despite not having taken university-level courses in statistical sampling).

### B. Ms. Nayoski Is Highly Qualified to Testify Regarding Coding and Documentation

The Government argues that Ms. Nayoski is not qualified to offer expert testimony in rebuttal to Dr. Corvin because she lacks the medical training necessary to opine on the medical necessity of the claimed psychotherapy treatment. But the Government's allegation here is not that claims were false because treatment was medically unnecessary; the Government's allegation is that claims were false because the documentation did not support application of the 90833 CPT code. At least **35 times** in its Complaint, the Government uses phrases like "without required documentation," "failed to document," and "failed to maintain documents" to describe
10

Case 5:19-cv-00512-BO-RJ    Document 90    Filed 06/11/25    Page 10 of 19

Defendants' alleged misconduct.³ And, the Government's FCA causes of action unambiguously allege that Defendants violated the FCA by submitting claims for CPT code 90833 that were not adequately supported by documentation. The Government's first cause of action, for submission of a false claim in violation of the FCA, alleges:

> By virtue of the acts and described above, Defendants each knowingly (including reckless disregard and deliberate ignorance) presented or caused to be presented to the United States false or fraudulent Medicare claims for payment in violation of the False Claims Act (31 U.S.C. § 3729(a)(l)(A)), in that the services for which Government reimbursement was claimed were not eligible for reimbursement ***because the Psychotherapy treatments were billed without required documentation of the treatment time and otherwise did not meet billing requirements*** for Psychotherapy treatment, ***because the claims were not supported by adequate documentation***, and because the claims violated Medicare policies, regulations, and instructions.

(DE 40 ¶ 193 (emphasis added). The Government's second cause of action, for making false statements material to a claim, alleges:

> By virtue of the acts and omissions described above, Defendants each knowingly (including reckless disregard and deliberate ignorance) made or used, or caused to be made or used, a false record or statement material to a false or fraudulent Medicare claim in violation of the False Claims Act (31 U.S.C. § 3729(a)(l)(B), as amended) in that the records and statements that the Defendants made or used, or caused to be made or used, to claim Medicare reimbursement were false and the Psychotherapy treatments for which Government reimbursement was claimed were not eligible for reimbursement ***because the Psychotherapy treatments were billed without documentation of the time and without satisfying other billing requirements*** for Psychotherapy treatment, because the services were not provided as billed, and because the claims violated Medicare policies, regulations, and instructions.

(DE 40 ¶ 200 (emphasis added).) Finally, the Government's fourth cause of action, for conspiracy to violate the FCA, alleges:

---

³ The relevant portions of the Complaint are Paragraphs 1-18 and 85-191 (*i.e.*, excluding the allegations in Paragraphs 18-84, which provide general background about the FCA and Medicare).

> As described above, Defendants conspired with others to submit claims for Psychotherapy treatments that were ***billed without required documentation*** of the time and ***without satisfying other billing requirements*** for Psychotherapy treatment, because the claims were ***not supported by adequate documentation***, and because the claims violated Medicare policies, regulations, and instructions, and to make and use records and statements to support these false Medicare claims.

(DE 40 ¶¶ 209 (emphasis added).) In short, there can be no question that the Government has chosen to premise its FCA claims on alleged inadequate documentation to support application of CPT code 90833.

Against all of this, the Government can only point to a few scattered paragraphs in its 43-page Complaint as support for its contention that medical necessity is "the central issue of this case." (Mot. at 18 (citing DE 40 at pp. 11, 12, 16, 18, 31, 40[4]).) But the references on pages 11, 12, and 16 concern Medicare generally, not any conduct of Defendants, and the reference on page 41 is to the common law fraud cause of action, not the FCA. That leaves only the references to "medical necessity" on pages 18, 31, and 40—but even these are couched in terms of allegedly inadequate documentation. (DE 40 at p. 31, ¶ 185 ("Mindpath has the duty to ***retain medical records and documentation*** in support of their Medicare claims to establish the medical necessity and other requirements of Psychotherapy and E/M services billed to Medicare." (emphasis added)); *id.* at p. 40, ¶ 212 (alleging that "the Medicare Program reimbursed for services that were not medically necessary, [or] ***that were not supported by adequate or accurate records***" (emphasis added)).)

Ms. Nayoski is abundantly qualified to testify regarding the adequacy of documentation supporting application of CPT codes for E/M and psychotherapy services. *See generally United*

---

[4] The Government's motion references page 41 of the Complaint, but the phrase "medical necessity" does not appear on that page, it appears on page 40 in Paragraph 212.

