```
              THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF NORTH CAROLINA
                       WESTERN DIVISION
                     No. 5:17-CV-616-BR


UNITED STATES OF AMERICA, ex rel.,
ANJELICA BROWN,

          Plaintiff-Relator,

          v.

MINDPATH CARE CENTERS, NORTH CAROLINA,
PLLC, JEFF WILLIAMS, ABIGAIL SHERIFF,
SARAH WILLIAMS,

          Defendants.
_____
```

# **CONFIDENTIAL**

```
              - - - - - - - - - - - - - -
                       Deposition
                          of
                  JODI LYNNE NAYOSKI
              - - - - - - - - - - - - - -


          The oral deposition of JODI LYNNE NAYOSKI was taken
by the Plaintiff-Relator on Monday, the 17th day of March, 2025,
commencing at 9:02 a.m., at the Law Office of Maynard Nexsen PC,
located at 4141 Parklake Avenue, Suite 200, Raleigh, North
Carolina.



                       PATRICIA C. ELLIOTT
                        Verbatim Reporter
```

1      Q.    Okay.  Where on Page 6 and 7 did you identify what

2   records you relied upon in forming your opinions in this

3   expert --

4      A.    Oh, I relied upon the records that were provided to me.

5      Q.    Well, the question is what records -- did you identify

6   in your extra report what records you relied upon?

7      A.    You're trying to get me to say something that I'm

8   not -- I don't -- I don't know.  The records were the medical

9   records that -- provided to me.

10     Q.    And you're telling me that here in the deposition.

11     A.    Yeah.

12     Q.    I'm asking where in the expert report did you identify

13  what records --

14     A.    Okay.

15     Q.    -- that you relied upon.

16     A.    So I personally reviewed documentation derived from 60

17  dates of service submitted to me.

18     Q.    So what documents?  You reviewed documents -- reviewed

19  documentation.  That's a very generic term.  So how do I know

20  which medical records you looked at?

21          **MS. HARRIS:**  Object to the form and asked and answered.

22          **THE WITNESS:**  All -- the sample numbers from the CID

23      correlate to the patients, the patient initials, the date of

24      service.  That feels pretty clear to me what I reviewed.

25          **BY MR. FOWLER:**

1    Q.    And those were all provided to you by MindPath counsel.

2    A.    Yes.

3    Q.    Okay.  And I'm not -- I don't want to ask about

4  communication with MindPath counsel, but I'm asking where in your

5  expert report that you identify what records that you actually

6  reviewed, put eyes on to help you form your opinions in this

7  case.

8         **MS. HARRIS:**  Object to the form.  Asked and answered.

9         And she also said she evaluated the corresponding progress

10        notes for audit samples, along with the remittance advice to

11        validate the payment amount.  So just for the record, she

12        identifies the records on Page 6.

13        **MR. FOWLER:**  I would ask counsel just to object and not

14        to testify.

15        **MS. HARRIS:**  I understand, but, you know --

16        **BY MR. FOWLER:**

17   Q.    So do you have in your report what specific records you

18  looked at for these 60 patients --

19   A.    Yes.

20   Q.    -- by Bates number or by date or anything else?

21   A.    I evaluated the corresponding progress notes for the

22  audit sample, along with the remittance advice, to validate the

23  payment amount.

24        There's no Bates numbers in here.  I am going by Dr.

25  Corvin's ID number, my sample ID number, the date of service that

 1  you-all provided in the CID.  The patient initials, that is how I

 2  identified which records I looked at.

 3      Q.   But if there's confusion about what progress notes are

 4  being looked at, how do we move past confusion to find out what

 5  specifically you looked at --

 6          **MS. HARRIS:**  Object to the form.

 7          **BY MR. FOWLER:**

 8      Q.   -- as -- as in the document, the Bates-numbered

 9  document or some other identifier for that document?

10          **MS. HARRIS:**  Object to the form.

11          **THE WITNESS:**  Yeah, I don't know what you're -- I don't

12      know what you're trying to ask.

13          **BY MR. FOWLER:**

14      Q.   And I've -- I've been struggling to get an answer to

15  this.  My question is how do we know what actual medical record

16  you looked at when you were forming your opinions in this case.

17          **MS. HARRIS:**  Object to the form.

18          **BY MR. FOWLER:**

19      Q.   Is there anything in the report in any way that says,

20  "For Patient MA, I looked at these specific documents,"

21  identified by Bates number or identified by some other method?

22      A.   No.

23      Q.   Okay.  So there's no identification of specific

24  progress notes that you looked at for Patient MA or these other

25  patients?

1      **MS. HARRIS:**  Object to the form.