*States v. Sharp*, 2009 WL 2913649, at *7 (N.D. W. Va. Sept. 8, 2009) (recognizing appropriateness of expert testimony regarding CPT coding where allegations of indictment concerned documentation, not medical necessity). As set forth in her CV, Ms. Nayoski holds no fewer than eight certifications from four different organizations related to CPT coding. (Nayoski Report Ex. C at 3.) Among other things, she is a Certified Professional Coder, a Certified Documentation Improvement Practitioner, and a Certified Healthcare Internal Audit Professional. (*Id.*; Nayoski Dep. 97:14-99:20 (discussing these and other professional certifications).) She also has extensive experience in compliance and auditing related to CPT coding requirements. (Nayoski Report Ex. C at 1-3; Nayoski Dep. 78:20-92:14.) Individuals with similar qualifications are routinely certified as coding experts in litigation. *See, e.g.*, *Perez v. Boecken*, 2020 WL 3074420, at *11 (W.D. Tex. June 10, 2020) (witness qualified to provide expert testimony on CPT coding based on training in "medical coding and medical bill auditing" and 14 years' experience in "medical billing review, coding, and auditing"); *United States ex rel. Armfield v. Gills*, 2012 WL 12918274, at *2 (M.D. Fla. July 6, 2012) (witness qualified to provide expert testimony on CPT coding based on being a certified professional coder and having "more than 25 years [sic] experience in medical coding and billing").

The Court should reject the Government's argument and find that Ms. Nayoski is qualified to offer expert testimony regarding the adequacy of documentation supporting application of CPT codes for E/M and psychotherapy services.

### C. Mr. Truitt Is Amply Qualified to Testify Regarding Statistical Sampling and Extrapolation

The Government's argument regarding Mr. Truitt's expert qualifications is nonsensical. First, the Government contends that Mr. Truitt is not qualified to offer expert testimony because he is not familiar with the law governing damages in FCA cases. (Mot. at 23-24.) But Mr. Truitt

is not a damages expert; he is being offered as a rebuttal expert regarding statistical sampling and extrapolation.[5] (Truitt Report at 2-3.) The Government then claims that Mr. Truitt "is more an auditor than a genuine statistician" because he "does not have a Masters of Statistics or any formal degree in statistics." (Mot. at 24.) However, Mr. Truitt does have relevant, graduate-level education in statistics. His "concentration in graduate school at the LBJ School of Public Affairs at the University of Texas was in quantitative methods, operations research and applied statistics." (Truitt Dep. 94:14-17.)

More importantly, Mr. Truitt has a wealth of experience directly related to his proffered expert testimony. During his deposition, Mr. Truitt gave the following response to the Government's question about what specialized knowledge he has that would aid the trier of fact in this case:

> [I have] 30 years of experience in data validity, reliability, data integrity, data description, sampling, estimation, extrapolation, and auditing in healthcare. Literally thousands of extrapolations, training materials, procedural documents, consultations with audit teams, working with lawyers, federal agencies, accountants, in making sure that sampling estimation and extrapolation processes were correctly performed.

(Truitt Dep. 93:14-22.) Additionally, Mr. Truitt has "taught applied statistics at the graduate level" and has "taught applied statistics and quantitative methods in multiple different formats." (Truitt Dep. 94:12-19.) He has written and published a textbook on statistical sampling for auditors and has authored policies and training materials for the U.S. Department of the Interior, Yale

---

[5] The Government also argues that Mr. Truitt is not qualified because "he has never testified in federal court as an expert." (Mot. at 23.) This is entirely irrelevant. As the Fourth Circuit has noted, "[e]very expert has a first time." *Garcia*, 752 F.3d at 391. Additionally, the Government ignores that Mr. Truitt has provided expert deposition and trial testimony in state-court litigation in California and Texas. (**Ex. 3** (Defendants' Supplemental Disclosure of Experts and Expert Reports) at 3).)

University, and other institutions. (Truitt Dep. 66:7-18.) Mr. Truitt's CV, provided to the Government with his expert report, highlights the breadth and depth of his firsthand experience performing audits and statistical sampling. (Truitt Report Ex. A.) Finally, Mr. Truitt's expert report and deposition testimony provide ample evidence of his deep knowledge of, and experience in, the statistical methods involved in this case. *Cf. United States ex rel. Barron v. Deloitte & Touche, LLP*, 2008 WL 7136868, at * (W.D. Tex. Sept. 26, 2008) (finding expert qualified based in part on his demonstration of knowledge of "forensic accounting investigations of compliance-related issues in the health care industry").

As a result of his education and vast experience, Mr. Truitt is unquestionably qualified to offer expert testimony regarding the adequacy of the statistical sampling and extrapolation presented through Mr. D'Zio's testimony. The Court should reject the Government's argument to the contrary.

### III. The Opinions of Defendants' Experts Are Neither Conclusory Nor *"Ipse Dixit"*

The Government argues that Ms. Nayoski's and Mr. Truitt's opinions are not reliable because they are merely "*ipse dixit*." (Mot. at 20 (contending that Ms. Nayoski "tendered mostly conclusory statements and opinions untethered from specific medical records"); *id.* at 25 (contending that Mr. Truitt's opinions are "conclusory, unsubstantiated, and reflect no reliable methodology"). The Government's argument is patently meritless.