2      **THE WITNESS:**  Beyond that they were the progress notes

3    for the patient and the date of service,

4      **BY MR. FOWLER:**

5    Q.   Which you -- which you obtained from your -- from

6    MindPath counsel.  Okay.

7      **MS. HARRIS:**  Object to the form.

8      **BY MR. FOWLER:**

9    Q.   Did you get medical records from any source other than

10   MindPath counsel?

11   A.   No.

12   Q.   Your supplemental indicates that you also relied upon

13   websites, but you did not attach those records to your expert

14   report or the supplemental, correct?

15     **MS. HARRIS:**  Object to the form.

16     **THE WITNESS:**  So in some cases, we -- we did

17   after -- after your request.

18     **BY MR. FOWLER:**

19   Q.   Okay.

20   A.   So CPT, we've copied the pages, which you've provided

21   to me as Exhibit 327.

22   Q.   Thank you.  And let's walk through each of them.

23     So Footnote 1 is the CPT -- AMA CPT codes.  And you did

24   provide that in your supplemental, which is Government Exhibit

25   327.

1    and you attached a couple of pages from the report.  And, again,

2    you didn't indicate that this was a hyperlink that would have the

3    entire report attached, correct?

4            **MS. HARRIS:**  Object to the form.

5            **THE WITNESS:**  I assume people know that if it's a blue

6        line at the bottom of a document that it is a hyperlink.

7            **BY MR. FOWLER:**

8        Q.   Okay.  And you discuss this HHS OIG report in part of

9    your expert report that you provided, correct?

10       A.   Yes.

11       Q.   Is your opinion regarding that HHS OIG report -- your

12   opinions all contained within your written expert report?

13       A.   Most of them are.  In discussing or in reading Dr.

14   Corvin's deposition, there is another point in there that I would

15   have made.

16       Q.   So why did you not include all of your opinions in your

17   expert report?

18       A.   Unfortunately, my role was rebutting his findings.  And

19   he did not bring up any of those findings in his report, so it

20   didn't seem to be necessary.

21       Q.   He didn't address the OIG expert -- the OIG report at

22   all, did he?

23       A.   No.

24       Q.   Okay.

25       A.   No.  So why would rebutting his expert report give you

1    based on knowledge, skill, experience, training or education that

2    demonstrates your specialized knowledge will help the trier of

3    fact determine a fact in issue in the case -- in this case.

4           What is your specialized knowledge about -- knowledge,

5    skill, experience, training or education that you're bringing

6    forward to give opinions on?

7           **MS. HARRIS:**  Object to the form.

8           **THE WITNESS:**  I am certified with several different

9        organizations related to coding, auditing, medical billing,

10       medical coding, medical auditing related to Part B claims

11       sent to Medicare.

12          **BY MR. FOWLER:**

13   Q.   Okay.  So is it fair to say that you're a professional

14   coder regarding Part B claims?

15          **MS. HARRIS:**  Object to the form.

16          **THE WITNESS:**  I am a professional coder and auditor.

17          **BY MR. FOWLER:**

18   Q.   Okay.  What's the difference between being a

19   professional coder and a auditor?

20   A.   An auditor goes quite a bit deeper into the records

21   than a coder might.  Typically, coders are production based,

22   where they're just trying to get codes out the door, claims out

23   the door, where an auditor will have the ability to look to the

24   record to really see documentation guidelines are being met.

25   Q.   And this may be obvious, but what is the source of your

1      Q.    What courses were those?

2      A.    I was a pre-med major my freshman year.  So I took

3  biology, anatomy, physiology, chemistry, calculus, all of the

4  usuals.

5      Q.    Did you take any psychiatry courses?

6      A.    Not in my freshman year, no.

7      Q.    Did you take any psychiatric courses at all at the

8  University of Dayton?

9      A.    No.  I did take psychology there.

10      Q.    Okay.

11      A.    I actually did end up with a minor in psychology.

12      Q.    So how many psychology take -- courses did you take for

13  that minor?

14      A.    That was probably 15 hours.

15      Q.    Fifteen hours.  And you were working, as you just

16  moment -- said a moment ago, while you were studying, which is

17  admirable.  And you were working at the University of Cincinnati

18  Medical Associates.

19          Describe briefly what those jobs were, please.

20      A.    So that is a -- University of Cincinnati Medical

21  Associates, which is now UC Physicians, they were a medical group

22  that I started in one of the local offices as a front desk

23  person, checking patients in, checking patients out, and then was

24  promoted to the referral coordinator, where you are gathering the

25  patient's pre-certifications and things like that, reading

1    medical records.

2            And then I went to work in the compliance office at UC

3    Physicians as an auditor there, where I started performing

4    audits.  All of those were done under attorney-client privilege.