#### A. Legal Standard

It is well settled that to be reliable, expert testimony must be "supported by adequate validation to render it trustworthy." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260 (4th Cir. 1999). As stated by the Supreme Court, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only

by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). On the other hand, an expert opinion that is supported by references to sources and that links the expert's specialized knowledge to his or her opinions is not inadmissible *ipse dixit*. *See, e.g.*, *NAPCO, Inc. v. Landmark Tech. A, LLC*, 2023 WL 5000756, at *8 (M.D.N.C. Aug. 4, 2023) (expert opinions not mere *ipse dixit* where opinions supported by "detailed analysis" and specific testimony regarding each opinion); *Tang Cap. Partners, LP v. BRC Inc.*, 757 F. Supp. 3d 363, 391 (S.D.N.Y. 2024) (expert report not *ipse dixit* where it explained the connection between the expert's knowledge and his opinions and referenced numerous relevant sources); *Livingston v. City of Chicago*, 597 F. Supp. 3d 1215, 1224 (N.D. Ill. 2022) ("[B]ecause Dr. Davis connects his expertise to the facts and data in this case, his opinion is the product of reliable principles and methods, not *ipse dixit*.").

### B. Ms. Nayoski's Opinions Are Neither Conclusory Nor "*Ipse Dixit*"

In arguing that Ms. Nayoski's opinions are unreliable because they are inadequately supported, the Government again relies on its blatant mischaracterization of this case as being about medical necessity. (Mot. at 20 (complaining that Ms. Nayoski "has not performed the Psychotherapy procedures at issue").) The Government also contends that Ms. Nayoski "appears to rely on the explanations (or rationalizations) suggested by Defendants, rather than forming original opinions based directly upon specific medical record documentation to support the claims billed." (Mot. at 21.) This is simply untrue. Ms. Nayoski's expert report explains specifically, as to each of the 12 claims on which she disagrees with Dr. Corvin, why the medical records she reviewed adequately supported application of the relevant CPT code. (Nayoski Report at 9-11.) She then expanded on these matters at her deposition. (*See, e.g.*, Nayoski Dep. 209:16-213:15

(discussing patient MA).)

There is no "analytical gap" in Ms. Nayoski's analysis, and the Court should reject the Government's attempt to exclude her testimony on this basis.

### C. Mr. Truitt's Opinions Are Neither Conclusory Nor "*Ipse Dixit*"

The Government is equally off-base in its contention that Mr. Truitt's expert opinions are unsupported by any analysis or methodology. Mr. Truitt's 13-page expert report exhaustively explains his opinions and the reasoning for them, supported with references to source materials and tables illustrating his analysis. During his deposition, Mr. Truitt further explained each and every one of his opinions in response to the Government's questions. In his expert report and in his deposition testimony, Mr. Truitt explained the analysis supporting his conclusions.

Because there is no "analytical gap" between Mr. Truitt's opinions and the methodology supporting them, the Court should reject the Government's argument on this point.

## IV. The Opinions Are Proper Rebuttal Testimony

Finally, the Government speculates that Ms. Nayoski and/or Mr. Truitt might offer some additional opinion that goes beyond the scope of rebuttal expert testimony. Notably, the Government does not claim that any part of Ms. Nayoski's or Mr. Truitt's expert reports or deposition testimony strays beyond proper rebuttal. It simply—and without any basis in fact—asks the Court to preemptively prohibit them from offering any opinion that is not proper rebuttal testimony. Unless and until such an opinion is offered by either Ms. Nayoski or Mr. Truitt, any order on this point would be merely advisory.

## CONCLUSION

For the foregoing reasons, the Court should deny the Government's motion to exclude or limit the rebuttal expert testimony of Ms. Nayoski and Mr. Truitt.

This the 11th day of June, 2025.

                MAYNARD NEXSEN, PC

                *s/R. Daniel Boyce*
                R. Daniel Boyce
                4141 Parklake Avenue Suite 200
                Raleigh, NC 27612
                Tel.: (919) 653-7827
                Fax: (919) 653-0435
                dboyce@maynardnexsen.com

                Alice V. Harris
                Jenna Godlewski
                1230 Main Street, Suite 700
                Columbia, SC 29201
                Tel.: (803) 253-8284
                Fax: (803) 253-8277
                aharris@maynardnexsen.com
                jgodlewski@maynardnexsen.com

                *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 11, 2025, I served *Defendants' Memorandum in Opposition to Government's Motion to Strike or Limit Testimony of Defense Experts Nayoski and Truitt* upon Counsel for the Government as follows:

>Neal I. Fowler, Esq.
>Assistant U.S. Attorney
>Civil Division
>150 Fayetteville Street
>Suite 2100
>Raleigh, North Carolina 27601-1461
>E: neal.fowler@usdoj.gov
>*Counsel for the Government*

>/s R. Daniel Boyce
>R. Daniel Boyce
>N.C. State Bar No. 12329
>**MAYNARD NEXSEN PC**
>4141 Parklake Avenue, Suite 200
>Raleigh, North Carolina 27612
>T: 919.755.1800
>F: 919.653.0425
>E: dboyce@maynardnexsen.com
>*Attorneys for Defendants*