5            Once I did that for a few years, then I was promoted to

6    the educator.  At that point in time, there was no set curriculum

7    to get certified to be coding.  So I created one that we used at

8    UC Physicians.  And I had almost all of the staffpeople who were

9    billers or coders come through and do a certification class.

10       Q.   What were your responsibilities as the compliance

11   educator when you worked at that position?

12       A.   So educating all of the staff.  We ran coding classes

13   continuously, but I also educated the providers and any other

14   compliance education as needed.

15       Q.   And you indicated in your resume that you were also a

16   compliance specialist.  Did you work for someone?  Was there a

17   compliance officer?

18       A.   Compliance officer.

19       Q.   Okay.  Is that standard, for there to be a compliance

20   officer and other compliance specialists?

21           **MS. HARRIS:**  Object to the form.

22           **THE WITNESS:**  Everywhere I have worked, there has been

23       a compliance officer, and compliance specialists are the

24       people doing the audits.

25           **BY MR. FOWLER:**

1          Q.   And what is the role of a compliance officer in a Part

2    B provider group?

3               **MS. HARRIS:**  Object to the form.

4               **THE WITNESS:**  Well, they oversee all of those audits.

5          They would, depending on the reporting structure, do the

6          reporting to the board as far as compliance activities.

7               They oversee the compliance plan, questions as they

8          come up.  You know, we want to implement this new machine,

9          what do we need to do to be compliant with it.  They have a

10         very large role.

11              **BY MR. FOWLER:**

12         Q.   Does the compliance officer look specifically at

13    billing for Medicare, for example?

14         A.   Typically, they leave that to us to do.

15         Q.   Leave it to us, being whom?

16         A.   The -- the specialists, the auditors.

17         Q.   Okay.  So there's a compliance specialist under the

18    compliance officer that looks at Medicare.

19         A.   Typically.

20         Q.   Okay.  After the University of Cincinnati Medical

21    Associates position, you went to Concentra Preferred Systems, and

22    you were the claims resolution specialist.

23              Can you describe briefly what that was?

24         A.   Yep.  That is -- was an organization that would

25    negotiate medical bills on behalf of payors to the providers to

 1  try and benefit from cost savings.  So we would call on a medical

 2  group where there was an existing bill, possibly in collections

 3  or something like that.

 4          We would speak to the provider based on their

 5  document -- or to the representative based on their

 6  documentation.  If they didn't, you know, have what they needed

 7  to be documented, that was a way for us to say, you know, we

 8  would offer you "x" amount of dollars to settle this service

 9  claim.

10      Q.    Okay.  And then you went to Blue Cross Blue Shield of

11  Illinois in March of 2002 through December 2005.  You were the

12  senior coding analyst.

13          Can you describe what you did there please?

14      A.    Yes.  In that role, primarily -- every payor has they

15  call an edit software where their CPT codes will bounce off of

16  each other if they are inappropriate.

17          So, for example, you would have -- a mammogram ode

18  would not be allowed to be paid for a male patient.  That would

19  hit an edit.

20      Q.    Uh-huh (yes).

21      A.    And there are many, many, many of those edits.  And so

22  during that time, we were implementing our edit software, and so

23  I had a big role in determining what would hit an edit, what we

24  would want to see documentation for to support billing of those

25  two things.  And so I composed the guidelines for all of that for

1   the appeal unit so they knew what they would be looking for if

2   something hit an edit.

3           I also then did higher level appeals.  They were still

4   being appealed at their lower level units.  They would come up to

5   our area, and we would review those and make a determination.

6       Q.   Your third bullet point under that category of senior

7   coding analyst is that you reviewed medical records for appeals

8   that were denied due to edit system and medical necessity.

9       A.   Uh-huh (yes).

10      Q.   I think that may be what you were just describing.

11          How did you determine whether or not there was medical

12  necessity for claims submitted to Blue Cross Blue Shield of

13  Illinois?

14      A.   So, again, there's a -- for the most part, a very

15  objective way that you can do that.  You know, what these

16  softwares are trying to flush out are big, obvious things; you

17  know, that we're not -- that I don't have a psychiatrist casting

18  a leg; you know, those bigger things that are happening that are

19  pretty objective.

20          For anything that we felt, like, might be a pattern or

21  might be something that needed further review, we would take it

22  to one of the medical directors, who would then contact the

23  provider.

24      Q.   Did you also have medical professionals that were

25  experts to help you determine whether or not there was medical

1    necessity?

2         A.    There were nurses in different areas of the units, but

3    the way that I worked in -- in our department, compliance -- we

4    had a direct line to the medical director.

5         Q.    So if the coder auditor couldn't determine whether or

6    not there's medical necessity, you would go to a -- a nurse or

7    the medical director.

8         A.    Yes.

9         Q.    Okay.  Did that happen fairly often?

10        A.    Not really.  I mean, the nurses are doing their own

11   thing.  You know, they -- they were not part of my process

12   necessarily.  So things that came to me probably, I would say,

13   were on the easier side of -- of whether we could determine

14   medical necessity or not.  Again, if not, we always had the

15   medical director we could go to, and he would call the physician.

16        Q.    So if it was not easy or straightforward, you would go

17   to the medical director.

18              Did he personally review the claims?

19        A.    He did.

20        Q.    Okay.  So he could look at the progress notes and say,

21   yes, that's fine, or no or we're going to challenge that.

22        A.    He would call the providers.

23        Q.    Okay.  So Blue Cross Blue Shield of Illinois, the

24   medical director would personally call the providers about

25   specific claims.

1        A.    He would.

2        Q.    Okay.  Was that done with a sampling method, or was it

3   done on a prepayment method, or how -- how would he call --

4        A.    It would be on a -- whatever basically was elevated to

5   him.  You know, if other people couldn't figure it out,

6   and -- and he felt it was a question, then he would make that

7   call.

8        Q.    Would it be for one claim or, like, 60 claims?

9            MS. HARRIS:  Object to the form.

10           THE WITNESS:   Yeah.  It -- it would really -- would

11       depend on what the need was at the time.

12           BY MR. FOWLER:

13       Q.    At the time you worked there in 2002 through '05, was

14  there a documentation requirement with Blue Cross Blue Shield

15  where you had to document the basis for each of the CPT claims

16  that were submitted?

17           MS. HARRIS:  Object to the form.

18           THE WITNESS:  I mean, yes, we would use CPT -- basic

19       CPT rules.  There may have been some specific medical

20       policies that Blue Cross Blue Shield put out as well that

21       had documentation requirements within them.

22           BY MR. FOWLER:

23       Q.    Let me jump to the top of Page 2.  You worked Altegra

24  Health, Inc.  You were the manager of the ICD-10 education and

25  physician education and also manager of professional coding.

1          Can you describe briefly what you did for Altegra?

2     A.    Yeah.  So that was a long -- a long stint there.  It

3  actually was a couple of different consulting firms that ended up

4  being bought by Altegra Health.

5          So over the course of that time there, as the coding

6  manager, audit manager, you know, we did multiple --  multiple

7  client audits, everything -- consulting, physician education.  We

8  would handle anybody who wanted to do a voluntary refund, you

9  know, or wanted some help fleshing that out.  I did a large

10  number here of instructing as well.  I also taught the -- AAPC's

11  coding curriculum through Altegra.

12     Q.    What did you do for Ultimate Medical Academy?  It says

13  adjunct faculty.

14     A.    Yeah.  That was a part-time job that -- they have an

15  online medical billing and coding program, and I was one of the

16  faculty members for that.

17     Q.    Did you teach coding specifically?

18     A.    I did.

19     Q.    Okay.  Was any of that related to psychotherapy?

20     A.    I don't recall.

21     Q.    Okay.  Let's turn to the first page.  You list Pinnacle

22  Enterprise Risk Consulting Services.  This is another consulting

23  company that you worked for.

24     A.    This is who I work for --

25     Q.    Currently.

**CONFIDENTIAL**

1        A.    -- currently.

2        Q.    Okay.  But Altegra was a consulting company, and this

3    is also a consulting company.

4        A.    Yes.

5        Q.    Okay.  And so you've worked for them approximately

6    eight years.  It looks like six years as a director and then now

7    you're working part-time.

8        A.    Correct.

9        Q.    Okay.  You state in the second line that you're a

10    skilled compliance auditor and serve as -- serves as interim

11    compliance manager for a large healthcare facility.

12             Explain what that is, please.

13        A.    As one of my consulting jobs, we can serve as interim

14    roles for organizations who may be -- somebody who's on maternity

15    leave or on vacation.  And so one of our clients had that need,

16    and so I served on site with them as their interim compliance

17    manager.

18        Q.    When you were interim compliance manager, did you

19    review whether they were compliant with Medicare billing?

20        A.    Yes.

21        Q.    Okay.  Is that what a compliance manager typically

22    does?

23             **MS. HARRIS:**  Object to the form.

24             **THE WITNESS:**  A compliance manager can do all sorts of

25        things, but, yes, overseeing audits, mostly government

1      payors, is -- is a big part of that.

2              **BY MR. FOWLER:**

3      Q.   Did they have a written compliance program in place?

4      A.   They did.

5      Q.   How long were you there as the interim compliance

6   manager?

7      A.   Two years.

8      Q.   Okay.  What was the name of that company?

9      A.   Scripps Health.

10      Q.   Okay.  So you actually worked for Scripps Health?

11      A.   Now I work for Scripps Health.

12      Q.   Okay.  So are you now the permanent compliance manager?

13      A.   I am a compliance auditor.

14      Q.   Okay.  So you work for the compliance manager.

15      A.   I do.

16      Q.   Okay.  What kind of healthcare company is Scripps

17   Health?

18      A.   Scripps Health is a large medical group, about 2,600

19   physicians.

20      Q.   What type of practices?

21      A.   Everything.

22      Q.   Are any of them behavioral health?

23      A.   Behavioral health.

24      Q.   As the senior compliance auditor, have you reviewed for

25   Scripps Health any 90833 psychotherapy claims?

1    A.   I have not.

2    Q.   You have not.  Okay.  Do you know if they bill 90833

3  psychotherapy codes?

4    A.   They do.

5    Q.   Okay.  But you have not reviewed those or --

6    A.   I have not.

7    Q.   -- audited those?

8         And I jumped ahead a little bit.  Let me go back to

9  Pinnacle.  You went part-time with them, working approximately 20

10  hours a week, I think you said.

11         And what hours are you working for Scripps Health?  I

12  mean, is that a full-time job, part-time?

13    A.   I work full-time for them.

14    Q.   Full-time for them.  And so full-time for Scripps

15  Health now and part-time for Pinnacle, doing auditing and

16  consulting and other things.

17         Is that a fair statement?

18    A.   That's correct.

19    Q.   Okay.  How much are you paid by Scripps Health for your

20  full-time job there?

21    A.   I also prefer not to answer that.

22    Q.   Unless there's a privilege --

23         **MS. HARRIS:**  Object to the --

24         **BY MR. FOWLER:**

25    Q.   -- or protection, we ask that --

1        **MS. HARRIS:**  Object to the form and am instructing the

2     witness not to answer because she may be breaching a

3     nondisclosure agreement.

4        **BY MR. FOWLER:**

5     Q.   The consultant work that you do for Pinnacle, you're

6  paid an hourly basis.  Approximately what percentage of that is

7  of your overall income in 2024?

8        **MS. HARRIS:**  Object to the form.

9        **THE WITNESS:**  I've got to do some math.  Probably 20

10    percent.

11       **BY MR. FOWLER:**

12    Q.   So 20 percent of your income in 2024 was auditing or

13 expert-type work.

14    A.   Was auditing for Pinnacle.

15    Q.   Okay.

16    A.   I mean, I audit for Scripps.

17    Q.   Okay.  So of that 20 percent from Pinnacle, how much of

18 that was expert work?  Just a percentage, not a number.

19    A.   We said five -- five percent --

20    Q.   Okay.

21    A.   -- is --

22    Q.   Okay.  Have you ever audited MindPath, other than what

23 you did in this specific case?

24    A.   No.

25    Q.   Okay.  Have you had any connection with MindPath other

1  than your expert opinion in this specific case?

2      A.   No.

3      Q.   Okay.  For Pinnacle, it says that you implemented

4  large-scale compliance plans for physician groups.

5           Can you describe just very briefly what that is?

6      A.   Yep.  That was a very large project on site in a

7  different state that, basically, their -- their board had written

8  a compliance plan and they needed it implemented.  And so several

9  of us were there to assist in getting the right staff for them

10 permanently and workflows, things like that.

11     Q.   It states you also managed due diligent claim reviews.

12 Can you describe briefly what that is?

13     A.   Yes.  I oversee the due diligence line of the service

14 where -- when a company or a physician group wants to buy another

15 physician group, there is typically a billing and coding audit

16 that is done as part of the transaction.  And I handle those

17 audits.

18     Q.   Is the review whether or not the claims are being

19 billed appropriately to Medicare, for example?

20     A.   Yes.

21     Q.   Were any of those audits related to 90833 psychotherapy

22 claims?

23     A.   No.

24     Q.   Okay.  You end the last paragraph on Page 1, "Jodi's

25 coding proficiency includes primary care, urgent care,

1   pediatrics, education [sic] and management across all

2   specialties, as well as ICD-9-CM and ICD-10-CM coding."

3           Are those your primary proficiency areas?

4           **MS. HARRIS:**  Object to the form.

5           **THE WITNESS:**  Yes.

6           **BY MR. FOWLER:**

7       Q.    Okay.  Why did you not include behavioral health or

8   psychotherapy?

9       A.    It's -- I would definitely add it after this case.

10      Q.    But before this case, you did not have it included.

11      A.    I would not have considered it a -- a huge strong suit.

12      Q.    Okay.  Have you audited any psychotherapy claims, you

13  know, the CPT 90833s that you recall today, other than the

14  MindPath case?

15      A.    I mean, I know that I have, but I can't recall the

16  specifics of them.

17      Q.    Okay.  So in that ten that you've done for Pinnacle,

18  there may be one that -- or some of those that may have been

19  90833s?

20      A.    There may be.

21      Q.    Okay.  But you don't recall any today.

22      A.    No.

23      Q.    Okay.  Let's move up to Scripps Health, and I'll just

24  ask you about the end of that paragraph.  The fourth line down,

25  it states, "She reviews and updates compliance policies and

1    procedures as needed."

2           So as the senior compliance auditor, do you review

3    compliance policies?

4       A.   Yes.

5       Q.   Okay.  Do you make suggestions about how the compliance

6    policies can be more effective and appropriate?

7       A.   Yes.

8           **MS. HARRIS:**  Object to the form.

9           **BY MR. FOWLER:**

10      Q.   Does that include Medicare compliance issues?

11          **MS. HARRIS:**  Object to the form.

12          **THE WITNESS:**  It includes all policies and procedures

13      related to all -- anything that we would consider to be a

14      compliance issue.

15          **BY MR. FOWLER:**

16      Q.   Have you been given any information about the

17   compliance policies of MindPath in this case?

18      A.   No.

19      Q.   Okay.  And I think you said earlier you haven't had any

20   conversations with their officers, employees or anyone other than

21   the attorney in this case.

22          So do you know anything about their compliance

23   policies?

24      A.   No.

25      Q.   So you don't know if they had written compliance

1          **MS. HARRIS:**  Object to the form.

2          **THE WITNESS:**  Not if we were looking at Medicare.

3          **BY MR. FOWLER:**

4     Q.    And why is that?

5     A.    Because pretty much every payor has their own likes and

6     dislikes and rules and regulations, and what's a error for Blue

7     Cross may not be an error for Medicare.

8     Q.    Is reasonable and necessary different between Blue

9     Cross and Blue Shield and Medicare?

10         **MS. HARRIS:**  Object to the form.

11         **THE WITNESS:**  That would be something you'd have to

12         look in their own policies.

13         **BY MR. FOWLER:**

14    Q.    Let's go back to your resume.  You've got lots of

15    certifications here, and I just want to understand them a little

16    bit.  And I'll just go through them in the list there on Page 3.

17         You're a Certified Coding Specialist, American Academy

18    of Professional Coders.  Just very briefly, what is that?

19    A.    So the first one is Certified Professional Coder from

20    the American Academy of Professional Coders.  That's CPC, and

21    that is that I have completed the class, taken a certification

22    exam, indicating that I can code for any specialty, any -- any

23    code in the CPT book.

24    Q.    The second one is Certified Coding

25    Specialist-Physician, American Health Information Management

1   Association, which seems to be a different association.

2        A.   It's a different association; same basic principle of

3   the certification.

4        Q.   The third one is Certified Professional Coding

5   Instructor, American Academy of Professional Coders.

6             What is that?

7        A.   That means that I can use their curriculum to teach

8   students to get certified.

9        Q.   Then the next one is certified in healthcare

10  compliance, Health Care Compliance Association.

11            Briefly explain what that is.

12       A.   Yeah.  So that is called the CHC and in -- certified in

13  healthcare compliance.  So you go through a long few days and an

14  exam testing your knowledge about compliance rules and

15  regulations and compliance plans.

16       Q.   The next is AAPC-approved ICD-10-CM trainer, American

17  Academy of Professional Coders.

18            What is that?

19       A.   I was approved to teach the new ICD-10 curriculum.

20       Q.   So that was for that specific training.

21       A.   Yes.

22       Q.   And the next one seems to be the same thing.  AMIMA

23  [sic] approved ICD-10 trainer, American Health Information

24  Management Association.

25       A.   Yeah, AHIMA, American Health Information Management.

 1    It is the same -- same thing but with a different certifying

 2    body.

 3        Q.   The next one is certified documentation improvement

 4    practitioner, American Health Information Management Association.

 5            Briefly explain what that is.

 6        A.   That is a CDIP, and that is a relatively new -- in the

 7    past ten years or so -- push to have providers improve their

 8    documentation related to diagnosis codings to make sure that

 9    we're capturing the severity of the -- of the patient, the length

10    of stays, anything that was present on admission or a

11    complication during admission.

12        Q.   And the last one is certified healthcare internal audit

13    professional, Association of Healthcare International [sic]

14    Auditors.

15            Briefly explain what that is.

16        A.   That is called CHIAP, and that is, again, just a

17    certification of internal healthcare audit processes.

18        Q.   Okay.  Do you have any other certifications or training

19    other than what's on your resume?

20        A.   No.

21        Q.   Okay.  Let's go into some general background.  At the

22    time you were asked to be a consultant and an expert for

23    MindPath, did you have any experience auditing psychotherapy

24    codes?

25        A.   Yes, across some number of clients that we had had

1      A.    I did.

2      Q.    Okay.  And those last two columns are your information,

3   rebuttal E&M finding and rebuttal psychotherapy finding.

4      A.    Correct.

5      Q.    And so the rest of that was your accumulating

6   information from either Dr. Corvin or from the patient records.

7      A.    Correct.

8      Q.    Okay.  And for the E&M findings, you found all of them

9   should be allowed.

10      A.    Correct.

11      Q.    And for the psychotherapy, which were the 90833s, you

12   determine that 19 out of the -- the 60 should be denied.

13      A.    Correct.

14      Q.    Okay.  And we'll go through each of the individual ones

15   later, but each of those should correspond, the ones that you

16   believe should be denied, to an explanation later in your report.

17   Is that -- is that true?

18          **MS. HARRIS:**  Object to the form.

19          **THE WITNESS:**  What should be allowed is explained in

20      the report.

21          **BY MR. FOWLER:**

22      Q.    Right.  Right.  So the ones allowed by you are

23   explained in the report.  The ones that you believe should be

24   denied, you did not describe.

25      A.    I did not describe anything that Dr. Corvin and I

1   agreed with.

2        Q.   Okay.  Did you do a separate analysis regarding those

3   others?  I mean, there were -- if there were 19 E&Ms that you

4   agreed with, there was -- whatever it was -- 41 that you

5   disagreed with.  Did you do any analysis for those 41?

6             **MS. HARRIS:**  Object to the form.

7             **THE WITNESS:**  I -- I didn't disagree with 41 E&Ms.

8             **BY MR. FOWLER:**

9        Q.   Of the 90833s.  I may have misspoke.

10            **MS. HARRIS:**  Object to the form.

11            **THE WITNESS:**  So I denied 19.

12            **BY MR. FOWLER:**

13       Q.   Right.

14       A.   If Dr. Corvin and I agreed on anything, I did not do a

15   full separate review.

16       Q.   And my question is whether you did an analysis of those

17   that you agreed on.  If he found they were fine, did you do any

18   review --

19       A.   Did I do any --

20       Q.   -- of the medical records?

21       A.   -- additional review?

22       Q.   Correct.

23       A.   No.  Because, I mean, I had done my original review.

24   So if he and I agreed, I did not do anything additional.

25       Q.   Were any of those in your original review ones that you

1        A.    Yes.

2        Q.    Okay.

3        A.    Yes.

4        Q.    And you've got opinions regarding those 12 for 90833s.

5   And I'll hold the E&Ms, but there are seven of those in dispute.

6   All those that Dr. Corvin challenged you believe should be

7   allowed for those seven E&Ms, correct?

8        A.    Correct.

9        Q.    Okay.  So let's start with MA, which is the first one

10  there.

11            **MR. BOYCE:**  Can we go off the record one minute?

12            **MR. FOWLER:**  Yes.

13                 [DISCUSSION OFF THE RECORD]

14              [MR. BOYCE EXITS THE DEPOSITION]

15            **BY MR. FOWLER:**

16       Q.    And you're welcome to, obviously, use your report.

17  We'll start with MA, which is your Number 2, date of service

18  11/23/20.  Is it fair to say that your opinion is that MA should

19  be allowed based on Summary 2 and Summary 3; that you believe the

20  modality was stated and the psychotherapy was more than

21  educational?

22       A.    Yes.

23       Q.    Okay.  So you disagree with Dr. Corvin's position

24  regarding modality and whether it was psychodynamic or

25  educational.  You just simply disagree.

**CONFIDENTIAL**

1      A.   Correct.

2      Q.   Other than what's stated in your report for MA, do you

3   have any other opinions for Patient MA that's -- that's not

4   already stated here?

5      A.   No.

6      Q.   What medical records, facts or data did you rely upon

7   in forming your opinion regarding Patient MA?

8           **MS. HARRIS:**  Object to the form.

9           **THE WITNESS:**  The medical records that were provided to

10       me.

11          **BY MR. FOWLER:**

12     Q.   Let me hand you what's marked as Government Exhibit

13   335, and I will draw your attention to Bates number 541157 and

14   541158.

15          Is that where the add-on therapy that's separate and

16   distinct is set out in this progress note?

17     A.   541157.

18     Q.   541157 and 541158.

19     A.   5418 [sic] doesn't have anything to do with this.

20     Q.   Okay.

21     A.   It's a different date of service.

22     Q.   So it's just 541157 sets out that add-on therapy.

23     A.   Uh-huh (yes).

24     Q.   Other than this progress note, did you rely upon any

25   other medical records in forming your opinion that this claim

1    should be allowed?

2         A.    No.

3         Q.    Where is the modality stated in this progress note

4    on --

5         A.    You don't have to state modality.

6         Q.    Okay.  Is it stated on 541157?

7         A.    I don't see modality.

8         Q.    Okay.  Do you see any psychotherapy described that is

9    not educational in nature?

10             **MS. HARRIS:**  Object to the form.

11             **BY MR. FOWLER:**

12        Q.    And if so, set out where that is.

13             **MS. HARRIS:**  Object to the form.

14             **THE WITNESS:**  I mean, all of this -- this is

15             negotiating about his medicines, negotiating.  That's not

16             side effects of medications.  There's an issue going on with

17             whether or not he wants to take them and negotiating that.

18             **BY MR. FOWLER:**

19        Q.    So you believe --

20        A.    That's not educational.

21        Q.    Negotiating medication, you believe, is psychotherapy.

22        A.    In this note, what he's describing I believe applies to

23   psychotherapy.

24        Q.    What specifically in this note sets out that it's

25   psychotherapy?  Just quote the parts of it that show that there's

 1    psychotherapy.

 2              **MS. HARRIS:**  Object to the form.

 3              **THE WITNESS:**  "The patient continues to negotiate less

 4         and less medicines.  He is doing well but is innate in his

 5         culture to minimize meds, even though on the expense of

 6         suffering.  I educated the patient about his history and how

 7         much his wife was frustrated with his mental conditions in

 8         the beginning.

 9              Encouraged him to consult with his wife if decided to

10         go against my advice.  I warned that untreated psychiatric

11         conditions can mimic dementia and trigger recurrent workups.

12         I encouraged the patient to work less and live more now that

13         he is 72."

14              **BY MR. FOWLER:**

15         Q.   Where are you reading from, ma'am?

16         A.   Add-on --

17         Q.   What page, Bates number?

18         A.   -- therapy note.  541157.

19         Q.   Okay.  Under interventions.  Thank you.

20         A.   The whole note.

21         Q.   So you believe all that shows psychotherapy.

22         A.   Yes.

23         Q.   Okay.  But you acknowledge that none of it suggests

24    what type of modality is being used.

25              **MS. HARRIS:**  Object to the form.  Asked and answered.

1          **THE WITNESS:**  Modality is not required.

2          **BY MR. FOWLER:**

3     Q.    Okay.  But the question was is it present there.

4          **MS. HARRIS:**  Object to the form.

5          **THE WITNESS:**  It's -- I don't see it present.

6          **BY MR. FOWLER:**

7     Q.    Okay.  And you believe that intervention statement that

8     you just quoted shows psychotherapy, as opposed to -- to merely

9     educational.

10         **MS. HARRIS:**  Object to the form.

11         **THE WITNESS:**  Yes.

12         **BY MR. FOWLER:**

13    Q.    Did you rely upon any other facts, data or assumptions

14    other than this progress note in forming your opinion?

15    A.    No.

16    Q.    Let's turn to Patient RB and your report for RB, which

17    is Number 7, is the top of Page 9.  You state, "Dr. Corvin deems

18    psychotherapy as an overpayment based on modality,

19    inconsistent -- inconsistency and the lack of documented goals in

20    response to treatment.  Documentation confirms the report of

21    90833 at 16 minutes of psychotherapy with documented -- were

22    documented and supported.  Please see the above Number 1 and

23    Number 2."

24         So that's referencing your summaries of 1 and 2.

25    A.    Correct.

STATE OF NORTH CAROLINA

COUNTY OF FRANKLIN


<u>CERTIFICATE</u>

       I, PATRICIA C. ELLIOTT, VERBATIM REPORTER AND NOTARY PUBLIC, DO HEREBY CERTIFY THAT THE FOREGOING WITNESS WAS DULY SWORN AND THAT THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPTION OF MY VOICE WRITER NOTES AND IS A TRUE RECORD OF THE TESTIMONY GIVEN BY THE FOREGOING WITNESS.

       I FURTHER CERTIFY THAT I AM NOT EMPLOYED BY OR RELATED TO ANY PARTY TO THIS ACTION BY BLOOD OR MARRIAGE AND THAT I AM IN NO WAY INTERESTED IN THE OUTCOME OF THIS MATTER.

       IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND THIS 7th DAY OF JANUARY, 2025.


          /S/ *Patricia C. Elliott*

          _____
          PATRICIA C. ELLIOTT
          VERBATIM REPORTER
          NOTARY PUBLIC